Spencer Sheehan, Esq.
SHEEHAN & ASSOCIATES, P.C.
*Attorneys for Plaintiff*
891 Northern Boulevard
Suite 201
Great Neck, NY 11021
Tel:  (516) 303-0552
Fax: (516) 234-7800
spencer@spencersheehan.com
EDNY No. SS8533

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| 6801 REALTY CO., LLC, | CASE NO. |
| Plaintiff, | |
| vs. | |
| UNITED STATES CITIZENSHIP AND IMMIGRATION SERVICES, | |
| LEÓN RODRIGUEZ, DIRECTOR OF THE UNITED STATES CITIZENSHIP AND IMMIGRATION SERVICES, | |
| LAURA B. ZUCHOWSKI, DIRECTOR OF VERMONT SERVICE CENTER, UNITED STATES CITIZENSHIP AND IMMIGRATION SERVICES, | **COMPLAINT** |
| UNITED STATES DEPARTMENT OF HOMELAND SECURITY, | |
| JEH JOHNSON, SECRETARY OF THE UNITED STATES DEPARTMENT OF HOMELAND SECURITY and | |
| LORETTA LYNCH, UNITED STATES ATTORNEY GENERAL, | |
| Defendants. | |

# Table of Contents

Table of Authorities ................................................................................................................ 6

I. Introduction .................................................................................................................... 15

II. Parties ............................................................................................................................. 15

III. Jurisdiction and Venue .................................................................................................. 17

IV. Procedural History ......................................................................................................... 18

V. Exhaustion of Administrative Remedies ...................................................................... 21

VI. Legal Standards .............................................................................................................. 22

    A. Rule of Prejudicial Error ............................................................................................ 22

    B. Applicable Level of Deference ................................................................................... 24

    C. "Arbitrary and Capricious" Standard ........................................................................ 25

    D. "Preponderance of the Evidence" Standard .............................................................. 27

    E. Remand Not Appropriate ........................................................................................... 28

VII. Factual Background ....................................................................................................... 31

    A. 8 C.F.R. § 214.2(h)(4)(iii)(A)(1) was satisfied by the petition ................................. 31

        1. Failure of defendant USCIS to Correctly Read Submitted Job
           Advertisements ................................................................................................ 31

        2. Position Evaluation Letters Discarded Solely on the Basis of
           Erroneous Reading of Job Advertisements ..................................................... 39

           (a) Credentials of Dr. Robert Grayson ......................................................... 40

           (b) Credentials of Dr. Stan Smith ................................................................. 42

3.    Defendant USCIS Failed to Properly Consider and Evaluate the Duties of the Position ............................................................ 44

4.    Defendant USCIS Erred in According Disproportionate Weight to the Size of Plaintiff's Organization .................................... 45

5.    Misplaced Reliance on Matter of Caron International ........................................... 48

6.    Incorrect Legal Standard Applied to Review of 8 C.F.R. § 214.2(h)(4)(iii)(A)(1) ............................................................ 50

7.    Conclusion ............................................................ 51

B.    8 C.F.R. § 214.2(h)(4)(iii)(A)(2) (first prong) was satisfied by the petition ................. 54

1.    Reliance on the Occupational Outlook Handbook .................................. 54

2.    Defendant USCIS Ignored or Failed to Consider Probative Evidence Which Was Consistent with Established Interpretations ........................ 56

3.    Letters or Affidavits From Firms or Individuals in the Industry ............................ 63

4.    Misplaced Reliance on Matter of Michael Hertz Associates ................................. 71

5.    Conclusion ............................................................ 74

C.    8 C.F.R. § 214.2(h)(4)(iii)(A)(2) (second prong) was satisfied by the petition ............ 78

1.    Relationship between a degree in a specific specialty, or its equivalent and the day-to-day duties of the position that beneficiary will be required to perform ................................................. 79

2.    Proof that the Duties of the Proposed Position are So Complex or Unique that Only an Individual with a Degree Can Perform Them ...................... 93

3.    Conclusion ............................................................ 95

D.    8 C.F.R. § 214.2(h)(4)(iii)(A)(4) was satisfied by the petition ...................................... 97

1.  Failure of defendant USCIS to Logically Follow Argument of Plaintiff ................................................................................. 97

2.  Factors Considered by USCIS for Satisfaction of Fourth Prong ........................ 100

    (a)  Whether the Position is Sufficiently Specialized and Complex ............. 101

    (b)  Necessity of Original Market Research ................................................... 106

    (c)  Application of Complex Theories or Techniques to Perform the Duties of the Specific Position ................................................................. 108

        (i)  Defining "research methodology" ....................................................... 112

        (ii) Real Estate Market Research ............................................................... 115

    (d)  Will the market research analyst be employed directly by the company needing their services? ............................................................ 122

    (e)  Do the duties of the position exceed the scope of the duties for the typical market research analyst? ............................................................ 123

3.  Conclusion ..................................................................................................... 128

VIII. Causes of Action ............................................................................................... 131

**A.  First Cause of Action – Violation of the APA with respect to 8 C.F.R. § 214.2(h)(4)(iii)(A)(1)** ............................................................................. 131

**B.  Second Cause of Action – Violation of the APA with respect to 8 C.F.R. § 214.2(h)(4)(iii)(A)(2) (First Prong)** ............................................................ 132

**C.  Third Cause of Action – Violation of the APA with respect to second prong of 8 C.F.R. § 214.2(h)(4)(iii)(A)(2)** ................................................................. 134

**D.** **Fourth Cause of Action – Violation of the APA with respect to 8 C.F.R. § 214.2(h)(4)(iii)(A)(4)** ..................................................................... 135

**E.** **Fifth Cause of Action – Deprivation and Violation of Rights under the INA**....... 137

**F.** **Sixth Cause of Action – Mandamus Act**.................................................. 137

**G.** **Seventh Cause of Action – Declaratory Judgment Act** ........................................... 138

IX. Prayer For Relief............................................................................................... 138

# Table of Authorities

## Cases

Advocates for Hwy. and Auto Safety v. Fed. Motor Carrier Safety Administration, 429

    F.3d 1136, 1140, 1147 (D.C. Cir. 2005) ................................................................. 26

All Aboard Worldwide Couriers v. Attorney Gen., 8 F.Supp.2d 379 (S.D.N.Y. 1998) .............. 17

American Airlines, Inc. v. Department of Transp., 202 F.3d 788, 797 (C.A.5 2000) ................. 23

Baiju v. United States Department of Labor, Civil Action No. 12-5610 (E.D.N.Y. Jan.

    31, 2014) ............................................................................................................. 75

Berrios v. Holder, 502 Fed.Appx. 100, 101 (2d Cir. 2012) ........................................... 25

Boatmen v. Gutierrez, 429 F.Supp.2d 543, 548 (E.D.N.Y. 2006) ................................... 26

Bowman Transp., Inc. v. Arkansas-Best Freight Sys. Inc., 419 U.S. 281, 285 (1974) .............. 25

Buckingham v. Secy. of U.S. Dept. of Agric., 603 F.3d 1073, 1080 (9th Cir. 2010) .................. 78

Bureau of Alcohol, Tobacco & Firearms v. F.L.R.A., 464 U.S. 89, 97 (1983) ........................... 78

Butte County, Cal. v. Hogen, 613 F.3d 190, 194 (D.C.Cir. 2010) ................................... 52

Cabaccang v. USCIS, 627 F.3d 1313 (9th Cir. 2010) ................................................... 30

CareMax Inc. v. Holder, 2014 WL 1493621 *4 (N.D. Cal. Apr. 16, 2014) ................................ 57

Central Hudson Gas & Electric Corp. v. Federal Energy Regulatory Commission, Civil

    Action No. 14-1786 (L) (2d Cir. Apr. 2, 2015) ....................................................... 53

Chen v. USINS, 359 F.3d 121, 128 (2d Cir. 2004) ...................................................... 26

Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 842-843 (1984) ............. 24

China Chef, Inc., and Lee Meng Tan v. James A. Puelo, 12 F.3d 211 (6th Cir. 1993) ............... 47

Chung Song Ja Corp. v. US Citizenship and Immigration Services, Civil Action No.

    C14-0177RSM (W.D.Wash. Mar. 11, 2015) .......................................................... 56

Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 416 (1971) .............................. 25

City of Kansas City, Mo. v. Dep't of Housing and Urban Dev., 923 F.2d 188, 194 (D.C.

    Cir. 1991) ............................................................................................................... 27

Cleary v. US Dept. of Agriculture and Farm Service Agency, Civil Action No. 07-11940

    (E.D. Mich. July 28, 2008) ..................................................................................... 29

Cnty. of Los Angeles v. Shalala, 192 F.3d 1005, 1021 (D.C. Cir. 1999) .................................... 27

Coburn v. McHugh, 679 F.3d 924, 926 (D.C. Cir. 2012) ........................................................... 76

Comcast Corp. v. FCC, 579 F.3d 1, 8 (D.C.Cir. 2009) ............................................................... 52

Community Health Systems, Inc. v. Burwell, Civil Action No. 14-1432 (D.C. July 7,

    2015) ..................................................................................................................... 27

Defenders of Wildlife v. Babbitt, 958 F. Supp. 670, 685 (D.C. 1997) ........................................ 26

Defensor v. Meissner, 201 F.3d 384, 387-88 (5th Cir. 2000)...................................................... 101

Doctors Nursing & Rehabilitation Center v. Sebelius, 613 F.3d 672 (7th Cir. 2010) ................. 30

Econ. Opportunity Comm'n, Inc. v. Weinberger, 524 F.2d 393, 400 (2d Cir. 1975)................... 23

EG Enterprises, Inc. v. Dep't of Homeland Security, 467 F.Supp.2d 728, 736 (E.D. Mich

    2006) ..................................................................................................................... 46

Fla. Power & Light Co. v. Lorion, 470 U.S. 729, 744 (1985) ...................................................... 28

Fred 26 Importers v. US Dept. of Homeland Sec., 445 F. Supp. 2d 1174 (C.D. Cal.

    2006) ..................................................................................................................... 47

Gao v. Gonzales, 464 F.3d 728 (7th Cir. 2006) .......................................................................... 30

Glara Fashion, Inc. v. Holder, 2012 WL 352309, at *6 (S.D.N.Y. Feb. 3, 2012) ....................... 26

Grupo Dataflux v. Atlas Global Group, L.P., 541 U.S. 567, 124 S.Ct. 1920, 158 L.Ed.2d

    866 (2004)................................................................................................................ 30

Guertin v. US Department of Housing and Urban Development, Civil Action No. 13-186

    (2d Cir. Feb. 26, 2014) ............................................................................................. 28

Hird/Blaker Corp. v. Sava, 712 F. Supp. 1095, 1102 (S.D.N.Y. 1989) ......................................... 54

J. Andrew Lange, Inc. v. FAA, 208 F.3d 389, 391 (2d Cir. 2000) ................................................ 75

James Madison Ltd., By Hecht v. Ludwig, 82 F.3d 1085, 1096 (D.C. Cir. 1996) ....................... 25

Judulang v. Holder, 132 S. Ct. 476, 484 (2011) .................................................................... 53, 129

Laborers' Pension Fund v. Pavement Maint., Inc., 542 F.3d 189, 194 (7th Cir.2008) ................ 30

Larry Grant Const. v. Mills, 956 F.Supp. 2d 93, 98 (D.C. 2013) ................................................. 76

Mansour v. INS, 230 F.3d 902, 908 (7th Cir. 2000) ...................................................................... 52

Marsh v. Or. Natural Res. Council, 490 U.S. 360, 378 (1989) ..................................................... 26

Marshall County Health Care Auth. v. Shalala, 988 F.2d 1221, 1224 (D.C.Cir.1993) ................ 25

McDonnell Douglas Corp. v. NASA, 895 F.Supp. 316, 319 (D.D.C.1995) ................................. 29

McElmurray v. U.S. Dept. of Agriculture, 535 F.Supp.2d 1318, 1336 (S.D.Ga. 2008) .............. 29

Middle Rio Grande Conservancy Dist. v. Norton, 294 F.3d 1220, 1226 (10th Cir. 2002) .......... 29

Morall v. Drug Enforcement Admin., 412 F.3d 165, 178 (D.C. Cir. 2005) ................................. 26

Motor Vehicle Manufacturer's Association v. State Farm Mutual Automobile Insurance

    Co., 463 U.S. 29, 43 (1983) ..................................................................................... 24

N.Y. Pub. Interest Research Group v. Whitman, 321 F.3d 316, 333-34 (2d Cir. 2003) ............. 23

Nat'l Ass'n of Homebuilders v. Defenders of Wildlife, 551 U.S. 664, 658 (2007) ..................... 26

Natural Res. Def. Council v. EPA, 658 F.3d 200, 215 (2d Cir. 2011) ......................................... 25

Occidental Eng'g Co. v. INS, 753 F.2d 766, 768 (9th Cir. 1985) ................................................ 52

Royal Siam Corp. v. Chertoff, 484 F.3d 139, 147 (1st Cir. 2007) ............................................... 55

Shanti, Inc. v. Reno, 36 F.Supp.2d 1151, 1160-1161 (D. Minn. 1999) ....................................... 17

Shinseki v. Sanders, 129 S. Ct. 1696, 1706 (2009) ...................................................... 22

Sierra Club v. U.S. Fish and Wildlife Service, 245 F.3d 434, 444 (5th Cir.2001) ...................... 23

Swan View Coalition v. Weber, Civil Action No. 13-129 (D.Mont. Sept. 25, 2014) ................. 78

Tapis Intern. v. INS, 94 F.Supp.2d 172, 176 (D. Mass. 2000) ...................................... 57

Tengasco, Inc. v. Jewell, Civil Action No. 14-2184 (E.D. La. July 15, 2015) ............................ 76

Town of Verona v. Jewell, Civil Action No. 08-0647 (N.D.N.Y. Mar. 26, 2015) ...................... 96

Tripoli Rocketry Ass'n, Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives,

    437 F.3d 75, 77 (D.C. Cir. 2006) .................................................................... 76

True Capital Mgmt., LLC v. U.S. Dep't of Homeland Sec., No. 13-261, 2013 WL

    3157904, at *1 (N.D.Cal. June 20, 2013) ........................................................ 30

Ward v. Brown, 22 F.3d 516, 522 (2d Cir. 1994) ......................................................... 28

Woodstock v. Kempthorne, 448 F. Supp. 2d 382, 389 (E.D.N.Y. 2006) ..................................... 23

Young China Daily v. Chappell, 742 F.Supp. 552 (N.D.Cal. 1989) ............................................ 46

Zhen Li Iao v. Gonzales, 400 F.3d 530, 535 (7th Cir. 2005)..................................................... 129

## Statutes

28 U.S.C. § 1361 ................................................................................................. 15, 138

28 U.S.C. § 1391(3) ................................................................................................ 17

28 U.S.C. § 2201(a) ............................................................................................... 138

28 U.S.C. § 2412 (d)(1)(A) ..................................................................................... 139

5 U.S.C. § 701 .............................................................................................. 15, 17, 21

5 U.S.C. § 702 ............................................................................................... passim

5 U.S.C. § 704 ...................................................................................................... 22

5 U.S.C. §706(2) .......................................................................... 132, 134, 135, 137

5 U.S.C. §706(2)(A) ............................................................................................ passim

8 U.S.C. § 1101 (a)(15)(H) ............................................................................ 137, 139

8 U.S.C. § 1101(a)(15)(H) ..................................................................................... 138

8 U.S.C. § 1101(a)(15)(H)(i)(b) ............................................................................... 18

8 U.S.C. § 1184(i)(1) ............................................................................................... 57

8 U.S.C. § 1329 ....................................................................................................... 17

## Treatises

<u>Black's Law Dictionary</u> 673 (10th ed. 2014) ........................................................ 99

## Regulations

8 C.F.R. § 103.2(b)(8)(i) ........................................................................................ 138

8 C.F.R. § 103.3(a)(1)(ii) .......................................................................................... 21

8 C.F.R. § 214(h)(10)(ii) ........................................................................................... 21

8 C.F.R. § 214(h)(4)(ii) ............................................................................................. 57

8 C.F.R. § 214.2(f)(5)(vi)(A) ..................................................................................... 18

8 C.F.R. § 214.2(h)(4)(ii) .................................................................................... 57, 77

8 C.F.R. § 214.2(h)(4)(iii)(A) .............................................................................. 19, 76

8 C.F.R. § 214.2(h)(4)(iii)(A)(1) ....................................................................... passim

8 C.F.R. § 214.2(h)(4)(iii)(A)(2) ....................................................................... passim

8 C.F.R. § 214.2(h)(4)(iii)(A)(4) ....................................................................... passim

8 C.F.R. § 214.2(h)(9)(i) ................................................................................... 53, 130

8 C.F.R. § 214.2(h)(iii)(A)(1) .................................................................................... 57

## Administrative Decisions

In re Petitioner [Identifying information redacted by Agency], 2013 WL 8124091, **8-
11 (OAH, Dec. 24, 2013) ........................................................................................ 57

Matter of [name not provided], CSC (AAO, Dec. 3, 2010) ....................................... 101

Matter of [name not provided], CSC (AAO, Feb. 18, 2014) ...................................... 66

Matter of [name not provided], CSC (AAO, Feb. 7, 2012) ....................................... 102

Matter of [name not provided], CSC (AAO, Nov. 1, 2011) ...................................... 108

Matter of [name not provided], EAC 03 046 53067 (AAO, Sept. 9, 2005) ............... 106

Matter of [name not provided], LIN 05 206 51392 (AAO, Jan. 29, 2007) ................. 106

Matter of [name not provided], SRC 04 231 51275 (AAO, June 5, 2006) ................. 102

Matter of [name not provided], VSC (AAO, Jan. 9, 2014) ........................................ 79

Matter of [name not provided], WAC 04 146 51985 (AAO, Jan. 13, 2006) .............. 103

Matter of [name not provided], WAC 04 211 51851 (AAO, Jan. 11, 2006) .............. 103

Matter of [name not provided], WAC 04 222 53261 (AAO, June 12, 2006) ............. 123

Matter of [name not provided], WAC 05 151 54408 (AAO, Feb. 7, 2007) ............... 80

Matter of [name not provided], WAC 05 192 50550 (AAO, May 1, 2007) ............... 124

Matter of [name not provided], WAC 05 200 52324 (AAO, June 6, 2007) ............... 106

Matter of [name not provided], WAC 06 266 54551 (AAO, Jan. 31, 2008) .............. 123

Matter of [name not provided], WAC 09 149 50035 (AAO, Apr. 29, 2011) ............. 101

Matter of Caron International, 19 I&N Dec. 791 (Comm. 1988) ............................... 48

Matter of Chawathe, 25 I&N Dec. 369, 375-376 (AAO 2010) .................................. 27

Matter of Michael Hertz Associates, 19 I&N Dec. 558 (Comm. 1988) ..................... 71

Matter of Pazandeh, 19 I&N Dec. 884 (BIA 1989) ................................................... 137

Matter of Sofici, 22 I&N Dec. 158, 165 (Comnr. 1998) ............................................ 102

Matter of Treasure Craft of California, 14 I&N Dec. 190 (Reg. Comnr. 1972)........................ 102

Other Authorities

A. Stewart Fotheringham et al., Geographically Weighted Regression: The Analysis of

Spatially Varying Relationships (2002)................................................................................ 119

Alec Fisher, Critical Thinking: An Introduction 23-24 (2nd ed. 2011)....................................... 98

Andy Krause, *Expanding GWR: Exploring an N-dimensional locally weighted*

*regression technique for home price estimation*, PRESENTATION AT WESTERN

REGIONAL SCIENCE ASSOCIATION, Feb. 2012, Poipu, Hawaii.................................... 120

Andy L. Krause & Christopher Bitter, *Spatial econometrics, land values and*

*sustainability: Trends in real estate valuation research*, CITIES, Dec. 2012, S19-S25........ 117

Bradford Case et al., *Modeling Spatial and Temporal House Price Patterns: A*

*Comparison of Four Models*, THE JOURNAL OF REAL ESTATE FINANCE AND

ECONOMICS, Sept. 2004, 167-191........................................................................................ 117

Chris A. Brunsdon et al., *Geographically Weighted Regression: A Method for Exploring*

*Spatial Nonstationarity*, GEOGRAPHICAL ANALYSIS, Oct. 1996, 281-298. ................... 119

David R. Morrow & Anthony Weston, A Workbook For Arguments: A Complete

Course in Critical Thinking 5 (2011)..................................................................................... 99

Debra Humphreys & Patrick Kelly, *How Liberal Arts and Sciences Majors Fare in*

*Employment: A Report on Earnings and Long-Term Career Paths*, Association of

American Colleges & Universities, Jan. 22, 2014 available at

http://www.gru.edu/provost/documents/38-

how_liberal_arts_and_science_majors_fare_in_employment.pdf (last visited October

2, 2015) ................................................................................................................................... 73

Douglas Walton, <u>Fundamentals of Critical Argumentation</u> 139 (2006) ...................................... 98

Ernst Robert Curtius, <u>European Literature and the Latin Middle Ages</u> 37 Trans. Willard

    R. Trask (1973) ..................................................................................................... 73

Gregory S. Guest et al., <u>Collecting Qualitative Data: A Field Manual for Applied</u>

    <u>Research</u> 3 (2012) .............................................................................................. 113

Hervé Abdi and Lynne J. Williams, *Principal Component Analysis*, WILEY

    INTERDISCIPLINARY REVIEWS: COMPUTATIONAL STATISTICS, Jun. 2010,

    433-459. ........................................................................................................... 122

Hervé Abdi, *Multivariate Analysis* in THE SAGE ENCYCLOPEDIA OF SOCIAL

    SCIENCE RESEARCH METHODS 699-702 (Michael S. Lewis-Beck et al. eds.,

    2003) ................................................................................................................ 122

Irving M. Copi et al., <u>Introduction to Logic</u> § 1.5(A) ("Conclusion and Premise

    Indicators), 21-22 (11th ed. 2002) ...................................................................... 98

John W. Creswell, <u>Research Design: Qualitative, Quantitative and Mixed Methods</u>

    <u>Approaches</u> (2nd ed. 2003) ................................................................................ 113

Karl E. Case & Robert J. Shiller, *Forecasting Prices and Excess Returns in the Housing*

    *Market*, REAL ESTATE ECONOMICS, Sept. 1990, 253-273 .............................. 118

MULTIVARIATE DATA ANALYSIS (Joseph F. Hair Jr. et al. eds., 2006) .......................... 122

Paul D. Leedy & Jean Ellis Ormrod, <u>Practical Research: Planning and Design</u> 14 (7th ed.

    2001) ................................................................................................................ 113

R. Burke Johnson & Anthony J. Onwuegbuzie, *Mixed Methods Research: A Research*

    *Paradigm Whose Time Has Come*, EDUCATIONAL RESEARCHER, Oct. 2004, 14-

    26 .................................................................................................................... 114

R. Kelley Pace et al., *Spatial Statistics and Real Estate*, THE JOURNAL OF REAL

ESTATE FINANCE AND ECONOMICS, July 1998, 5-13 .................................................. 119

Radoslaw Cellmer, *The Use of the Geographically Weighted Regression for the Real

Estate Market Analysis*, FOLIA OECONOMICA STETINENSIA, Jan. 2012, 19-32 .......... 119

Rena Mourouzi-Sivitanidou, <u>Market Analysis for Real Estate</u> (Petros Sivitanides ed.,

2011) ............................................................................................................................. 115

Robert Legg & Tia Bowe, *Applying Geographically Weighted Regression to a Real

Estate Problem:  An example from Marquette, Michigan*, ARCUSER, Mar. 2009, 44-

45 ................................................................................................................................... 119

Robin Dubin et al., *Spatial Autoregression Techniques for Real Estate Data*, JOURNAL

OF REAL ESTATE LITERATURE, Jan. 1999, 79-96 ......................................................... 118

Suriatini Ismail, *Spatial Autocorrelation and Real Estate Studies:  A Literature Review*,

MALAYSIAN JOURNAL OF REAL ESTATE, 2006, 1-13 ................................................. 118

Theodore Wilbur Anderson, <u>An Introduction to Multivariate Statistical Analysis</u> (3rd ed.

2003) ............................................................................................................................. 122

# I.    Introduction

1.      This is an individual action  for declaratory and mandatory relief, authorized by the Declaratory Judgment Act, 28 U.S.C. § 1361, and the Administrative Procedure Act, 5 U.S.C. § 701 *et. seq*.

2.      Plaintiff brings this action for mandamus, declaratory judgment and injunctive relief against the defendants who unlawfully denied plaintiff's Petition for a Nonimmigrant Worker ("Form I-129" or the "Petition"), filed on behalf of Mr. Dimitrios Poulakis ("beneficiary").

3.      Plaintiff had sought to temporarily employ beneficiary as a nonimmigrant worker in the United States to perform services in the specialty occupation of a full-time Residential Market Research Analyst.

4.      Defendants' denial of plaintiff's application has harmed plaintiff because beneficiary was to fill a critical, specialized position with plaintiff, and by defendants' unlawful denial, plaintiff has been denied the opportunity to employ beneficiary in said specialty occupation to the detriment of plaintiff's business operations.

# II.    Parties

5.      Plaintiff 6801 Realty Co., LLC ("plaintiff") is a limited liability company formed in 1999 under the laws of the State of New York with a principal place of business in the County of Kings, State of New York within the Eastern District of New York

6.      The managing member of plaintiff is Mr. James John Anestis, who is a citizen of the State of New York and resides in the Eastern District of New York, County of Kings.

7.      Defendant United States Citizenship and Immigration Services ("USCIS") is an agency of the United States government composed within the United States Department of

Homeland Security ("DHS") with authority over immigration matters, including the review and adjudication of Nonimmigrant Employment Petitions, including I-129 petitions filed by employers on behalf of employees or intended employees in specialty occupations.

8.      Defendant León Rodriguez is the Director of USCIS.  In that capacity and through is agents, he is responsible for the overall administration of USCIS and the implementation of the immigration laws of the United States.  Director Rodriguez is sued in his official capacity.

9.      Defendant Laura B. Zuchowski, is the Vermont Service Center ("VSC") Director, the division of USCIS responsible for adjudication of the petition at issue. VSC Director Zuchowski is responsible for implementing the immigration laws and regulations, including the provisions involved in this action.  In that capacity and through her agents, she exercises the power to grant petitions for nonimmigrant workers and applications for change of status. Director Zuchowski is sued in her official capacity.

10.     Defendant Department of Homeland Security is the executive department of the United States responsible for the administration and enforcement of the immigration laws and regulations of the United States.

11.     Defendant Jeh Johnson is the Secretary of the Department of Homeland Security, is a member of the Cabinet of the President of the United States, and is responsible for the overall administration of DHS and the implementation of the immigration laws of the United States. Secretary Johnson is sued in his official capacity.

12.     Defendant Loretta Lynch is the United States Attorney General, and, as such, gives advice and opinions to the heads of the executive departments of the Government of the United States, including the Department of Homeland Security.  In the capacity as U.S. Attorney General

and through her agents, she exercises the power to implement the immigration laws of the United States.  Attorney General Lynch is sued in her official capacity.

## III.   Jurisdiction and Venue

13.   This action arises under a federal statute, 8 U.S.C. § 1184.  This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 (jurisdiction of civil actions arising under the Constitution and laws of the United States), 5 U.S.C. § 701 *et seq.* (the Administrative Procedure Act), 28 U.S.C. § 2201 (Declaratory Judgment Act), 28 U.S.C. § 1651 (All Writs Act); 28 U.S.C. § 1361 (regarding an action to compel an officer of the United States to perform his duty) and 8 U.S.C. § 1329 (providing for jurisdiction of this Court over actions arising under the Immigration and Nationality Act, as amended.  See also All Aboard Worldwide Couriers v. Attorney Gen., 8 F.Supp.2d 379 (S.D.N.Y. 1998); Shanti, Inc. v. Reno, 36 F.Supp.2d 1151, 1160-1161 (D. Minn. 1999) (finding jurisdiction over denial of petition for nonimmigrant visas).

14.   Venue properly lies in the Eastern District of New York. See 28 U.S.C. § 1391(3) (providing that at in a civil action in which each defendant is an officer or employee of the United States or any agency thereof acting in his official capacity, or under color of legal authority, or any agency of the United States, the action may be brought in any judicial district in which a defendant or plaintiff in the action resides).

15.   Plaintiff currently, and at all times relevant to this Complaint, conducts business within the jurisdiction of the United States District Court for the Eastern District of New York.

16.   Defendant USCIS is an agency which exists within defendant DHS, an executive department of the United States.  Defendants USCIS and DHS operate within this district.

# IV. Procedural History

17.     On March 27, 2014, the Office of Foreign Labor Certification, United States Department of Labor ("DOL") certified the Labor Condition Application for Nonimmigrant Workers ("LCA" or "ETA Form 9035 & 9035E") filed on behalf of plaintiff with Case number I-200-14080-222474.   Exhibit "A," Labor Condition Application for Nonimmigrant Workers ("LCA" or "ETA Form 9035 & 9035E"), annexed hereto.

18.     The job title listed in the LCA was Residential Market Research Analyst with ONET/OES Code 13-1161.  The wage rate was specified as between $60,000.00 and $65,000.00 per year.  Exhibit "A," p.2.

19.     On March 31, 2014, plaintiff timely filed Form I-129 and accompanying documents with defendant USCIS to temporarily employ the professional services of beneficiary as a "specialty occupation" worker (Residential Market Research Analyst) pursuant to 8 U.S.C. § 1101(a)(15)(H)(i)(b) and 8 C.F.R. § 214.2(f)(5)(vi)(A), with a requested commencement date of temporary employment as October 1, 2014.  Exhibit "B," Initial Application, annexed hereto.

20.     On April 15, 2014, defendant USCIS issued Form I-797C ("Notice of Action") with respect to the petition which indicated the application had been received and that the appropriate fees were paid.  The application was assigned Receipt Number EAC-14-135-51877.  Exhibit "C," I-797C ("Notice of Action"), April 15, 2014, annexed hereto.

21.     On May 5, 2014, defendant USCIS issued, and plaintiff thereafter received, Form I-797 ("Notice of Action – Request for Evidence").  Exhibit "D," I-797 ("Notice of Action – Request for Evidence"), May 5, 2014, annexed hereto.  The "Notice of Action – Request for Evidence" (""Request for Evidence" or "RFE") asked for additional information regarding the proffered position in order to render a decision on the application.  Specifically, defendant USCIS

requested additional evidence which included: a more detailed description of the beneficiary's proposed duties and responsibilities, the percentage of time devoted to each duty, the educational requirements for these duties and the relationship between the beneficiary's education and the position.

22. The Request for Evidence also recited the following criteria, which on the surface appear to be a reiteration of what is contained at 8 C.F.R. § 214.2(h)(4)(iii)(A), only one of which must be satisfied to qualify a position as a "specialty occupation":

  i. A baccalaureate or higher degree, or its equivalent, in a specific field of study [sic] is normally the minimum requirement for entry into the particular position ("Criterion #1).[1]

  ii. In your company or industry, a baccalaureate degree in a specific field of study is a standard minimum requirement for the job offered (Criterion #2a);

  iii. The proffered position is so complex or unique that it can be performed only by an individual with a degree in a specific field of study (Criterion #2b);

  iv. If the petitioner has previously employed an individual in the proffered position, indicate and verify the level of education and the field of study of that individual (Criterion #3); and

  v. The nature of the specific duties for the proffered position are so specialized and complex that the knowledge required to perform the duties is usually associated with the attainment of a baccalaureate or higher degree in a specific field of study (Criterion #4).

Exhibit "D," I-797 ("Notice of Action – Request for Evidence"), May 5, 2014, p.3.

---

[1] The requirement that USCIS appears to be quoting actually states "A baccalaureate or higher degree or its equivalent is normally the minimum requirement for entry into the particular position." The inclusion of the phrase "in a specific field of study" is not contained in the regulation at 8 C.F.R. § 214.2(h)(4)(iii)(A)(1). The relevance of this incorrect criterion will be expounded upon in a subsequent section of this Complaint.

23. On July 28, 2014, plaintiff's counsel timely submitted its Response to the RFE ("Response"). Exhibit "E," Response of plaintiff to RFE, July 28, 2014, annexed hereto. The Response consisted of legal arguments presented by counsel for petitioner, which stated that the petition satisfied three of the four above-listed regulatory criteria for the position to qualify as a "specialty occupation." Along with this legal reasoning was included documentation regarding the plaintiff's business entity, a letter from Mr. Anestis regarding the potential employment of the beneficiary, a letter from the principal of a business which operates in the same geographic market segment as plaintiff, job advertisements created by plaintiff which were paid for by plaintiff and publicly posted by plaintiff to seek applicants for the position which contained detailed descriptions of the duties of the position, copies of beneficiary's passport, academic transcript and diploma with accompanying certified translations, evaluation and equivalency reports based on beneficiary's coursework and degree, beneficiary's resume, letters of recommendation on behalf of beneficiary and two expert opinion letters as to beneficiary's suitability for the position in question and whether the duties of the position in question satisfied any of the four specialty occupation criteria.

24. On July 30, 2014, plaintiff's counsel received a faxed letter from defendant USCIS denying the petition ("Decision"). Exhibit "F," Decision of defendant USCIS, July 30, 2014, annexed hereto.

25. On August 1, 2014, plaintiff's counsel received an email from VSC-Premium.Processing@uscis.dhs.gov. This email stated "Good Afternoon, Your response to the RFE was received on July 29, 2014. On July 30, 2014, the petition was denied…Thank You. Officer Barbara." Exhibit "G," Email from VSC-Premium Processing, August 1, 2014, annexed hereto.

# V.  Exhaustion of Administrative Remedies

26.    In federal court cases brought under the Administrative Procedures Act ("APA"), a plaintiff is not required to exhaust non-mandatory administrative remedies.  <u>Darby v. Cisneros</u>, 509 U.S. 137, 154 (1993).

27.    In order for plaintiff to be exempted from the requirement that it exhaust its administrative remedies as a prerequisite to initiating an action in federal court, the following criteria must be met:

    i.    The federal court suit is brought pursuant to the APA.  5 U.S.C. § 701 *et seq.*;

    ii.    There is no statute that mandates an administrative appeal;

    iii.    There is no regulation that mandates an administrative appeal or if there is a regulation that mandates an administrative appeal, it does not also stay the agency decision pending the administrative appeal; and

    iv.    The adverse agency decision to be challenged is final for purposes of the APA.  5 U.S.C. § 704.

    <u>Darby</u>, 509 U.S. at 146-47, 154 (1993).

28.    At bar, the present action is brought pursuant to the APA.  5 U.S.C. § 701 *et seq.*

29.    There exists no statute that mandates an administrative appeal of defendant USCIS' decision.

30.    There exists no regulations which require an administrative appeal.  8 C.F.R. § 103.3(a)(1)(ii) ("Certain unfavorable decisions on applications, petitions, and other types of cases may be appealed."); <u>see</u> <u>also</u> 8 C.F.R. § 214(h)(10)(ii) ("The petitioner shall be notified of the reasons for the denial and of the right to appeal the denial of the petition under 8 CFR part 103.").

31.    The statutory text is consistent with the Decision by defendant USCIS which states, "If you disagree with this decision, or if you have additional evidence that shows this decision is

incorrect, you may appeal this decision by filing a completed Notice of Appeal or Motion (Form I-290B)."  Exhibit "F," p.7.

32.     Lastly, the decision by USCIS is considered "final" when "the initial decisionmaker has arrived at a definitive position on the issue that inflicts an actual, concrete injury."  Darby at 144 quoting Williamson County Regional Planning Comm'n v. Hamilton Bank of Johnson City, 473 U.S. 172, 193 (1985).  This interpretation is consistent with the plain language found at 5 U.S.C. § 704.  ("Except as otherwise expressly required by statute, agency action otherwise final is final for the purposes of this section whether or not there has been presented or determined an application for a declaratory order, for any form of reconsideration, or, unless the agency otherwise requires by rule and provides that the action meanwhile is inoperative, for an appeal to superior agency authority.").

33.     In the present matter, the Decision states "If a motion or appeal is not filed within 33 days, this decision is final."  No appeal or motion was filed by plaintiff in response to the Decision of defendant USCIS.  Exhibit "F," p.7.

34.     The "actual, concrete injury" sustained by plaintiff as a result of defendant USCIS' determination is the inability to temporarily employ beneficiary in a "specialty occupation."

# VI.   Legal Standards

## A.   Rule of Prejudicial Error

35.     Any analysis under the APA must necessarily be guided by the "prejudicial error rule."  This states that "[A] court shall review the whole record ... and due account shall be taken of the rule of prejudicial error."  5 U. S. C. § 706 as cited by Shinseki v. Sanders, 129 S. Ct. 1696, 1706 (2009).

36.     The APA, and this Court, recognize that not all administrative mistakes result in prejudice.  See Woodstock v. Kempthorne, 448 F. Supp. 2d 382, 389 (E.D.N.Y. 2006) citing 5 U.S.C. § 706 ("In making its determinations the Court shall take 'due account . . . of the rule of prejudicial error.'";  N.Y. Pub. Interest Research Group v. Whitman, 321 F.3d 316, 333-34 (2d Cir. 2003) ("The rule of prejudicial error typically eliminates the necessity of remand following judicial review when the error that the agency has made was *not* prejudicial and did not impinge on fundamental rights.") (emphasis in original); Econ. Opportunity Comm'n, Inc. v. Weinberger, 524 F.2d 393, 400 (2d Cir. 1975) (rejecting the argument that "any procedural infirmity results in arbitrary administrative action which must be set aside by a reviewing court").

37.     This District, in Woodstock went on to state that the "rule of 'prejudicial error' is similar to the rule of harmless error" and as a result,  "agency mistakes that 'had no bearing on the procedure used or the substance of the decision reached' in the particular case at issue constitute harmless error under section 706 of the APA and do not warrant corrective measures.  448 F.Supp.2d 382, 389; N.Y. Pub. Interest Research Group, 321 F.3d at .334 n. 13 (quotation marks and internal citation omitted); see also Sierra Club v. U.S. Fish and Wildlife Service, 245 F.3d 434, 444 (5th Cir.2001).

38.     The burden of showing that an error is harmful typically falls upon the party attacking the agency's determination.  Shinseki, 129 S. Ct. 1696, 1706 (2009) citing American Airlines, Inc. v. Department of Transp., 202 F.3d 788, 797 (C.A.5 2000) (declining to remand where appellant failed to show that error in administrative proceeding was harmful).  In most situations, the error(s) alleged will be apparent to the reviewing court from the facts of the case.

B.    Applicable Level of Deference

39.    When reviewing agency decisions under the Administrative Procedure Act, the appropriate level of deference must be determined based on the issues before the court.

40.    In what is referred to as "*Chevron* deference," the Court examines the statute and the regulation and asks whether the agency's rulemaking is based on a reasonable analysis of the statute.  Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 842-843 (1984).  This level of deference is limited to agency rulemaking.  Chevron U.S.A. Inc., 467 U.S. at 843-45.

41.    At bar, the present issue is not one of statutory interpretation, hence *Chevron* deference is inapplicable.  Here, this Court is presented with the issue of the degree of deference granted to fact-based decisions of an agency.  The guiding principles therefore can be found in Motor Vehicle Manufacturer's Association v. State Farm Mutual Automobile Insurance Co., 463 U.S. 29, 43 (1983), where the Supreme Court was tasked with examining an agency's analysis of the facts.

42.    The United States Supreme Court explained that an agency has an obligation to "examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'"  State Farm, 463 U.S. at 43.

43.    In a *State Farm*-type situation, the court examines the entire record, including the agency's explanation of its action, to determine whether there is a rational connection between the factual record and the agency action.  *State Farm*-type deference, because it is fact-based, is not limited to the rulemaking context.  In *Chevron*-type deference scenarios, the court is deferring to a policy determination made by an agency.

44.    However, the invocation of *State Farm* analysis is not an argument that it is the role of the courts to resolve factual issues that had been presented to an agency, but rather to "operate

instead as appellate courts resolving legal questions." James Madison Ltd., By Hecht v. Ludwig, 82 F.3d 1085, 1096 (D.C. Cir. 1996) citing Marshall County Health Care Auth. v. Shalala, 988 F.2d 1221, 1224 (D.C.Cir.1993) and 6 J. Moore, *Federal Practice* ¶ 56.17[3], 56-362 (1988). District Courts therefore "address a predominantly legal issue: Did the agency 'articulate a rational connection between the facts found and the choice made?'" James Madison Ltd., By Hecht, 82 F.3d 1085, 1096 (D.C. Cir. 1996) citing Bowman Transp., Inc. v. Arkansas-Best Freight Sys. Inc., 419 U.S. 281, 285 (1974).

C. "Arbitrary and Capricious" Standard

45. Assuming an agency's action was authorized by statute, and that the errors alleged by a party were demonstrated to be harmful, a court then must consider whether the action at issue was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). An agency decision may be overturned as arbitrary and capricious only "'if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'" Berrios v. Holder, 502 Fed.Appx. 100, 101 (2d Cir. 2012) (quoting State Farm, 463 U.S. at 43).

46. "In reviewing agency action, [a][c]ourt may not 'substitute its judgment for that of the agency.'" Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 416 (1971) as quoted by Natural Res. Def. Council v. EPA, 658 F.3d 200, 215 (2d Cir. 2011). Rather, a reviewing court's task is to determine "whether the [agency's] decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." Citizens to Preserve Overton Park, Inc., 401 U.S. at 416; see also Marsh v. Or. Natural Res. Council, 490 U.S. 360, 378

(1989). Courts will "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." Nat'l Ass'n of Homebuilders v. Defenders of Wildlife, 551 U.S. 664, 658 (2007) (internal quotations and citations omitted).

47.     Plaintiff bears the burden of showing, by citation to evidence in the administrative record, that an agency's actions are arbitrary and capricious. See Boatmen v. Gutierrez, 429 F.Supp.2d 543, 548 (E.D.N.Y. 2006); see also Glara Fashion, Inc. v. Holder, 2012 WL 352309, at *6 (S.D.N.Y. Feb. 3, 2012).

48.     The actions of an agency will be found to  be arbitrary and capricious under 706(2)(A) when the evidence before it is ignored, disregarded or overlooked. Defenders of Wildlife v. Babbitt, 958 F. Supp. 670, 685 (D.C. 1997) (finding decision of agency arbitrary and capricious where it "relied on glaringly faulty factual premises."); Advocates for Hwy. and Auto Safety v. Fed. Motor Carrier Safety Administration, 429 F.3d 1136, 1140, 1147 (D.C. Cir. 2005) (holding that where an agency's final rule "inexplicably ignores" the evidence contained in the administrative record, said decision "cannot stand," and that where an agency "disregarded the volumes of evidence [pertaining to the issue before it]" in rendering its conclusion, such action is "arbitrary and capricious under § 706(2)(A)."); Morall v. Drug Enforcement Admin., 412 F.3d 165, 178 (D.C. Cir. 2005) (holding that an agency decision "does not withstand review" when "the agency decisionmaker *entirely ignored* relevant evidence.") (emphasis in original); Chen v. USINS, 359 F.3d 121, 128 (2d Cir. 2004) (finding that the where the "IJ [Immigration Judge] erred in overlooking Chen's testimony that he had been beaten, and the BIA [Board of Immigration Appeals] perpetuated and compounded that flaw by not only ignoring the testimony but also flatly asserting that no such testimony existed in the record," that "[T]hese errors cannot be viewed as inconsequential.").

49.     If an agency's decision is not "supported by substantial evidence," such a decision is "arbitrary and capricious" since "'it is impossible to conceive of a 'nonarbitrary' factual judgment supported only by evidence that is not substantial in the APA sense.'" Community Health Systems, Inc. v. Burwell, Civil Action No. 14-1432 (D.C. July 7, 2015).

50.     "Consequently, when assessing whether agency action is arbitrary or capricious, 'in their application to the requirement of factual support[,] the substantial evidence test and the arbitrary or capricious test are one and the same.'" Community Health Systems, Inc.

51.     When an agency "'fail[s] to provide a reasoned explanation, or where the record belies the agency's conclusion, [the court] must undo its action.'" Cnty. of Los Angeles v. Shalala, 192 F.3d 1005, 1021 (D.C. Cir. 1999) (quoting BellSouth Corp. v. FCC, 162 F.3d 1215, 1222 (D.C. Cir. 1999); see City of Kansas City, Mo. v. Dep't of Housing and Urban Dev., 923 F.2d 188, 194 (D.C. Cir. 1991) ("Agency action based on a factual premise that is flatly contradicted by the agency's own record does not constitute reasoned administrative decisionmaking, and cannot survive review under the arbitrary and capricious standard.").

   D.     "Preponderance of the Evidence" Standard

52.     The standard which plaintiff was required to satisfy in the initial application was the "preponderance of the evidence," as set forth by the Administrative Appeals Office ("AAO"). Matter of Chawathe, 25 I&N Dec. 369, 375-376 (AAO 2010) ("Except where a different standard is specified by law, a petitioner or applicant in administrative immigration proceedings must prove by a preponderance of evidence that he or she is eligible for the benefit sought."). Exhibit "H," Matter of Chawathe, 25 I&N Dec. 369, 375-376 (AAO 2010), annexed hereto.

53.     "The 'preponderance of the evidence' standard requires that the evidence demonstrate that the applicant's claim is 'probably true,' where the determination of 'truth' is made

based on the factual circumstances of each individual case. Exhibit "H," <u>Matter of Chawathe</u>, 25 I&N Dec. 369, 375-376 (AAO 2010).

54.     Therefore, in adjudicating the application pursuant to the preponderance of the evidence standard, defendant USCIS must examine each piece of evidence for relevance, probative value, and credibility, both individually and within the context of the totality of the evidence, to determine whether the fact to be proven is probably true. Exhibit "H," <u>Matter of Chawathe</u>, 25 I&N Dec. 369, 375-376 (AAO 2010).

55.     Even if defendant USCIS has some doubt as to the truth, if the petitioner submits relevant, probative, and credible evidence that leads defendant USCIS to believe that the claim is "more likely than not" or "probably" true, the applicant or petitioner has satisfied the standard of proof. Exhibit "H," <u>Matter of Chawathe</u>, 25 I&N Dec. 369, 375-376 (AAO 2010); <u>see</u> <u>INS v. Cardoza-Foncesca</u>, 480 U.S. 421, 431 (1987) (discussing "more likely than not" as a greater than 50% chance of an occurrence taking place).

### E.     Remand Not Appropriate

56.     The general practice which occurs when it is determined that an agency violates its obligations under the APA is to vacate the decision and remand to the agency to conduct further proceedings. <u>See, e.g.</u>, <u>Ward v. Brown</u>, 22 F.3d 516, 522 (2d Cir. 1994) (in holding that an agency acted arbitrarily or capriciously, "the appropriate course for a reviewing court ordinarily is to remand the case to the agency"); <u>Guertin v. US Department of Housing and Urban Development</u>, Civil Action No. 13-186 (2d Cir. Feb. 26, 2014) (where an agency is found to have acted arbitrarily or capriciously, "the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation.") citing <u>Fla. Power & Light Co. v. Lorion</u>, 470 U.S. 729, 744 (1985).

57.     This rule, however, is not absolute.  Thus, there are occasions in which remand to the agency for further review is not appropriate.  Guertin v. HUD citing Middle Rio Grande Conservancy Dist. v. Norton, 294 F.3d 1220, 1226 (10th Cir. 2002) (holding that remanding to the agency was not appropriate because, among other reasons, "the record contains overwhelming evidence" that the agency must prepare an environmental impact statement).

58.     Where the administrative record contains compelling evidence in support of the plaintiff's position, remand to an agency for further proceedings is not necessary since that record would not change if the matter is remanded to the agency.  Guertin v. HUD.

59.     Additionally, remanding for further proceedings may be inappropriate where administrative determinations "unevaluated or ignored" the record.  McElmurray v. U.S. Dept. of Agriculture, 535 F.Supp.2d 1318, 1336 (S.D.Ga. 2008).

60.     "The agency 'is not entitled to a second bite of the apple just because it made a poor decision – if that were the case, administrative law would be a never ending loop from which aggrieved parties would never receive justice.'" McDonnell Douglas Corp. v. NASA, 895 F.Supp. 316, 319 (D.D.C.1995); Cleary v. US Dept. of Agriculture and Farm Service Agency, Civil Action No. 07-11940 (E.D. Mich. July 28, 2008) (holding that remand of the agency decision was not appropriate where the findings were based upon numerous, material factual errors made by the agency).

61.     In situations similar to the case at bar when USCIS has been a defendant in an action pursuant to the APA based on denial of a nonimmigrant employment petition, USCIS has reopened the petition of the plaintiff, sua sponte.

62.     Courts which have addressed this issue have found that sua sponte reopening of a plaintiff's petition strips a reviewing court of its jurisdiction, since the adverse decision initially

provided to the plaintiff is no longer "final." True Capital Mgmt., LLC v. U.S. Dep't of Homeland Sec., No. 13-261, 2013 WL 3157904, at *1 (N.D.Cal. June 20, 2013). The court in True Capital Mgmt. relied upon the holding of Cabaccang v. USCIS, 627 F.3d 1313 (9th Cir. 2010) to conclude that USCIS may essentially remove jurisdiction from a reviewing court through a sua sponte reopening of the petition in question. However, in Cabaccang, removal proceedings already had been commenced against the plaintiff therein, fundamentally altering the jurisdictional analysis. Gao v. Gonzales, 464 F.3d 728 (7th Cir. 2006)

63.     The general rule is that jurisdiction is analyzed by a court based on events at the time the case is brought. Grupo Dataflux v. Atlas Global Group, L.P., 541 U.S. 567, 124 S.Ct. 1920, 158 L.Ed.2d 866 (2004). While this rule is generally encountered in the context of determining diversity jurisdiction, it remains applicable in non-diversity contexts as well. Doctors Nursing & Rehabilitation Center v. Sebelius, 613 F.3d 672 (7th Cir. 2010); see, e.g., Laborers' Pension Fund v. Pavement Maint., Inc., 542 F.3d 189, 194 (7th Cir.2008) ("If jurisdiction exists at the outset of a suit, subsequent procedural events will not divest the court of that original jurisdiction.").

64.     The line of cases which exist in support of the proposition that defendant USCIS may, sua sponte, reopen a petition it had already denied, thereby removing jurisdiction from a reviewing court, focused on plaintiffs who were already within the U.S. and were subject to removal proceedings as a result of the adverse decisions rendered by USCIS on their nonimmigrant employment petitions. At bar, the beneficiary is not within the U.S. and is not subject to any removal proceedings.

65.     There is now existing between the parties hereto an actual, justifiable controversy. Therefore, plaintiff is entitled to a declaration of its rights and further relief sought.

# VII.  Factual Background

### A.  8 C.F.R. § 214.2(h)(4)(iii)(A)(1) was satisfied by the petition

66.     The first criterion at 8 C.F.R. § 214.2(h)(4)(iii)(A)(1) requires that a petitioner demonstrate that a baccalaureate or higher degree or its equivalent is normally the minimum requirement for entry into the particular position.

67.     In its decision, defendant USCIS stated that the evidence submitted by plaintiff for satisfaction of this criterion "does not establish that a bachelor's degree in a specific field of study is a standard minimum requirement within your company's industry."  Exhibit "F," Decision of defendant USCIS, July 30, 2014, p.4.

68.     The relevant issues with respect to defendant USCIS' determination are several, which will be expounded upon below.  First, there is the error on behalf of defendant USCIS to correctly read and categorize the materials submitted by plaintiff, including the job advertisements publicly posted by plaintiff.  Second, the failure to properly identify the aforementioned documents submitted can clearly be shown as the causal connection for the determination of defendant USCIS that the first criterion was not met by plaintiff.  Third, defendant USCIS applied the incorrect legal standard to materials submitted by petitioner yet incorrectly classified.

### 1.  Failure of defendant USCIS to Correctly Read Submitted Job Advertisements

69.     At the outset of its review, defendant USCIS failed to read the proffered evidence – five (5) contemporaneous job advertisements by plaintiff, publicly posted, in order to fill the position of residential market research analyst with plaintiff.

70.     In the RFE, it was requested that if plaintiff "publicized the job opening, submitting tear sheets or other advertising documentation may help establish the educational requirements for the proffered position of Residential Market Research Analyst."  Exhibit "D," p.4.

71.     The purpose of this request was evidentiary in nature, in order to "establish the beneficiary will be employed with the duties you have set forth."  Exhibit "D," p.4.

72.     In its decision of July 30, 2014, defendant USCIS recounted the usage of job advertisements as a form of potential proof of the duties described for the position.  However, defendant USCIS now called the position a "business development coordinator" instead of a market research analyst.  Exhibit "F," p.4.

73.     Momentarily leaving aside the fact that the reviewing officer overlooked the necessity of modifying a template denial, defendant USCIS went on to list the evidence submitted by petitioner in support of the application.  Foremost among these items was what defendant USCIS referred to as "job postings for similarly related positions."  Exhibit "F," p.4.

74.     It is important to emphasize here that these erroneously labeled "job postings for similarly related positions" were the <u>first set</u> of evidentiary materials analyzed by defendant USCIS in its decision.  As will be demonstrated, this resulted in the subsequent negative evaluations of the other forms of proof submitted by plaintiff, ultimately resulting in the denial of the application.

75.     After 840 words, the examining officer of defendant USCIS begins a recitation of what it believes petitioner had submitted:

> In response to the request for evidence, although explained in greater detail, you submitted the same job description as initially provided.  It is suggested from the evidence submitted that this is the first residential market research analyst position that your company has hired.  It is also stated in an excerpt from your letter that a minimum of a baccalaureate degree is required to fill this position. Your response included a letter from the attorney on record, job postings for similarly related positions, along with two position evaluation letters.

Exhibit "F," p.4.

76.     The above paragraph contains no evaluations or assessments of any of the evidentiary materials submitted with the petition. It is merely a recitation of what defendant USCIS *believed* plaintiff had submitted.

77.     In the subsequent paragraph, defendant USCIS states:

> As evidence that a baccalaureate or higher degree, or its equivalent in a specific specialty, is normally the minimum requirement for entry into the particular position within your industry, **you submitted job postings for similarly related positions. However, USCIS cannot determine the size of these companies, the number of employees working, the duties and responsibilities, since the information submitted was without regard to company size and they all employ residential market research analyst related positions with unspecified degrees.** The information chosen does not establish industry standards. As previously stated, though, it is not the title that is of concern but the duties of the job. Therefore, **the evidence submitted does not establish that a bachelor's degree in a specific field of study is a standard minimum requirement within your company's industry**.

Exhibit "F," p.4 (emphasis added).

78.     Throughout the application of plaintiff, the job advertisements publicly posted by plaintiff were referenced and cited to on numerous occasions. Furthermore, these job advertisements were annexed as exhibits to the application. At no point did plaintiff claim these were job advertisements for similar positions with other business entities and at all times, it was unambiguous that the job advertisements were for the position of residential market research analyst with plaintiff. Only defendant USCIS believed, erroneously, that the job postings were for "similarly related positions." Exhibit "F," p.4.

79.     The first reference made by plaintiff to the job advertisements submitted in support of the application can be found in the Table of Exhibits, where "Tear Sheets/Job Advertisements" was listed as Exhibit 6 beginning on page seventy-five (75).  Exhibit "E," pp. 16, 91-101.

80.     The next reference to the job advertisements can be found in Part II, Section C of the Application, entitled "Attempts to Hire Residential Market Research Analyst."  Exhibit "E," p. 21.

81.     So that there can be no misunderstanding or confusion that these advertisements were not for "similarly related positions", Plaintiff provides the relevant portions the application below:

> Nevertheless, while Petitioner was not required to attempted to recruit a U.S. worker for this position, Petitioner did so with the hope that filling this position would be less of an administrative burden via the hiring a qualified U.S. worker.  <u>See Exhibit 6, p.74, annexed hereto.</u>  <u>This was done via various internet job boards, such as Indeed.com, Craigslist (nyc.craigslist.org), SimplyHired.com, glassdoor.com and Veterans.Jobs, with the goal of attracting an individual who could perform the duties Petitioner had outlined in the job advertisement.</u>
>
> In response to this position's availability, Petitioner received dozens of inquiries and resumes from those people who believed they fit the outlined criteria.  While Petitioner conducted numerous interviews along with a smaller number of second interviews, no candidate other than Beneficiary was able to demonstrate they possessed the practical and academic experience called for by this position.
>
> Exhibit "E," p. 21 (emphasis added).

82.     Section D of Part II of the Application, entitled "Detailed Description of the Proffered Position," again referenced the job advertisements in question, and stated that:

> <u>The most accurate description for the Residential Market Research Analyst position can be found in the job advertisements posted by Petitioner,</u> referred to by USCIS as "tear sheets or other advertising documentation."
>
> Exhibit "E," pp. 21-22 (emphasis added).

83.     That same section of the Application went on to incorporate the text of the job advertisements, verbatim, when explaining the duties of the position.  Specifically, the position called for an applicant who would:

> provide research and analysis of existing data (tables, statistics, databases) and gather market-specific information (focus groups, opinion surveys, questionnaires) in order to focus the company's efforts on undeveloped market areas. The position will require the preparation of mid-quarterly and quarterly reports to guide management in the allocation of our assets, whether purchasing and/or renovating residential properties and implementing promotional campaigns at the optimal effective level.

> Exhibit 6, pp. 78, 83.

> Exhibit "E," p. 22.

84.     Furthermore, the application repeated the exact text found in petitioner's job advertisements, and included page numbers for the reviewer to confirm the information provided was indeed that present within the source materials.  The responsibilities and job duties were listed as follows:

- Identify geographic areas lacking in residential rental properties
- Use quantitative and qualitative research methods to collect data, including focus groups, interviews and surveys;
- Gather data on competitors and analyze their prices, sales, and method of marketing and distribution;
- Prepare reports of findings, illustrating data graphically and translating complex findings into written text;
- Gather and synthesize data on prospective customer demographics, preferences and elasticity of demand to identify potential markets and factors affecting demand for rental units;
- Assess promotional needs to determine optimal allocation of advertising budget between internet, newspaper and local community publications and advise on most effective means of reaching company goals;
- Evaluate market penetration and saturation by competitor companies;
- Create and appraise procedures and techniques for collecting and aggregating data, such as opinion polls and questionnaires, or procure existing data from databases;
- Review industry statistics to determine residential real estate trends

within targeted areas;

- Quantify the effectiveness of marketing, advertising, and communications programs and strategies.

Exhibit 6, pp.75-76, 78, 81, 83.

Exhibit "E," p. 22.

85.     As indicated by the page numbers which followed the above-referenced list of job duties, the reviewing officer of defendant USCIS was again directed to Exhibit 6 and the specific pages wherein the job duties were set forth in job advertisements written and publicly posted by plaintiff.

86.     As the RFE recommended that providing evidence of any job advertisements published by petitioner could "help establish the educational requirements for the proffered position of Residential Market Research Analyst," that is precisely what plaintiff did.  Exhibit "D," p.4.

87.     In Part III, Section B, the application referenced the advertising for the position by noting that the "'tear sheets or other advertising documentation' have been annexed" to the application and pointed out again where these documents were located with the submission. Exhibit "E," p. 25.

88.     In all job advertisements placed by plaintiff and provided to defendant USCIS, the following text appears:  "We are an equal opportunity, affirmative action employer. Women, minorities and people with disabilities are encouraged to apply.  **Requirements**:  College graduate in Economics (with emphasis on quantitative skills)."  Exhibit "E," pp. 92-93, 95, 100 (emphasis in original).

89.     The aforementioned text was reproduced in the Application, wherein it was further stated that "The necessity of a baccalaureate degree in economics was indicated in every listing of this position, as the first and foremost requirement."  Exhibit "E," p. 23.

90.     The purpose of referencing the job advertisements written and posted by plaintiff for the position of market research analyst was to demonstrate to defendant USCIS the bona fide criteria necessary to perform the duties expected of a successful applicant.  It was expected that having been informed in the Application that the job advertisements could be found within Exhibit 6, the reviewing officer of defendant USCIS would have contemporaneously reviewed the advertisements side-by-side with the relevant sections.

91.     Additionally, every single job advertisement annexed to the application clearly stated that the hiring company was "6801 Realty Co., LLC" and the position was "Residential Market Research Analyst."  Exhibit "E," pp. 92-96, 100-101.[2]

92.     For instance, the first advertisement included was posted by plaintiff to Craigslist, the popular classified advertisement website.  Exhibit "E," p. 92.  The position is listed at the top of the page as "**Residential Market Research Analyst (Brooklyn)**" (emphasis in original) while the company is listed twice at the bottom of the advertisement:  "About 6801 Realty Co., LLC" and "Hiring Organization: 6801 REALTY CO., LLC."  Exhibit "E," p. 92.

93.     The second advertisement included was posted at Glassdoor.com.  The heading at the top of both pages reads: "6801 Realty Co., LLC Residential Market Research Analyst" (emphasis in original).  Exhibit "E," pp. 93-94.

---

[2] Though the multiple job advertisements were posted in or around March 2014, the dates on the pages of the subsequent advertisements range from March 12, 2014 to July 14, 2014.  The reason some of the advertisements are dated in June and July 2014 was because they were retrieved in the process of preparing the Response.

94.     A few lines down from the top of the first page, the advertisement states the following appears:  "**Residential Market Research Analyst**.  6801 Realty Co., LLC" (emphasis in original).  Exhibit "E," pp. 93-94.

95.     If defendant USCIS had failed to notice the aforementioned text, the lower part of the advertisement states "About 6801 Realty Co., LLC."  Exhibit "E," p. 93.

96.     The third advertisement, from the job board located Oodle.com, contains a heading at the top of both pages stating "Residential Market Research Analyst" and "6801 Realty."  The name of plaintiff's business was mentioned in seven (7) other places throughout the advertisement.  Exhibit "E," pp. 95-96.

97.     Recognizing the sacrifices of our military, plaintiff ensured the advertisement appeared on the website Veterans.Jobs.  Again, it could not be any less ambiguous that this advertisement was for the position of Residential Market Research Analyst with 6801 Realty Co., LLC, which is mentioned six (6) times in the listing.  Exhibit "E," pp. 100-101.

98.     The position evaluation letter provided by Dr. Robert Grayson reviewed the duties of the position and the criteria in both prongs of 8 C.F.R. § 214.2(h)(4)(iii)(A)(2).  This is emphasized here not so much for Dr. Grayson's substantive analysis of the position and beneficiary's qualifications, but because of his reference to the job advertisements provided to him by plaintiff.  Particularly, Dr. Grayson declared that he reviewed "Petitioner's response to the Request for Evidence from USCIS, Beneficiary's resume, Letters of Recommendation, Beneficiary's Certified Translated Transcript and Diploma, the evaluations conducted by the Foundation for International Services, Inc. and **the job advertisements which Petitioner used to locate an individual with the skills and abilities needed to fill this position**."  Exhibit "E," p. 146 (emphasis added).

2. Position Evaluation Letters Discarded Solely on the Basis of Erroneous Reading of Job Advertisements

99. By the third paragraph of page four (4) of defendant USCIS' decision, the only evidence evaluated by defendant USCIS were the job advertisements posted by plaintiff to fill this position. Exhibit "F," p.4.

100. This paragraph begins with "Lastly, you submitted two position evaluation letters." The commencement of the sentence with "Lastly" is an indication that what follows will be an analysis of the final item(s) of evidence presented by plaintiff. Exhibit "F," p.4.

101. As indicated, defendant USCIS erred in failing to read the submitted job advertisements and summarily concluded they were for "similarly related positions" with other companies instead of with plaintiff. The conclusion of this paragraph stated that the job postings fail to "establish that a bachelor's degree in a specific field of study is a standard minimum requirement within your company's industry." Exhibit "F," p.4.

102. Defendant USCIS stated that although Dr. Grayson and Dr. Smith "claim[ed] the that the duties of the position executed at your establishment would require a bachelor's degree or higher," their findings and analysis were not credited. The proffered reason was that "where an opinion is not in accord with other information or is in any way questionable, USCIS is not required to accept or may give less weight to that evidence." Exhibit "F," p.4.

103. In the next paragraph, defendant USCIS concluded that "Therefore, the evidence submitted does not establish that a bachelor's degree in a specific field of study is a standard minimum requirement within your company's industry." Exhibit "F," p.4.

104. At this point in defendant USCIS' decision, no other information submitted in support of the application was evaluated in any way other than the wrongly categorized job

advertisements. Consequently, the only conceivable and logical factual basis for the statement of the reviewing officer of defendant USCIS that the opinions of Dr. Grayson and Dr. Smith were "not in accord with other information or are [is] in any way questionable" was the erroneous reading of the job advertisements. Exhibit "F," p.4.

(a)     Credentials of Dr. Robert Grayson

105.    Dr. Grayson's curriculum vitae demonstrates he possesses expertise on the matters upon which he opined in his letter. Specifically, his position evaluation letter and curriculum vitae state that he is the author of Introduction to Marketing: A Practical Approach, which was published by Appleton-Century-Crofts and founded the Marketing Journal Publishing Company, which produces The Journal of Consumer Marketing, The Journal of Business & Industrial Marketing, The Journal of Services Marketing and The Journal of Product & Business Management. Exhibit "E," pp.142, 148-49.

106.    These journals are academic in nature and are produced for those who work in the field of market research. Their purpose was to "uniquely fill the gap between the anecdotal trade press and esoteric research journals." Exhibit "E," p.149.

107.    Additionally, Dr. Grayson is a founder of the Product Development and Management Association and served as the president of the New York Chapter of the American Marketing Association. Moreover, Dr. Grayson established the "Marketing Man of the Year Award" and the "Effie Award," given to the creators of the most effective advertising commercials. The "Effie" (short for "effective advertising") is unique in the field of advertising awards since it "goes beyond creativity to measure actual sales results." Exhibit "E," p.148.

108.    Dr. Grayson's letter and curriculum vitae establish his credentials as a recognized authority on the relevant educational requirements for the proffered position. Particularly, he states

that during his over forty (40) years in the marketing industry, he "developed guidelines for 'best practices'" in consulting with residential real estate companies similar in size, scope, organization to petitioner's when the sought to hire for the position of market research analyst. Exhibit "E," pp.143-145.

109. Dr. Grayson's work in managing the hiring process for market research analysts included drafting job descriptions, establishing education requirements including a review of academic coursework and designating the relevant skills required by a successful applicant. Exhibit "E," p.143.

110. Having established the expertise and credentials of Dr. Grayson on the matter which he has opined, defendant USCIS may now attempt to diminish these credentials by claiming that plaintiff cites his expertise in marketing and not, specifically, in the field of market research. With that in mind, plaintiff preemptively refers to Dr. Grayson's letter where he states that during his career, he "learned that any marketing analysis must be based on sound, empirically valid and robust research. If there is a paucity of research, no deductions can be drawn nor inferences made." Exhibit "E," p.143.

111. Dr. Grayson's development of innovative marketing concepts was founded upon "the rigorous testing and analysis of raw data." Exhibit "E," p.143.

112. Furthermore, Dr. Grayson wrote that as a condition precedent for marketing a product (be it a telephone, fragrance or in this instance, residential real estate rental properties), "it is imperative that there be an understanding of the need for that product, the preferences of consumers and the variables which may influence their decisions." Exhibit "E," p.143.

(b)     Credentials of Dr. Stan Smith

113.    Dr. Smith's credentials, submitted in the form of his curriculum vitae and described by him in his letter, demonstrated that he possesses expertise on the matters upon which his opinion is based.  Exhibit "E," pp. 152-153, 160-170.

114.    Dr. Smith asserts that he evaluated the position with plaintiff in order to determine whether it qualifies as a specialty occupation as interpreted by defendant USCIS.  Exhibit "E," p.153.

115.    Specifically, Dr. Smith scrutinized the duties set forth by plaintiff that would be performed by beneficiary.  Exhibit "E," pp. 155-157.  As the duties required by the position are quantitative in nature, Dr. Smith, an economist with a PhD in economics earned from the University of Chicago, was well-equipped to provide his opinion as to these duties.  Exhibit "E," pp. 152-153, 161.

116.    Dr. Smith's expertise in economics has focused on data analysis, projections, statistics, sampling and modeling and regression analysis.  These are all areas which were discussed in the Response submitted by plaintiff which would encompass the work beneficiary would be required to perform.  Exhibit "E," pp. 152-153, 156, 160-170.

117.    Projections can be made of future wages, widgets, or, of course, demand for residential real estate rental housing.  Whatever the subject of that demand is, economics provides the toolset to gauge it.

118.    "Data" is the plural of the word "datum," which means a piece of information, such as a fact, measurement, or observation.  Thus, the word "data" describes multiple pieces or a collection of information.  All data have some source and are created by some process. To use and interpret data properly, we need to know how the information was generated and collected.  Dr.

Smith wrote that he examined the original data sources contained in the tables entitled "Market Specific Research Data."  Exhibit "E," p.155.

119.    How to decide which measures to include in an analysis and which measures to leave aside can be a challenging task.  It is important that the end-user of the data selects measures that relate to the conceptual model being utilized and that can be interpreted within the framework of that model.  As a trained economist who interacts with data in his position as President of the Smith Economics Group, Dr. Smith is capable of evaluating the complexity of this task.  Exhibit "E," p.153.

120.    Since natural experiments are rare in economics, models are used to yield hypotheses about economic behavior.  In the case of plaintiff, that behavior includes a prospective tenant's willingness to pay an additional amount of money for things such as proximity to mass transit and additional square footage.  A model is used to by inputting data and seeing how the outcome of the experiment changes.

121.    Confronting those economic models with data is what econometrics does.  The basic tool for econometrics is the linear regression model, and its intended use by beneficiary was detailed in the Response and in Dr. Smith's letter.  Exhibit "E," pp. 154-156.  The Response and Dr. Smith's letter also focused in-depth on the other types of analysis which would be undertaken by beneficiary in the performance of the job duties.  Exhibit "E," pp. 154-156.

122.    Had defendant USCIS reviewed Dr. Smith's letter and curriculum vitae, it would have been evident of his skill in these areas.  While his lengthy list of publications does not contain titles such as "The Application of Econometrics", the use of econometrics is inherent in the nature of his work as an economist who focuses on matters "where quantitative analysis are vital to the outcomes of [his] clients."  Exhibit "E," p.152. Rearrange these sections.

123.     Furthermore, Dr. Smith's letter states clearly that he has made recommendations with respect to the hiring of market research analysts for other companies and with his own firm. Exhibit "E," p.154. This demonstrates Dr. Smith's assessment was of probative value in determining whether or not the application should have been approved.

### 3. Defendant USCIS Failed to Properly Consider and Evaluate the Duties of the Position

124.     With respect to the Application of petitioner, there is no evidence from the record which indicates defendant USCIS even considered the duties of the position. In the first part of defendant USCIS' decision where the agency erroneously misreads the job advertisements, the reviewing officer emphasizes that "it is not the title [of the position] that is of concern but the duties of the job." Exhibit "F," p.5.

125.     The next reference to the duties of the position is in the subsequent paragraph where the expert letters are summarily dismissed. As recited, supra, defendant USCIS discarded the claims of Dr. Grayson and Dr. Smith with respect to the duties of the position since their opinions were judged "not in accord with other information." Exhibit "F," p.5.

126.     As amply demonstrated herein, the basis upon which the expert opinion letters were discarded was severely flawed. At the point in its decision where defendant USCIS dismissed the probative value of the expert opinion letters, the only evidence considered was incorrectly considered "job postings for similarly related positions." Exhibit "F," p.4.

127.     Had defendant USCIS accurately reviewed the Application, it would have become apparent through the specificity and detail associated with each job duty, that this specific market research analyst position indeed required "a level of specialized knowledge that may be obtained only through a baccalaureate degree in a specific field of study." Exhibit "F," p.5.

128.    The application included two tables with four columns:  Job Duty, Practical Experience, Applicable Academic Coursework and Percentage of Time Devoted to Each Job Duty. Exhibit "E," pp. 43-44.

129.    The connections between coursework completed by Beneficiary in the course of academic study for his baccalaureate degree and the day-to-day duties of this position as a market research analyst were expounded upon in the application (show where this was, repeat it here). Add stuff from other sections, expert letter analysis, etc. in this place. that the level of detail provided for each of the five main job duties.

4.    Defendant USCIS Erred in According Disproportionate Weight to the Size of Plaintiff's Organization

130.    Though defendant USCIS purported to address 8 C.F.R. § 214.2(h)(4)(iii)(A)(1) in those paragraphs where it relied in error on its reading of the job advertisements placed by petitioner and where, based upon said advertisements, dismissed the position evaluation letters, it also addressed 8 C.F.R. § 214.2(h)(4)(iii)(A)(1) in the last two paragraphs of page five.  Exhibit "F," p.5.

131.    Here, defendant USCIS stated that petitioner failed to demonstrate "that your organization has complex operations to require a degree in a specific field of study for the proffered position."  Exhibit "F," p.5.

132.    As a result, defendant USCIS stated that the record did "not support a finding that you will employ the beneficiary in a residential market research analyst position requiring a level of specialized knowledge that may be obtained only through a baccalaureate degree in a specific field of study."  Exhibit "F," p.5.

133.    This reasoning resulted in the conclusion (again) that "the evidence of record has not satisfied the criterion at 8 CFR section 214.2(h)(4)(iii)(A)(1)." Exhibit "F," p. 5.

134.    As already demonstrated, defendant USCIS failed to properly review the "evidence of record." As a result, the conclusion that petitioner did not satisfy 8 C.F.R. § 214.2(h)(4)(iii)(A)(1) cannot stand since it is based upon a fundamental failure to review the "evidence of record."

135.    Nevertheless, defendant USCIS went on to argue that plaintiff's size renders it unable to hire someone for a position which requires a degree in a specific field of study. This statement is prefaced by the obligatory caveat that "though the size of a company does not, in and of itself determine a company's need for a residential research market analyst, its income level and scale of operations have a direct and substantial bearing on the scope of the duties the beneficiary would perform." Exhibit "F," p.5.

136.    Though defendant USCIS would likely argue that the boilerplate caveat attached to its conclusion inoculates any challenge to its reasoning, it is evident that such a caveat rings hollow (or tokenism) in light of the errors and omissions detailed thus far.

137.    In Young China Daily v. Chappell, 742 F.Supp. 552 (N.D.Cal. 1989), the Court ruled that "the size of the operation bears no rational relationship to the need for a professional." Numerous legal actions have thereafter relied upon Young China Daily for the basic proposition that "size is not relevant" to the considerations of USCIS.

138.    At bar, plaintiff asserts no such thing. In EG Enterprises, Inc. v. Dep't of Homeland Security, 467 F.Supp.2d 728, 736 (E.D.Mich 2006), the court pared back the holding of Young China Daily.

139.     That court correctly noted that while it may be an abuse of discretion for USCIS to only consider the size of a business, there can be no showing that USCIS acted in an arbitrary or capricious fashion when it considers the job duties for the specific position and the duties of similar positions as described in the Occupation Outlook Handbook ("OOH"), published annually by the Bureau of Labor Statistics, U.S. Department of Labor.  EG Enterprises, Inc., 467 F.Supp.2d at 737.

140.     In Fred 26 Importers v. US Dept. of Homeland Sec., 445 F. Supp. 2d 1174 (C.D. Cal. 2006), plaintiff challenged USCIS' denial of its application to employ an individual in a specialty occupation.  Based upon the small size of the entity, "the duties for the human resources manager position are not sufficiently specialized or complex such that knowledge required to perform the duties is usually associated with attainment of a bachelor's degree."  Fred 26 Importers, 445 F. Supp. 2d 1174, 1180.

141.     However, the court ruled that the AAO failed to provide any basis for its decision. Specifically, it did not "cite any evidence in support of its conclusion," discuss the "specific job duties of the position," the reasons why the proffered duties were not specialized or complex or how the size of plaintiff's business effects the nature of the job duties.  Fred 26 Importers, 445 F. Supp. 2d 1174, 1180.

142.     Instead, the AAO "merely reiterated the criterion and then stated that the position does not meet the requirement. The conclusory nature of the AAO's finding provides no basis on which the Court can evaluate the decision."  Fred 26 Importers, 445 F. Supp. 2d 1174, 1180.

143.     Furthermore, in China Chef, Inc., and Lee Meng Tan v. James A. Puelo, 12 F.3d 211 (6th Cir. 1993), the Sixth Circuit Court of Appeals stated that Young China Daily only stands for the proposition that "the duties of a graphic designer at a small newspaper do not necessarily differ from those of a graphic designer at a major newspaper."

144. As in <u>EG Enterprises</u>, the analysis by defendant USCIS may of course consider the size of the petitioning entity, though it cannot exclusively ground its decision in that entity's size.

145. In the present action, defendant USCIS denied plaintiff's petition based on the record that was before it. As indicated herein, the review of the record by defendant USCIS was replete with errors of omission and commission.

146. The decision in <u>China Chef, Inc.</u> is not, nor should be, a blanket entryway for any small company seeking to contest an unfavorable decision. 12 F.3d 211 (6th Cir. 1993). However, the application of the holding of <u>China Chef, Inc.</u> leads neither to the general conclusion that the skills required to be the manager of a small company are always the same as those required to be a manager at a large company, nor to the specific conclusion that the size of a business is not relevant to the nature of the duties of its manager. 12 F.3d 211 (6th Cir. 1993).

147. Instead, defendant USCIS is required to examine the entirety of each specific application, including the duties for the specific position. The size of the petitioning entity is but one factor, and as demonstrated above, should be considered in light of the relevant case law.

5. Misplaced Reliance on <u>Matter of Caron International</u>

148. The denial of defendant USCIS also relied heavily upon <u>Matter of Caron International</u>, 19 I&N Dec. 791 (Comm. 1988) for the proposition that the legacy INS (now USCIS) "may, in its discretion, use as advisory opinions statements from universities, professional organizations or other sources submitted in evidence as expert testimony." Exhibit "F," p.5 and Exhibit "I," <u>Matter of Caron International</u>, annexed hereto. Nevertheless, if defendant USCIS determines such an opinion is not consistent "with other information or is in any way questionable", they are "not required to accept or may give less weight to that evidence." Exhibit "F," p.5.

149.　At bar, defendant USCIS had *only* considered the job advertisements which it misread as for positions with companies other than petitioner's.

150.　In Matter of Caron International, the INS was charged with reviewing three letters from universities and one from the American Yarn Spinners Association, Inc. These letters supported that petitioner's proposition that the position of "vice-president of manufacturing in the textile industry requires a person with a baccalaureate degree." Exhibit "I," p.5.

151.　While Matter of Caron International has provided the phrase, "where an opinion is not in accord with other information or is in any way questionable, USCIS [the Service] is not required to accept or may give less weight to that evidence," it should be considered within the context of that specific decision.

152.　In Matter of Caron International, the four expert letters reached inconsistent conclusions regarding the necessity of a college degree for the specific position. One letter stated more than a bachelor's degree was required while another stated the position in question ~~a degree~~ was "normally filled" by one with a college degree. Exhibit "I," p.5.

153.　INS summarized the opposing standards stated by the experts in Matter of Caron International as follows:

> Together, the three university letters allow for a relatively broad range of major fields of study as prerequisites to the position of vice-president of manufacturing, not a specific major or narrow range of majors. The majors cited in the three letters are (1) business or engineering; (2) mechanical engineering, chemical engineering, textile science, textile chemistry, or industrial management; (3) textile management and technology.

Exhibit "I," p.6.

154.　At bar, defendant USCIS cannot maintain there existed any inconsistency or contradictions within the expert letters of Dr. Grayson and Dr. Smith. Furthermore, defendant USCIS has not nor cannot demonstrate any genuine rationale, supported by the record, as to any

factors which may have caused it to provide the justification based on <u>Matter of Caron</u>
<u>International</u> which it did.

6.  Incorrect Legal Standard Applied to Review of 8 C.F.R. §
214.2(h)(4)(iii)(A)(1)

155.    If it were insufficient that defendant USCIS disregarded the evidence presented to
it, defendant USCIS applied a regulation which does not exist.   Specifically, 8 C.F.R. §
214.2(h)(4)(iii)(A)(1) requires that "A baccalaureate or higher degree or its equivalent is normally
the minimum requirement for entry into the particular position."   However, in concluding that
petitioner did not meet this first criteria, defendant USCIS applies a variation of the correct
regulation:   "As evidence that a baccalaureate or higher degree, or its equivalent in a specific
specialty, is normally the minimum requirement for entry into the particular position within your
industry, you submitted job postings for similarly related positions."  Exhibit "F," p.5.

156.    If it was not enough to fail to read the submitted documents, defendant USCIS
continued on the same track by identifying a heretofore unknown legal standard.

157.    Defendant USCIS first states that plaintiff was required to demonstrate "a
baccalaureate or higher degree, or its equivalent in a specific specialty, is normally the minimum
requirement for entry into the particular position within your industry."  Exhibit "F," p.5.

158.    The statute at 8 C.F.R. § 214.2(h)(4)(iii)(A)(1) clearly states that "A baccalaureate
or higher degree or its equivalent is normally the minimum requirement for entry into the particular
position" and *not* the standard in an industry as a whole.

159.    Industry standards for evaluating a position are only stated in 8 C.F.R. §
214.2(h)(4)(iii)(A)(2).  ("The degree requirement is common to the industry in parallel positions
among similar organizations.")

160.    It is apparent then that defendant USCIS not only improperly classified the submitted job advertisements, but compounded this by applying criteria found not at 8 C.F.R. § 214.2(h)(4)(iii)(A)(1) but rather the very different criteria set forth at 8 C.F.R. § 214.2(h)(4)(iii)(A)(2).

161.    This is important because 8 C.F.R. § 214.2(h)(4)(iii)(A)(1) requires defendant USCIS to closely evaluate "the particular position" with plaintiff's organization and *not* the industry as a whole.

162.    Within an industry, similar entities naturally have different positions to fill and varying criteria they require from prospective candidates.  It is as if plaintiff provided an answer the question asked of it, to which defendant USCIS replied that plaintiff failed to properly answer an altogether different question.

163.    Though this error appears minor in comparison to disregarding significant, probative evidence, its emphasis on "industry standards" inverts the statutory requirement which require a focus *only* on "the particular position."  As plaintiff's application was designed to, and did, satisfy 8 C.F.R. § 214.2(h)(4)(iii)(A)(1), defendant USCIS cannot now claim that petitioner failed to fulfill 8 C.F.R. § 214.2(h)(4)(iii)(A)(1) by actually utilizing the regulation at 8 C.F.R. § 214.2(h)(4)(iii)(A)(2).

## 7.  Conclusion

164.    Defendant USCIS' decision was arbitrary and capricious in finding that plaintiff did not satisfy 8 C.F.R. § 214.2(h)(4)(iii)(A)(1).

165.    While it is understood that an agency cannot "write an exegesis on every contention," it is required that the agency "consider the issues raised, and announce its decision in terms sufficient to enable a reviewing court to perceive that it has heard and thought and not merely

reacted." <u>Mansour v. INS</u>, 230 F.3d 902, 908 (7th Cir. 2000) (finding that where an agency referred to petitioner as "Syrian" when he actually was "Assyrian" is the kind of mistake that makes a Court "question whether [the agency] adequately comprehended and addressed" the petitioner's claim.")

166.    In reviewing whether or not 8 C.F.R. § 214.2(h)(4)(iii)(A)(1) was satisfied, defendant USCIS' "refusal to consider evidence bearing on the issue before it constitutes arbitrary agency action within the meaning of § 706." <u>Butte County, Cal. v. Hogen</u>, 613 F.3d 190, 194 (D.C.Cir. 2010) citing <u>State Farm</u>, 463 U.S. at 43 and <u>Comcast Corp. v. FCC</u>, 579 F.3d 1, 8 (D.C.Cir. 2009).

167.    The above-referenced analysis demonstrates that defendant USCIS failed and/or refused to review evidence submitted by petitioner. This evidence included the job advertisements, the position evaluation letters and the descriptions of the duties of the particular position.

168.    Additionally, defendant USCIS applied a novel, yet incorrect regulation and misapplied the holding of <u>Matter of Caron International</u>.

169.    District courts have held that their standard of review permits a finding of abuse of discretion where an agency "decision is based on an improper understanding of the law." <u>Occidental Eng'g Co. v. INS</u>, 753 F.2d 766, 768 (9th Cir. 1985); 5 U.S.C. § 706(2)(A) ("The reviewing court shall hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.")

170.    The above-referenced deficiencies – ignoring or failing to review significant probative evidence (or more accurately, reviewing evidence but claiming it was the opposite of what it actually was) and failing to apply the relevant legal authorities, are demonstrative of the fact that defendant USCIS did not engage in "reasoned decisionmaking." <u>Judulang v. Holder</u>, 132

S. Ct. 476, 484 (2011) ("[C]ourts retain a role, and an important one, in ensuring that agencies have engaged in reasoned decisionmaking. When reviewing an agency action, we must assess, among other matters, 'whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment.'") (citations and quotations omitted).

171.    By relying on factors not contained in the relevant regulations, the conclusion of defendant USCIS that plaintiff failed to meet the criteria at 8 C.F.R. § 214.2(h)(4)(iii)(A)(1) was arbitrary and capricious.

172.    As emphasized herein, the failure to properly review the evidence submitted by plaintiff was the direct and proximate cause of the two conclusions of defendant USCIS that plaintiff did not satisfy 8 C.F.R. § 214.2(h)(4)(iii)(A)(1).

173.    The actions of defendant USCIS were in direct contravention of 8 C.F.R. § 214.2(h)(9)(i), which states that, when adjudicating petitions such as that submitted herein, "[T]he director shall consider all the evidence submitted."   By ignoring or failing to review the job advertisements and subsequently discarding evidence as a result thereof, "all the evidence submitted" was not considered.

174.    Defendant USCIS' actions, which concluded that plaintiff's application did not satisfy 8 C.F.R. § 214.2(h)(4)(iii)(A)(1), were arbitrary and capricious, since said actions ignored highly probative evidence.  Central Hudson Gas & Electric Corp. v. Federal Energy Regulatory Commission, Civil Action No. 14-1786 (L) (2d Cir. Apr. 2, 2015) ("An order ranks as arbitrary and capricious if 'the agency relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'") (citations omitted).

175.    Defendant USCIS was obligated under 5 U.S.C. § 706(2)(A) to "examine the relevant data and articulate a satisfactory explanation for its action[s] including a 'rational connection between the facts found and the choice[s] made.'" Central Hudson Gas & Electric Corp.  By not even looking at the evidence, or perhaps reading it incorrectly, it is apparent that there cannot exist such a "rational connection" between the evidence and the conclusion that 8 C.F.R. § 214.2(h)(4)(iii)(A)(1) was not satisfied.

176.    For the above-stated reasons, the decision of defendant USCIS that 8 C.F.R. § 214.2(h)(4)(iii)(A)(1) was not satisfied was arbitrary and capricious and not in accordance with law.  5 U.S.C. § 706(2)(A).

B.    8 C.F.R. § 214.2(h)(4)(iii)(A)(2) (first prong) was satisfied by the petition

177.    The first prong of 8 C.F.R. § 214.2(h)(4)(iii)(A)(2) requires a showing that the "degree requirement is common to the industry in parallel positions among similar organizations."

178.    In determining whether there is such a common degree requirement, factors often considered by USCIS include: whether the Occupational Outlook Handbook (the "Handbook") reports that the industry requires a degree, whether the industry's professional association has made a degree a minimum entry requirement, and whether letters or affidavits from firms or individuals in the industry attest that such firms "routinely employ and recruit only degreed individuals." Shanti, Inc. v. Reno quoting Hird/Blaker Corp. v. Sava, 712 F. Supp. 1095, 1102 (S.D.N.Y. 1989).

1.    Reliance on the Occupational Outlook Handbook

179.    The Handbook states that "Most market research analysts need at least a bachelor's degree."  With respect to the type of degree, the Handbook reports that market research analysts:

> typically need a bachelor's degree in market research or a related field.
> Many have degrees in fields such as statistics, math, and computer science.

> Others have backgrounds in business administration, the social sciences, or communications.
>
> Courses in statistics, research methods, and marketing are essential for these workers. Courses in communications and social sciences, such as economics, psychology, and sociology, are also important.

Exhibit "J," Bureau of Labor Statistics, U.S. Department of Labor, Occupational Outlook Handbook, 2014-15 Edition, Market Research Analysts, on the Internet at http://www.bls.gov/ooh/business-and-financial/market-research-analysts.htm (visited August 11, 2015), annexed hereto.

180. Thus, the <u>Handbook</u> claims that a market research analyst can have a degree in more than one field of study. Since the <u>Handbook</u> does not require a market research analyst to have a degree in one particular academic major, defendant USCIS concluded that the proffered position did not qualify as a specialty occupation ("the requirement of a degree in Economics is inadequate to establish that a position qualifies as a specialty occupation."). Exhibit "F," p.6.

181. Defendant USCIS went on to assert that the petitioner was required to demonstrate that the proffered position "requires a precise and specific course of study that relates directly and closely to the position in question" and that "the requirement of a degree with a generalized title, such as Economics, without further specification, does not establish the position as a specialty occupation." Exhibit "F," p.6.

182. This is a correct interpretation of the law, since if an employer were to claim a specialty occupation position merely required "a general purpose bachelor's degree, such as a business administration degree," the entire rationale of the specialty occupation visa could be turned on its head. <u>Royal Siam Corp. v. Chertoff</u>, 484 F.3d 139, 147 (1st Cir. 2007) ("[A]n employer could ensure the granting of a specialty occupation visa petition by the simple expedient of creating a generic (and essentially artificial) degree requirement."); <u>Chung Song Ja Corp. v. US Citizenship and Immigration Services</u>, Civil Action No. C14-0177RSM (W.D.Wash. Mar. 11,

2015) ("Permitting an occupation to qualify simply by requiring a generalized bachelor degree would run contrary to congressional intent to provide a visa program for specialized, as opposed to merely educated, workers.")

183. Plaintiff cannot nor has disputed that the <u>Handbook</u> does not indicate that a bachelor's degree is a requirement for the position at issue. In the present instance, plaintiff not once invoked the requirement of a bachelor's degree *as stated in the <u>Handbook</u>* for the proposition that this particular position qualified as a specialty occupation. Plaintiff even acknowledged the authority of the <u>Handbook</u> and how it did not establish the requirement of a degree in a specific specialty for the position of market research analyst. Exhibit "E," p.50 ("The <u>Handbook</u> indicates that a disparate group of disciplines, varying from computer science to economics are acceptable for employment as a market research analyst.").

184. Nevertheless, the evidence submitted in support of plaintiff's argument was again ignored or otherwise not considered.

2. Defendant USCIS Ignored or Failed to Consider Probative Evidence Which Was Consistent with Established Interpretations

185. Defendant USCIS noted that "the requirement of a degree in Economics is inadequate to establish that a position qualifies as a specialty occupation. A petitioner must demonstrate that the proffered position requires a precise and specific course of study that relates directly and closely to the position in question." Exhibit "F," p.6.

186. The above-cited language appears to be consistent with the reasonable interpretations of the regulatory framework for evaluation of specialty occupation positions that is generally applied by defendant USCIS. <u>Chung Song Ja Corp. v. US Citizenship and Immigration Services</u>.

187.    Though "8 C.F.R. § 214.2(h)(iii)(A)(1) does not use the language of 'specific specialty,' USCIS does not abuse its discretion in reading this regulation together with 8 C.F.R. § 214(h)(4)(ii), which defines a 'specialty occupation' as one that 'requires the attainment of a bachelor's degree or higher in a specific specialty, or its equivalent.'" See In re Petitioner [Identifying information redacted by Agency], 2013 WL 8124091, **8-11 (OAH, Dec. 24, 2013) (explaining that the "regulatory language must be construed in harmony with the thrust of the related provisions and with the statute as a whole"). This latter definition is identical to that provided by the INA itself. See 8 U.S.C. §1184(i)(1).

188.    The requirement of a specialized degree, or its equivalent, is also in keeping with the intent of the nonimmigrant worker program, which "allows an employer to reach outside of the U.S. to fill a temporary position because of a special need, presumably one that cannot be easily fulfilled within the U.S." CareMax Inc. v. Holder, 2014 WL 1493621 *4 (N.D. Cal. Apr. 16, 2014); see Chung Song Ja Corp. v. US Citizenship and Immigration Services.

189.    Courts have consistently held that the regulatory criteria "does not restrict qualifying occupations to those for which there exists a single, specifically tailored and titled degree program. Indeed, such an interpretation ignores the statutory and regulatory allowance for occupations that require the attainment of the 'equivalent' of specialized bachelor's degree as a threshold for entry." Chung Song Ja Corp. v. US Citizenship and Immigration Services; 8 C.F.R. § 214.2(h)(4)(ii); 8 U.S.C. § 1184(i)."

190.    By the inclusion of the word "equivalent," Congress "recognized that the needs of a specialty occupation can be met even where a specifically tailored baccalaureate program is not typically available for a given field." Tapis Intern. v. INS, 94 F.Supp.2d 172, 176 (D. Mass. 2000)

(rejecting agency interpretation because it would preclude any position from satisfying the specialty occupation requirements where a specifically tailored degree program is not available).

191.     Continuing, it is the argument of plaintiff that the application never asserted that beneficiary's degree, by itself, transformed the position into one that was a specialty occupation. Royal Siam Corp. v. Chertoff, 484 F.3d 139 at 147 ("requiring such a [general-purpose bachelor's] degree, without more, will not justify the granting of a petition for an H-1B specialty occupation visa.").

192.     In Royal Siam Corp. v. Chertoff, 484 F.3d 139 at 147 (1st Cir. 2007), the court correctly determined that the employer's "requirement for a free-floating degree in business administration was insufficient, without some compelling connection to the responsibilities of the restaurant manager position, to require a finding of a specialty occupation here."

193.     Plaintiff was well aware of established USCIS interpretation at the time the application was made and preemptively acknowledged that:

> Although a bachelor's degree in economics may be a legitimate prerequisite for a particular position, requiring such a degree, without more, will not justify a finding that a particular position qualifies for classification as a specialty occupation.  See *Royal Siam Corp. v. Chertoff*, 484 F.3d at 147.

Exhibit "E," p. 50.

194.     This is precisely what the Decision of defendant USCIS states:

> A petitioner must demonstrate that the proffered position requires a precise and specific course of study that relates directly and closely to the position in question. Since there must be a close correlation between the required specialized studies and the position, the requirement of a degree with a generalized title, such as Economics, without further specification, does not establish the position as a specialty occupation.  *See Matter of Michael Hertz Associates*, 19 I&N Dec. 558 (Comm.1988).

Exhibit "F," p. 6.

195.     Nevertheless, it appears that defendant USCIS gave as much attention to whether or not plaintiff had satisfied this aspect of its application as it did to the discarded job advertisements.  Had defendant USCIS done so, it would have been evident that plaintiff addressed this argument in the application:

> [I]t is not just *any* degree in economics that should satisfy the criteria set forth in the job duties [pp. 26-40].  More specifically, the job requirements enumerated demand someone with strong quantitative skills and academic experience applying economic theories and formulas to tangible issues.

Exhibit "E," p.50 (emphasis in original).

196.     Plaintiff's application expounded upon the connection between the specific duties of the proffered position *and* the precise academic background, down to the granular level of the particular coursework, of beneficiary.

197.     Had defendant USCIS properly reviewed the evidence, they would have seen the following:  (i) section entitled Duties and Responsibilities of the Residential Market Research Analyst, (ii) two tables which list the specific university courses beneficiary completed and how those courses were directly related to the tasks that would be performed on behalf of the petitioner, (iii) section entitled "Alignment between the 'body of specialized knowledge' Possessed by Beneficiary and the Duties Required by the Position of Residential Market Research Analyst," (iv) translated transcript and diploma, (v) credential evaluation reports and (vi) the highly personalized position evaluation letters of Dr. Grayson and Dr. Smith, respectively.  Exhibit "E," pp. 26-40, 43-44, 48, 105-135, 141-146, 151-158.

198.     This section of the petition labeled "Duties and Responsibilities…" is fifteen (15) pages long and describes, in exacting detail, the duties which beneficiary would perform.  Exhibit "E," pp. 26-40.

199.    These duties consist of the application of economic concepts such as elasticity along with more advanced quantitative techniques such as regression and multivariate analysis. The application also expounded upon how beneficiary would apply the theoretical principles of economics to the day-to-day tasks as a residential market research analyst:

> Beneficiary will examine demand for residential housing units when the price increases and assess whether the loss of revenue from the expected decline in demand is offset by the higher price charged. By properly determining the elasticity of demand, Petitioner will be able to maximize revenues.
>
> …
>
> Another way in which Beneficiary will look at demand is by measuring proxies of change in demand, most of which are absorption measures.
>
> …
>
> Beneficiary will be expected to quantity [via multiple regression analysis] the impact of Petitioner adding amenities and services to its properties. Specifically, what would the price Petitioner would be able to charge if washers and dryers were located in the individual unit, and would the expected price point differ among varying age brackets? Only through multiple regression analysis can the answer to questions like this be ascertained.
>
> …
>
> Since all real estate is a function of space, Beneficiary will utilize Geographically Weighted Regression (GWR) [after applying the ordinary lease squares models (OLS)] to examine more than one independent variable. For instance, in the position of Residential Market Research Analyst, Beneficiary will use the percent of income paid per month toward housing costs as the dependent variable, while the independent variables will be employment status, overcrowding rate and median disposable income. Applying GWR, it is expected that the primacy of one of the three independent variables can be determined. This result will permit Petitioner's firm to market its offerings to those groups likely to be most receptive to Petitioner's products (residential housing).
>
> …

[By applying the Population Identity, $Pop_t = Pop_{t-1}$ (1 + Birth Rate – Death Rate) + Net Migration $\rightarrow$ Net Migration = $Pop_t – Pop_{t-1}$ (1 + Birth Rate – Death Rate)], Beneficiary should be able to discern the primary reasons behind positive or negative net immigration. If Petitioner's firm understands the reasons for migration to a specific area, the firm will be able to develop and/or market its offerings to those residents.

…

[In applying three distinct techniques of multivariate analysis – specifically, Principal Component Analysis, Factor Analysis and Discriminant Analysis – to ascertain any underlying patterns in the housing market], Beneficiary will analyze different variables (percent of housing stock subject to rent-regulations, percent of residents speaking Greek, total number of residential units, net migration, etc.) that may affect the housing market in that area.

…

The hedonic model [the Hedonic Price Method or hedonic regression] is highly   relevant to Petitioner's firm since its methodology controls for the characteristics of properties, thereby allowing the analyst (Beneficiary) to distinguish the specific impact of the discrete variables, such as the number of bedrooms per unit or the size of the windows, from actual property appreciation.

…

By applying HPM [the Hedonic Price Method, through the use of a hedonic price function such as $P = f$(LOC, TYPE, SIZE, VIEW, NEIGH)], Beneficiary can extract those qualities highly desired by prospective tenants. Petitioner can then utilize this information to either invest in acquiring these properties with these qualities or merely adjust current prices to more efficiently match market demand.

Exhibit "E," pp. 31-37.

200.     In further support of beneficiary's academic degree lining up with the proffered

position, two tables were presented. These tables separated the job duties performed by beneficiary

in other capacities, the practical experience derived from said job duties and the specific courses

completed by beneficiary and which can be corroborated by a review of beneficiary's certified, translated transcript. An excerpt from the table which fleshes out the relationship between beneficiary's specific academic coursework and the tasks this coursework allowed him to perform, is presented below:

| Job Duty | Practical Experience | Applicable Academic Coursework | Percentage of Time Devoted to Each Job Duty |
|----------|---------------------|-------------------------------|---------------------------------------------|
| Providing research and analysis of existing data | Collecting and conducted statistical modeling on tourism demographics, preferences, needs, and vacation and leisure habits to identify potential markets and factors affecting product demand. Prepare reports of findings, illustrating data graphically and translating complex findings into written text. | MATHEMATICS I, INTRODUCTION TO INFORMATICS, BUSINESS ECONOMICS AND ACCOUNTING, ECONOMETRICS, APPLIED STATISTICS, STANDARDS OF PRODUCTIVE ACTIVIES PLANNING, APPLIED ECONOMETRICS, SPATIAL ANALYSIS OF SERVICES, INFORMATICS & ECONOMY | 71 |

Exhibit "E," p. 43.

201.    It has been, and is, at all times asserted, that the application demonstrated in precise detail how the "proffered position requires a precise and specific course of study that relates directly and closely to the position in question."

202.    At all times where the degree requirement for the position was mentioned, it was unambiguous that *only* a degree in economics would be considered when seeking to fill the prospective position.

203.    At all times, plaintiff sought to hire a residential market research analyst who had a bachelor's degree in economics and only economics. Moreover, plaintiff also required that the economics degree emphasized quantitative skills.

204.    In support of this, plaintiff directs this Court to the position requirements in all five of the advertisements which defendant USCIS failed to adequately read. The job advertisements

uniformly state:  College graduate in Economics (with emphasis on quantitative skills).  Exhibit "E," pp. 91-101.

### 3.   Letters or Affidavits From Firms or Individuals in the Industry

205.    Where the issue is the existence of a common degree requirement, letters or affidavits from firms or individuals in the industry are considered in rendering a decision with respect to whether or not the criteria in the first prong of 8 C.F.R. § 214.2(h)(4)(iii)(A)(2) are satisfied.  Shanti, Inc. v. Reno, 36 F.Supp.2d 1151 at 165 quoting Hird/Blaker Corp. v. Sava, 712 F. Supp. 1095 at 1102.

206.    As discussed, *supra*, the only evidence reviewed by defendant USCIS prior to the position evaluation letters were the job advertisements erroneously considered to be for positions with other companies.  Since this failure caused these letters to be dismissed, it is apparent and evident that defendant USCIS *could not* rely on upon the letters of Dr. Grayson and Dr. Smith for their analyses that (i) based on a complete review of beneficiary's translated transcript, beneficiary's specific concentration within the field of economics was in quantitative analysis and (ii) the necessity of not just any degree in economics, but one in which an individual has proven himself capable, through rigorous coursework and professional, academic instruction, of applying the theoretical, and highly quantitative formulae that provide the knowledge to perform the specific duties required by plaintiff.

207.    The only mention of the aforementioned expert letters was on page five of the decision of defendant USCIS, where the findings were summarily discarded due to, in the opinion of defendant USCIS, them not being "in accord with other information or [is] in any way questionable."  Exhibit "F," p.5.

208.    Though the reviewing officer of defendant USCIS discarded the expert opinion letters without apparently reading them, plaintiff will review these letters here for the purposes of clarity.

209.    Dr. Grayson's discarded letter emphasized the importance of quantitative skills when carrying out the precise duties specified by plaintiff for the proffered position.  Dr. Grayson unambiguously stated that in his four decades of advising firms similar to plaintiff's with respect to size, revenues and focus on rental properties, he has always emphasized that the "candidate be capable of performing regression and multivariate analysis, among other advanced economic calculations."  Exhibit "E," p.143.

210.    Based on his expertise, Dr. Grayson wrote that "a candidate for the position of 'Market Research Analyst' must possess a bachelor's degree in economics as a minimum for entry into this position.  However, *not all economic degrees are created equal*."  (emphasis in original). Exhibit "E," p.143.

211.    Dr. Grayson's experience consists of reviewing transcripts of applicants for the position of Market Research Analyst to determine whether their "coursework completed in obtaining that degree will be applicable to the duties" of the position.  In doing so, Dr. Grayson observed "many individuals with bachelor's degrees in economics whose transcripts did not demonstrate they had acquired the necessary quantitative background – advanced courses in econometrics, statistics, etc. – to carry out the functions of the Market Research Analyst position." Exhibit "E," p.143.

212.    Dr. Grayson's letter in support of petitioner's application emphasized again that in order to carry out the duties specified by petitioner for the position of Market Research Analyst,

the "applicant *must* possess a bachelor's degree in economics, with an emphasis on quantitative analysis and methodologies." (emphasis in original). Exhibit "E," p.144.

213. Dr. Smith likewise highlighted the "strong quantitative and analytical skills" a residential market research analyst would be required to possess. Exhibit "E," p.154.

214. In evaluating how the different types of analysis set forth in the Response, such as spatial economic analysis, population trend analysis and the hedonic price method, would be utilized in plaintiff's organization, Dr. Smith stated that although these concepts:

> are economic in nature, not every individual who graduated with a bachelor's degree in economics is exposed to and instructed in their application. This depends on whether the student has chosen to enroll in economic courses which are quantitative in nature and intellectually rigorous.

Exhibit "E," p.155.

215. According to Dr. Smith:

> Merely because an individual obtains a bachelor's degree in economics does not mean that person will be able to carry out the aforementioned functions [microeconomic analysis, macroeconomic analysis, regression analysis, spatial economic analysis, population trend analysis, multivariate analysis, sentiment analysis and hedonic price method]. In logical terms, a bachelor's degree in economics is *necessary, but not sufficient* to conducting the duties listed under research and analysis.

Exhibit "E," p.155 (emphasis in original).

216. Concluding his assessment, Dr. Smith renders his expert opinion that beneficiary's "transcript indicates he has the skillset to apply the theoretical principles of economics to the residential real estate market and fulfill the specific duties required" by plaintiff's organization in the position of Residential Market Research Analyst. Exhibit "E," p.155.

217.    Situations where defendant USCIS has evaluated the contents of expert letters provide guidance as to what criteria are used in order to establish their merit.  However, these criteria cannot be found in precedential AAO decisions or published court decisions.

218.    Therefore, plaintiff resorts to the questions posed by defendant USCIS in unpublished AAO decisions, while acknowledging such decisions are not binding upon defendant USCIS or any court.

219.    For instance, USCIS examines whether the expert opinion letter discusses the duties of the position in substantive detail and whether or not the letter has analyzed those duties.  USCIS also reviews any expert letter to determine the evidence upon which the expert has opined.  For example, did the expert review *all* of the materials received by USCIS or only a portion of them, thereby not possessing a complete picture of the beneficiary's duties and the position in question?  Additionally, USCIS looks to see if the expert has any familiarity with the type of work product beneficiary would create for the plaintiff.  Matter of [name not provided], CSC (AAO, Feb. 18, 2014), annexed hereto as Exhibit "J."

220.    Dr. Grayson states that his assessment was based on a thorough examination of the:

> initial I-129 Application, Petitioner's response to the Request for Evidence from USCIS, Beneficiary's resume, Letters of Recommendation, Beneficiary's Certified Translated Transcript and Diploma, the evaluations conducted by the Foundation for International Services, Inc. and the job advertisements which Petitioner used to locate an individual with the skills and abilities needed to fill this position.

Exhibit "E," p.155.

221.    Dr. Smith's analysis, while prepared for the purpose of evaluating whether the criteria at 8 C.F.R. § 214.2(h)(4)(iii)(A)(4) had been fulfilled, provides insight regarding the first prong of 8 C.F.R. § 214.2(h)(4)(iii)(A)(2) as well.  This assessment was based on the duties of the

position as expressed in the Response to the Request for Evidence, the data sources cited therein along with the transcript of beneficiary, among other documentation which were supplied to him by the plaintiff.  Exhibit "E," pp.153-154.

222.    Dr. Grayson further asserted that he has advised residential real estate firms with respect to the hiring for the position of market research analyst.  Dr. Grayson emphasized that these companies are:

> located in organizations that are similar to the petitioner (6801 Realty Co., LLC)" in that the residential real estate firms I have worked with share similar characteristics to 6801 Realty Co., LLC. This includes their size, revenues and focus on rental properties.

Exhibit "E," p. 144.

223.    Dr. Grayson's letter reiterates his experience evaluating applicants and hiring practices for the position of market research analyst, as he has performed such tasks for "residential real estate firms similar in size and scope to Petitioner's."  Exhibit "E," p. 144.

224.    Dr. Smith's analysis was slightly different in scope than Dr. Grayson's, since Dr. Smith focused largely on the duties to be performed with plaintiff's company and whether those duties, in themselves, were "so specialized and complex that knowledge required to perform the duties is usually associated with the attainment of a baccalaureate or higher degree."  Exhibit "E," p. 155.

225.    Dr. Grayson emphasized that in hiring a market research analyst, "primary emphasis must be placed on the candidate's ability to select and interpret large data sets by applying economic techniques and quantitative analysis."  Exhibit "E," p. 143.

226.    While this may begin with applying basic economic principles such as elasticity, it must also require "performing regression and multivariate analysis, among other advanced economic calculations."  Exhibit "E," p. 143.

227. Dr. Grayson did not merely review the academic qualifications of beneficiary in his letter. He expounded on the relevancy of the academic coursework of beneficiary to the position of market research analyst. Specifically, Dr. Grayson stated that calculus, modeling and statistical analysis are essential to the duties of the position in question. Where an individual obtains a degree in economics where a focus is placed on quantitative analysis, that individual will be exposed to:

> The use of economic theories, the application of rigorous thinking and how it clarifies previously opaque phenomena to previously opaque phenomena to provide real-world insights with respect to the actions of various parties. In the course of a student's curriculum, he or she will obtain the prerequisite tools for bringing economic principles, analytical methods, and quantitative skills to bear on problems in diverse contests, such as regional development and industry-specific analysis (e.g., "Urban Housing Markets in Los Angeles").

Exhibit "E," p. 144.

228. Dr. Grayson's evaluation also included reviewing the:

> raw, unfiltered data sets (including but not limited to aggregated demographic data indicating housing expenditures as a percent of gross income and percent of households where total occupancy exceeds applicable limits) which Beneficiary will analyze.

Exhibit "E," p. 145.

229. While Dr. Grayson did indeed recite the job duties of beneficiary, he emphasized that these duties "require a theoretical understanding of economics." The economic concepts beneficiary has learned will be directly applied to the practical concerns of plaintiff, such as locating areas of residential growth and ascertaining the true value of potential acquisitions. Exhibit "E," pp. 143, 145.

230. Dr. Smith reviewed and analyzed all of the duties listed by plaintiff in the application. Exhibit "E," pp. 154-156.

231. For the duty entitled, "Gathering Market Specific Information," Dr. Smith stated that he actually simulated the performance of the duties that were proposed for beneficiary, "in order to fully grasp what [plaintiff] was to ask of" beneficiary. Exhibit "E," p.155. In so doing, Dr. Smith downloaded and reviewed "statistics from the United States Census Bureau, Fair Market Rents Data Sets, New York City Population Projections and HPD [New York City Department of Housing, Preservation and Development] Data Downloads, among other categories," all of which were listed in the application as data sources which beneficiary would utilize. Exhibit "E," pp. 27-28, 155.

232. For the duty entitled, "Identify geographical areas lacking in residential rental properties," Dr. Smith reviewed the Geographic Research Data contained in the table of the same name within the application. Exhibit "E," pp. 29-30, 155.

233. These data sources included "New York population projection by age and sex: County Projections 2005-2035 Model description," published by the Program on Applied Demographics, Cornell University along with the New York City Housing and Vacancy Survey, published by the NYC HPD. Exhibit "E," pp. 29-30, 155.

234. Dr. Smith opined that this data would apprise plaintiff regarding the optimal geographic areas with respect to plaintiff's operations. Exhibit "E," p.155.

235. For the duty entitled, "Providing research and analysis of existing data," Dr. Smith reviewed the Response, which included the application of spatial economic analysis, population trend analysis and multiple regression analysis. Exhibit "E," p.156.

236. Dr. Smith stated that "[U]tilizing economic concepts such as regression analysis, spatial economic analysis, population trend analysis and sentiment analysis in order to provide valuable information into the residential real estate market are theoretically challenging exercises"

which necessitate "the use of complex equations and formulas which are difficult for one to learn via self-study or on-the-job training." Exhibit "E," p.156.

237. With regards to his review of the job duty, "Prepare mid-quarterly and quarterly reports," Dr. Smith opined that this function is essentially a bridge between "distill[ing] the raw figures into something which decision makers can use to implement their goals (e.g., to increase market share, reach quarterly targets for profit percentage, etc.)." Exhibit "E," p.156.

238. It was also stressed by Dr. Smith that the market research analyst must be capable of "discerning the most significant findings from the research and analysis." Exhibit "E," p.156.

239. Lastly, Dr. Smith looked at the job duty labeled "Devise marketing expansion strategies." Exhibit "E," p.157. Dr. Smith stated that this duty could only be successful once the previously established job duties were successfully performed. Any marketing strategy, according to Dr. Smith, had to be based on a solid foundation, such as consistent demand from a particular demographic group in order for resources to be utilized in the most efficient manner. Exhibit "E," p.157.

240. Dr. Smith discussed the relevancy of the coursework beneficiary completed. When advising companies like plaintiff's who are seeking to employ a market research analyst, Dr. Smith reviews "a candidate's academic transcript to determine they possess the skillset required to perform the duties of the position." Exhibit "E," p.154.

241. Dr. Smith asserted that "[W]ith a degree in economics as demonstrated by his completed coursework, [beneficiary] is able to add empirical content analysis to the observation of market phenomena," which is especially vital to the residential real estate market. Individuals with a bachelor's degree in economics can "add the following to an analysis of data points: Multivariate Analysis, Regression Analysis, Variance Analysis, Means Testing, Significance

Testing, Sampling Techniques, Least Squares Analysis, [and] Quantitative Sample Analysis."
Exhibit "E," p.154.

242.    Dr. Smith stated:

> merely because an individual obtains a bachelor's degree in economics does not mean that person will be able to carry out the aforementioned functions [pp. 26-40]. In logical terms, a bachelor's degree in economics is *necessary, but not sufficient* to conducting the duties listed/

Exhibit "E," p.156 (emphasis in original).

### 4. Misplaced Reliance on Matter of Michael Hertz Associates

243.    In the analysis performed with respect to the first prong of 8 C.F.R. § 214.2(h)(4)(iii)(A)(2), defendant USCIS relies upon Matter of Michael Hertz Associates, 19 I&N Dec. 558 (Comm. 1988), for the conclusion that:

> Since there must be a close correlation between the required specialized studies and the position, the requirement of a degree with a generalized title, such as Economics, without further specification, does not establish the position as a specialty occupation.

Exhibit "F," p.5.

244.    While it is the argument of plaintiff that (i) a "close correlation between the required specialized studies and the position" was in fact demonstrated and (ii) "further specification" as to the type of degree in Economics required by the person who would fill the position was provided, it is also apparent that defendant USCIS has not adequately applied the holding of Matter of Michael Hertz Associates.

245.    In the Matter of Michael Hertz Associates, the INS stated:

> Since there must be a close corollary between the required specialized studies and the position, the requirement of a degree of generalized title, such as business administration or liberal arts,

without further specification, does not establish eligibility.  The mere requirement of a college degree for the sake of general education, or to obtain what an employer perceives to be a higher, caliber employee, also does not establish eligibility.

Exhibit "L," <u>Matter of Michael Hertz Associates</u>, p.2, annexed hereto.

246.    In <u>Matter of Michael Hertz Associates</u>, INS referred to "business administration" or "liberal arts" as degrees with generalized titles.  Exhibit "L."

247.    At the time of the decision in <u>Matter of Michael Hertz Associates</u>, INS had already established "Business administration" as a general term, which included professional and nonprofessional activities.  <u>Matter of Ling</u>, 13 I&N Dec. 35 (R.C. 1968). ("It is evident that while a person may have a degree in business administration, such degree may qualify him for some but not all of the occupations included in the broad field of business administration."   Exhibit "M," p.3, annexed hereto.

248.    Therefore, "business administration," as recited repetitively in <u>Matter of Michael Hertz Associates</u>, was never considered to be a specific field of study in the sense that accounting would be.

249.    This interpretation of <u>Matter of Michael Hertz Associates</u> is supported by its statement that "the requirement of a degree of generalized title, such as business administration or liberal arts, without further specification, does not establish eligibility" for a specialty occupation. Exhibit "L," p.2.

250.    When referring to a degree in liberal arts, it is understood that multiple disciplines or degrees are subsumed under its mantle.

251.    Historically speaking, liberal arts are those subjects or skills that in classical antiquity were considered essential for a free person (Latin: liberal, "worthy of a free person") to

know in order to take an active part in civic life. Ernst Robert Curtius, <u>European Literature and the Latin Middle Ages</u> 37 Trans. Willard R. Trask (1973).[3]

252.    In practical and modern parlance, liberal arts (or alternatively, "liberal arts and sciences") refers to those disciplines spanning the humanities, arts, social sciences and sciences. Debra Humphreys & Patrick Kelly, *How Liberal Arts and Sciences Majors Fare in Employment: A Report on Earnings and Long-Term Career Paths*, Association of American Colleges & Universities, Jan. 22, 2014 available at http://www.gru.edu/provost/documents/38-how_liberal_arts_and_science_majors_fare_in_employment.pdf (last visited October 2, 2015).

253.    It should be clear then that when deciding <u>Matter of Michael Hertz Associates</u>, by including the phrase "without further specification" following "liberal arts," the INS was stating that if an employer merely claims a specialty occupation position need only be filled by an individual who possesses a degree in the "liberal arts," such an admission would not demonstrate the position is a bona fide specialty occupation. ("The mere requirement of a college degree for the sake of general education, or to obtain what an employer perceives to be a higher, caliber employee, also does not establish eligibility."). Exhibit "L," p.2.

254.    In other words, <u>Matter of Michael Hertz Associates</u> made the distinction between specialty occupation positions which employers claimed could be filled by persons holding a college degree in "liberal arts" and specialty occupation positions where employers were specific in requiring a degree in *one* of the liberal arts, such as economics, biology or mathematics.

255.    Plaintiff expected that defendant USCIS would rely on the rote invocation of the incorrect interpretation of <u>Matter of Michael Hertz Associates</u> and the "without more" language from <u>Royal Siam Corp. v. Chertoff</u>, 484 F.3d 139 at 147.

---

[3] The classical sources include Cicero, De Oratore, I.72–73, III.127, and De re publica, I.30.

256. This is why the application and supporting materials stressed that merely having a baccalaureate degree in economics was <u>never</u> considered sufficient for filling this position and how the quantitative requirements of the position demanded an individual whose degree in economics had an emphasis on quantitative analysis. Indeed, the job advertisements contained this specification as well.

5. Conclusion

257. At all times, the application emphasized that the "job requirements enumerated [for the position] demand[ed] someone with strong quantitative skills and academic experience applying economic theories and formulas to tangible issues." Exhibit "E," p.50.

258. Plaintiff's Response stated that beneficiary had been selected because beneficiary would be capable of applying econometric and statistical techniques in order to "identify patterns, trends, causality, correlations and other significant factors which will advance the objectives of Petitioner's organization." Exhibit "E," p.50.

259. Throughout the Response, plaintiff asserted that beneficiary's quantitative skills, obtained as a direct result of beneficiary's academic coursework, was the reason beneficiary was selected for this position.

260. The Response carefully reviewed the legal criteria necessary to satisfy the first prong of 8 C.F.R. § 214.2(h)(4)(iii)(A)(2) ("Beneficiary possesses a degree in economics, a social science. Where a minimum entry requirement for a position may be the attainment of a degree in more than a singular field of study, the Petitioner must establish a close correlation between Beneficiary's 'body of highly specialized knowledge' possessed and the position. 8 C.F.R. § 214.2(h)(4)(ii)."). Exhibit "E," p.50.

261.     It was expected that upon a review of the submitted evidence, defendant USCIS would have concurred with petitioner "that it is not just *any* degree in economics that should satisfy the criteria set forth in the job duties.  More specifically, the job requirements enumerated demand someone with strong quantitative skills and academic experience applying economic theories and formulas to tangible issues."  Exhibit "E," p.50 (emphasis in original).

262.     Through its Decision finding that the first prong of 8 C.F.R. § 214.2(h)(4)(iii)(A)(2) was not satisfied with respect to the position at issue, defendant USCIS' actions were arbitrary and capricious.  5 U.S.C. § 706(2)(A).

263.     It is not plaintiff's position that this Court's review of defendant USCIS' determination should be anything but deferential.  Baiju v. United States Department of Labor, Civil Action No. 12-5610 (E.D.N.Y. Jan. 31, 2014) ("This deferential standard of review does not permit the Court to substitute its judgment for that of the agency.") (citations omitted).

264.     It is however plaintiff's position that defendant USCIS did not establish any nexus between its findings and the evidence contained in the record.  Baiju ("As long as the agency examines the relevant data and has set out a satisfactory explanation including a rational connection between the facts found and the choice made, a reviewing court will uphold the agency action.") (citations and quotations omitted).

265.     It is evident that based on the administrative record before defendant USCIS at the time its decision was made, defendant USCIS failed to consider the pertinent evidence, did not examine the relevant factors and failed to articulate "a satisfactory explanation for its action including whether there is a 'rational connection between the facts found and the choice made.'" J. Andrew Lange, Inc. v. FAA, 208 F.3d 389, 391 (2d Cir. 2000) quoting Burlington Truck Lines, Inc. v. United States, 371 U.S. 156, 168, 83 S.Ct. 239, 9 L.Ed.2d 207 (1962); Coburn v. McHugh,

679 F.3d 924, 926 (D.C. Cir. 2012) ("an agency decision is owed no deference if it fails to give a reason that a court can measure. . . against the 'arbitrary or capricious' standard of the APA.") (citations omitted); <u>Tripoli Rocketry Ass'n, Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives</u>, 437 F.3d 75, 77 (D.C. Cir. 2006) (explaining that "no deference" is owed to an agency's "purported expertise" where its explanation "lacks any coherence").

266. The administrative record must show that defendant USCIS "considered the relevant factors and explained the facts and policy concerns on which it relied, and [that] those facts have some basis in the record." <u>Larry Grant Const. v. Mills</u>, 956 F.Supp. 2d 93, 98 (D.C. 2013). As defendant USCIS evidently did not consider the relevant factors which were presented and/or misread or failed to read the evidence before it, the conclusion that petitioner failed to satisfy the first prong of 8 C.F.R. § 214.2(h)(4)(iii)(A)(2).

267. Prior to concluding that an agency's decision was arbitrary and capricious, "a court must be very confident that the decision maker overlooked something important or seriously erred in appreciating the significance of the evidence." <u>Tengasco, Inc. v. Jewell</u>, Civil Action No. 14-2184 (E.D. La. July 15, 2015).

268. In addition to failing to consider and/or misreading the evidence contained in the record, defendant USCIS applied the incorrect legal criterion where it stated "As explained above, USCIS interprets the degree requirement at 8 C.F.R. § 214.2(h)(4)(iii)(A) to require a degree in a specific specialty that is directly related to the proposed position." Exhibit "F," p.5.

269. Through its decision, defendant USCIS failed to apply the relevant statutory language of "or its equivalent" when determining if the first prong of 8 C.F.R. § 214.2(h)(4)(iii)(A)(2) was satisfied.

270.    In so stating, defendant USCIS overlooks the regulations at 8 C.F.R. §

214.2(h)(4)(ii) which define "specialty occupation" as follows:

> *Specialty occupation* means an occupation which requires
> theoretical and practical application of a body of highly specialized
> knowledge in fields of human endeavor including, but not limited
> to, architecture, engineering, mathematics, physical sciences,
> social sciences, medicine and health, education, business
> specialties, accounting, law, theology, and the arts, and which
> requires the attainment of a bachelor's degree or higher in a
> specific specialty, or its equivalent, as a minimum for entry into
> the occupation in the United States.

(italics in original)

271.    Moreover, Section 214(i) of the Immigration and Nationality Act ("INA") defines

"specialty occupation" as an occupation which requires:

> (A) theoretical and practical application of a body of highly
> specialized knowledge, and
> (B) attainment of a bachelor's or higher degree in the specific
> specialty (or its equivalent) as a minimum for entry into the
> occupation in the United States.

272.    By the inclusion of the word "equivalent" in the applicable statutes, Congress

"recognized that the needs of a specialty occupation can be met even where a specifically tailored

baccalaureate program is not typically available for a given field."  Chung Song Ja Corp. v. US

Citizenship and Immigration Services; Tapis Intern. v. INS, 94 F.Supp.2d 172, 176 (D. Mass.

2000) (rejecting agency interpretation because it would preclude any position from satisfying the

specialty occupation requirements where a specifically tailored degree program is not available).

273.    Though there exists a presumption that an agency's decisions are valid, should it

be demonstrated that a decision is inconsistent with a statutory requirement, a court shall not

uphold such a decision.  Swan View Coalition v. Weber, Civil Action No. 13-129 (D.Mont. Sept.

25, 2014) ("Review of the agency's action is 'highly deferential, presuming the agency action to be valid.'"); <u>Buckingham v. Secy. of U.S. Dept. of Agric.</u>, 603 F.3d 1073, 1080 (9th Cir. 2010).

274.    However, this presumption does not require courts to "rubber stamp" administrative decisions "they deem inconsistent with a statutory mandate or that frustrate the congressional policy underlying a statute." <u>Bureau of Alcohol, Tobacco & Firearms v. F.L.R.A.</u>, 464 U.S. 89, 97 (1983).

275.    For the above-stated reasons, the decision of defendant USCIS that plaintiff did not satisfy the first prong of 8 C.F.R. § 214.2(h)(4)(iii)(A)(2) was arbitrary and capricious and not in accordance with law.  5 U.S.C. § 706(2)(A).

C.    8 C.F.R. § 214.2(h)(4)(iii)(A)(2) (second prong) was satisfied by the petition

276.    The second prong at 8 C.F.R. § 214.2(h)(4)(iii)(A)(2) requires a showing that the particular position is so complex or unique that it can be performed only by an individual with at least a bachelor's degree in a specific specialty, or its equivalent.

277.    Defendant USCIS concluded that this criteria had not been met with the following explanation:  "For reasons already set forth in this decision, the nature of the duties of the proposed position as set forth in this petition does not support such a finding."  Exhibit "F," p.6.

278.    Defendant USCIS continued by claiming that no information was provided "that distinguishes the proposed position from similar market research analyst positions not requiring a four-year degree or its equivalent, based upon its unique nature or complexity."  Exhibit "F," p.6.

279.    To the contrary, the application did include such information, in extensive detail and with particularity.  Instead of reiterating the contents of the application here, plaintiff has reviewed the factors typically examined by defendant USCIS in prior decisions where the AAO

evaluates whether an application has satisfied the second prong of 8 C.F.R. § 214.2(h)(4)(iii)(A)(2).

280.	This includes (i) how an established curriculum of coursework in a specific area, leading to a baccalaureate or higher degree in a specific specialty or its equivalent, is required to perform the duties of the proffered position, (ii) the role of beneficiary in the day-to-day performance of those duties, (iii) proof that the duties of the proposed position are so complex or unique that only an individual with a degree can perform them and (iv) a review of the Labor Condition Application to establish that the wage level is commensurate with the duties and responsibilities claimed for the position.  Matter of [name not provided], VSC (AAO, Jan. 9, 2014), annexed hereto as Exhibit "N," pp. 22-23.

> 1.	Relationship between a degree in a specific specialty, or its equivalent and the day-to-day duties of the position that beneficiary will be required to perform

281.	At all relevant times within the application, the actual duties beneficiary was to perform with plaintiff were directly connected to the curriculum of study completed by beneficiary.  Not only were the specific courses listed with their relevance to the discrete, specific tasks of the position, the position evaluation letters of Dr. Grayson and Dr. Smith, respectively, described how and why the curriculum of such courses "leading to a baccalaureate or higher degree in a specific specialty or its equivalent is required to perform the duties of the proffered position." Exhibit "E," pp. 43-44, 46-53 and Exhibit "N," p. 23.

282.	It is well understood that in seeking approval of an application, a party "cannot rely on general statements when discussing the duties attached to specific employment. When establishing a position as a specialty occupation, a petitioner must describe the specific duties and responsibilities to be performed by a beneficiary in relation to its particular business interests."

Matter of [name not provided], WAC 05 151 54408 (AAO, Feb. 7, 2007), annexed hereto as Exhibit "O," p. 7.

283.    In Matter of [name not provided], WAC 05 151 54408 (AAO, Feb. 7, 2007), the AAO was critical of the circular reasoning applied by petitioner in its efforts to demonstrate that its position of Civil Engineer was a specialty occupation.  Exhibit "O," p.7.

284.    Specifically, although the petitioner construction company stated that its proposed position "'requires a college degree because the position of Civil Engineer requires the knowledge of math, ability to read blueprints, read topography maps, knowledge of building codes, and other knowledge that you acquire while obtaining a Bachelor's degree in Engineering,'" USCIS found these claims were not independently substantiated by the evidence submitted.  Exhibit "O," p.7.

285.    These skills listed by that petitioner were noted to be "common in many endeavors associated with the construction business."  Exhibit "O," p.7.  That decision went on to state that the petitioner therein chose to "describe aspects of various occupations without providing a description of the specific duties included in the proffered position that are directly related to the petitioner's business."  Exhibit "O," p.7.

286.    It was necessary, according to the AAO, to describe "what the individual in the proffered position will face in regard to engineering problems and how the individual will use his education to solve the problems."  Exhibit "O," p.7.

287.    Furthermore, the record in that petition was devoid of any projects of the petitioner nor any explanation as to how petitioner would use the services of beneficiary to carry out said projects.  Exhibit "O," p.7.

288.    The gist of Matter of [name not provided], WAC 05 151 54408 (AAO, Feb. 7, 2007) is that it is clearly insufficient to describe the duties of a specialty occupation without

specific reference to the performance of those duties in the context of the petitioner's business. Exhibit "O."

289.    However, unlike in Matter of [name not provided], WAC 05 151 54408 (AAO, Feb. 7, 2007), where the AAO denied the petition of the civil engineer, the application submitted by plaintiff provided granular details of the discrete tasks beneficiary would perform subsumed within each of the enumerated duties.

290.    The application at issue in this action did not merely state that beneficiary would "gather market specific information" in the position of residential market research analyst.  If that was all that was provided to defendant USCIS, its denial would not have been arbitrary or capricious.

291.    Instead, the application contained fourteen (14) specific data points which are directly related to the business of petitioner in the residential real estate leasing field.  These data points were (i) household population, (ii) household composition, (iii) households born abroad (>50 percent of household members born abroad), (iv) immigrant households, (v) transitioning households, (vi) doubled-up households, (vii) rental housing stock, (viii) variations in rent expenditures, (ix) affordability (rent/income ratio) of rental housing, (x) structural conditions of housing stock, (xi) market saturation (supply/demand analysis), (xii) mortgage status, (xiii) economic conditions of Greek speaking populations and (xiv) satisfaction of Greek speaking populations with living conditions.  Exhibit "E," pp. 27-28 ("Market Specific Research Data Tables").

292.    The hastily discarded position evaluation letter of Dr. Grayson addressed 8 C.F.R. § 214.2(h)(4)(iii)(A)(2) and concluded it had been satisfied.

293.     Dr. Grayson concluded that a degree in the field of economics, "with an emphasis on quantitative analysis and methodologies," for this position of market research analyst, was a necessity.  Exhibit "E," p.145. ([I]t is my expert and professional opinion that to perform the duties of a 'Market Research Analyst," the applicant *must* possess a bachelor's degree in economics, with an emphasis on quantitative analysis and methodologies.") (emphasis in original).

294.     This conclusion was based in part upon his "review of raw, unfiltered data sets (including but not limited to aggregated demographic data indicating housing expenditures as a percent of gross income and percent of households where total occupancy exceeds applicable limits) which Beneficiary will analyze."  Dr. Grayson stated that these data sets were provided to him by plaintiff to ensure the accuracy of his assessment of the position and beneficiary's abilities. Exhibit "E," p.146.

295.     Dr. Grayson emphasized that for candidates with degrees in economics where their transcripts demonstrated "they had acquired the necessary quantitative background – advanced courses in econometrics, statistics, etc. – to carry out the functions of the Market Research Analyst position," the knowledge and skills learned by said individual "goes beyond the introductory concepts of supply and demand" and that "Intermediate courses demonstrate the use of economic theories, the application of rigorous thinking and how it clarifies previously opaque phenomena to provide real-world insights with respect to the actions of various parties."  Exhibit "E," pp. 144, 146.

296.     When a person achieves a degree in economics with coursework such as beneficiary has completed, they will have obtained "the prerequisite tools for bringing economic principles, analytical methods, and quantitative skills to bear on problems in diverse contexts, such as regional

development and industry-specific analysis (e.g., 'Urban Housing Markets in Los Angeles')." Exhibit "E," p.146.

297.    In the Response, plaintiff cited Dr. Grayson's expert opinion that the duties beneficiary would perform "require the theoretical and practical background" that only economics can provide, which includes the knowledge and application of calculus, modeling and statistical analysis.  Exhibit "E," p.51. ("[A] candidate for the position of 'Market Research Analyst [with plaintiff]" must possess a bachelor's degree in economics as a minimum for entry into this position. However, the candidate's academic coursework must 'demonstrate they had acquired the necessary quantitative background – advanced courses in econometrics, statistics, etc. – to carry out the functions of the Market Research Analyst Position.").

298.    Without these foundations, Dr. Grayson stated, the ability of any person to perform the duties required by petitioner would be "severely hindered to the point where the firm might as well hire a candidate with a bachelor's degree in business, accounting or even history."  Exhibit "E," p. 145.

299.    Unlike defendant USCIS, Dr. Grayson reviewed the data sources cited in the Response in the table entitled "Market Specific Research Data."  Exhibit "E," pp. 27-28.

300.    The column headings included Data Type, Specific Data Point(s), Data Point Subsets and Data Sources.  Exhibit "E," pp. 27-28.

301.    This two page table was included under the job duty "Gathering Market Specific Information."  The description of this job duty described how beneficiary would utilize his skills and abilities to review the data listed therein "in furtherance of Petitioner's business objectives."  Exhibit "E," p. 26.

302.     In emphasizing the necessity of beneficiary's background to be able to perform the duties required by this position, Dr. Grayson delved into the particular day-to-day tasks which beneficiary would perform.  Specifically, he stated he had reviewed the "raw, unfiltered data sets" listed in the Market Specific Research Data table included in the application.  Exhibit "E," p.146.

303.     Dr. Grayson stated that his thorough review included the data point entitled "housing expenditures as a percent of gross income."  Exhibit "E," p.146.

304.     This can be located on the Market Specific Research Data table in the second column, "Specific Data Point(s)" and ninth row, "Affordability (rent/income ratio) of Rental Housing."  The "Data Point Subsets" that would be extracted from the "Specific Data Point(s)" of "Affordability (rent/income ratio) of Rental Housing" were the median gross rent to income ratio in Kings and Queens County and the median rent to income ratio amount households of varying income levels.  Exhibit "E," p. 26.

305.     The "Data Sources" for these subset data points were the Fair Market Rents Data Sets and the Housing Affordability Data System ("HADS"), both assembled and published by the United States Department of Housing and Urban Development.  Exhibit "E," p. 27.

306.     Dr. Grayson's hastily disregarded opinion also stated he examined the data set "percent of households where total occupancy exceeds applicable limits."  Exhibit "E," p.146.

307.     These data points are identified in the Market Specific Research Data table as "Number of households where occupancy levels were two hundred percent of capacity," "Variation of doubled-up households by age" and "Variation of doubled-up households by income distribution."  Exhibit "E," p. 26.

308.     The "Data Sources" for these Data Point Subsets were the American Community Survey ("ACS"), published by the United States Census Bureau, the New York City Housing and

Vacancy Survey, published by the New York City Department of Housing Preservation and Development ("HPD") and the Center for Urban Research, a part of The Graduate Center of the City University of New York ("CUNY").  Exhibit "E," p.26.

309.    Overall, having reviewed the duties of the position, independently assessing the data sources and scrutinizing the duties of the proffered position, Dr. Grayson declared "it is my professional and expert judgment that this particular position of Residential Market Research Analyst with [plaintiff] can only be performed by an individual with a degree in economics." Exhibit "E," p.145.

310.    In the subsequent paragraph, Dr. Grayson professed that an applicant for this position "*must* possess a bachelor's degree in economics, with an emphasis on quantitative analysis and methodologies."  Exhibit "E," p.145 (emphasis in original).

311.    While a more complete analysis of Dr. Smith's findings can be found in other areas of this Complaint, here the focus will be on his determinations with respect to the second prong of 8 C.F.R. § 214.2(h)(4)(iii)(A)(2).

312.    Dr. Smith's evaluation of the position states that, consistent with his expertise in economics, as evidenced by his Ph.D. in Economics from the University of Chicago, he "reviewed the manner in which these particular techniques [microeconomic analysis, macroeconomic analysis, regression analysis, spatial economic analysis, population trend analysis, multivariate analysis, sentiment analysis and hedonic price method] are to be applied to the residential real estate market for the benefit of [plaintiff]."  Exhibit "E," p.156.

313.    Plaintiff's Response was meticulous in describing not just what general or hypothetical duties beneficiary would perform, but what specifically those duties would entail. For instance, primary data sources were enumerated in the Market Specific Research Data tables.

The data points that would be obtained from these sources were further identified. Exhibit "E," pp. 27-28.

314.     With regards to focusing on specific geographic areas lacking in residential properties, the Response stated beneficiary would examine the "Specific Data Point(s)" specified in the table entitled "Geographic Research Data." Exhibit "E," pp. 29-30.

315.     These data points included spatial variation of age distribution, level of educational attainment, vacant rental units, spatial distribution of unavailable vacant units, income distribution by neighborhood and housing satisfaction level by neighborhood. Exhibit "E," p. 29.

316.     The Data Point Subsets which corresponded with the specific data points focused on, among other points, the number of individuals between the ages of thirty-five (35) and sixty-four (64) in Kings and Queen County, the percentage of individuals with a college degree in Kings and Queen County, the percent and number of rental units priced at 30% and 80%, respectively, of area median income in Kings and Queens County. Exhibit "E," p. 29.

317.     The above-referenced data point subsets and specific data points were listed as being located within data sources including, but not limited to the "New York population projection by age and sex: County Projections 2005-2035 Model description," published by the Program on Applied Demographics at Cornell University, the New York City Housing and Vacancy Survey, published by the New York City Department of Housing Preservation and Development, the American Housing Survey Housing Affordability Data System (HADS) and BehaviorBank, published by Experian. Exhibit "E," p. 29.

318.     Under the third job duty of "Providing research and analysis of existing data," eight different types of analysis were described with how they would be applied to plaintiff's business. Exhibit "E," pp. 31-37.

319.     For "microeconomic analysis," it was explained that beneficiary would examine demand for residential housing units when the price increases and assess whether the loss of revenue from the expected decline in demand is offset by the higher price charged. In economics, this is referred to as elasticity of demand. Exhibit "E," pp.31-32.

320.     For "macroeconomic analysis", it was described how market-wide determinants of real estate demand and supply would be examined by beneficiary. For instance, the Response stated that beneficiary seek to measuring proxies of changes in demand, most of which are absorption measures. Properly used proxies of marginal changes in space demand include gross absorption, net absorption, and average or normal absorption. Multiple formulas were provided which demonstrated how these calculations would be performed. Exhibit "E," p.32.

321.     Regression analysis was stated as a part of the third job duty. As regressions are used to quantify the relationship between variables, the Response made clear that beneficiary would be expected to quantify the impact of plaintiff adding amenities and services to its properties. Particularly, what price could plaintiff charge if extra amenities were provided, and would this extra amount differ among tenants in varying age brackets. Exhibit "E," p.33.

322.     Spatial economic analysis, beginning with the ordinary least squares models (OLS), would provide petitioner with the appropriate amount to pay for a given property that would be used for residential real estate. Subordinated within spatial economic analysis, the Response cited the use of Geographically Weighted Regression (GWR) to examine more than one independent variable. Exhibit "E," pp.33-34.

323.     For instance, in the position of Residential Market Research Analyst, beneficiary would use the percent of income paid per month toward housing costs as the dependent variable, while independent variables will be employment status, overcrowding rate and median disposable

income.  The application of GWR by beneficiary would determine which of the three independent variables was strongest.  This result would permit plaintiff to market its offerings to those groups likely to be most receptive to plaintiff's rental properties.  Exhibit "E," pp. 33-34.

324.    Population trend analysis – including internal growth, net migration, etc. – was emphasized as a tool to be applied by beneficiary to discern the primary reasons driving any change in population.  From here, beneficiary would be able to advise on how the firm could develop and market its properties to prospective residents.  Exhibit "E," pp. 34-35.

325.    The application of multivariate analysis by beneficiary was explained in section f. This technique analyzes different variables, such as percent of housing stock subject to rent-regulations, and total number of residential units, that may affect the housing market in that area. Then, three distinct multivariate statistical techniques were described along with how they would be utilized in the position.  Exhibit "E," p. 34.

326.    Sentiment analysis, which refers to the use of textual analysis and natural language processing to identify and extract subjective information from source materials, was also discussed.  For this technique, it was stated that beneficiary would review Greek language publications to ascertain the attitude (or sentiment) of the speakers or writers on a given topic. These topics would include economic and housing conditions within the Greek-speaking communities in the New York City area.  Based upon the findings made by beneficiary, petitioner would then be able to decide where to invest in marketing and advertisements.  Exhibit "E," p. 36.

327.    Finally, the hedonic price method (HPM) or hedonic regression, would be applied to estimate the value of the characteristics of a commodity that indirectly affect its market price. In this instance, that commodity is the rental residential real estate of petitioner's firm.  HPM

measures the relative importance of the independent, explanatory variables through the use of regression analysis. Exhibit "E," pp. 36-37.

328. The hedonic model allows for the control of the characteristics of properties, thereby allowing beneficiary to distinguish the specific impact of the discrete variables, such as the number of bedrooms per unit or the size of the windows, from actual property appreciation. Exhibit "E," pp. 36-37.

329. Dr. Smith asserts that being capable of understanding and apply the duties of this particular position as a residential market research analyst are "theoretically challenging exercises" which "require the use of complex equations and formulas which are difficult for one to learn via self-study or on-the-job training," thereby concluding that such skills and abilities can exclusively be comprehended through a university setting, and more particularly, a baccalaureate degree in economics with an emphasis on quantitative analysis. Exhibit "E," p. 156.

330. In the Response, it was stated how beneficiary would have used these formulas on a day-to-day basis to carry out the duties necessary for plaintiff's business.

331. Dr. Smith reviewed the following formulas as set forth in the Response in assessing the duties of this position:

      i.     Elasticity of Supply/Demand

$$\varepsilon_s = \frac{\Delta Q/Q}{\Delta P/P} \frac{[\text{percentage change in quantity supplied}]}{[\text{percentage change in property price}]}$$

$$\varepsilon_D = \frac{\Delta Q/Q}{\Delta P/P} \frac{[\text{percentage change in quantity demanded}]}{[\text{percentage change in price}]}$$

$$|\varepsilon_D| > 1 \quad [\text{demand is price elastic}]$$
$$|\varepsilon_D| = 1 \quad [\text{demand is unit elastic}]$$
$$|\varepsilon_D| < 1 \quad [\text{demand is price inelastic}]$$

    ii.      Linear Regression

Y' = a + bX

| | | |
|---|---|---|
| Y' | = | predicted value of Y (which is the dependent variable) |
| a | = | the value of Y when X is equal to zero (also called "Y Intercept") |
| b | = | the change in Y for each 1 increment change in X |
| X | = | an X score on the first independent variable for which a value of Y is to be predicted |

    iii.      Multiple Regression

$Y' = a + b_1 X_1 + b_2 X_2,$

| | | |
|---|---|---|
| Y' | = | predicted value of Y (which is the dependent variable) |
| a | = | the value of Y when X is equal to zero (also called "Y Intercept") |
| $b_1$ | = | the change in Y for each 1 increment change in $X_1$ |
| $b_2$ | = | the change in Y for each 1 increment change in $X_2$ |
| $X_1$ | = | an X score on the first independent variable for which a value of Y is to be predicted |
| $X_2$ | = | an X score on the second independent variable for which a value of Y is to be predicted |

    iv.      Ordinary Least Squares (OLS)



Sum squared error $\sum_i (X_i^\top w - y_i)^2$

v. **Geographically Weighted Regression (GWR)**

$$y_i(\mathbf{u}) = \beta_{0i}(\mathbf{u}) + \beta_{1i}(\mathbf{u})x_{1i} + \beta_{2i}(\mathbf{u})x_{2i} + \dots + \beta_{mi}(\mathbf{u})x_{mi}$$

$\beta_{0i}(\mathbf{u})$ indicates that the parameter (or coefficient) describes a relationship around the location, **u**, and is specific to that location.

vi. **Population Trend Analysis**

$Pop_t = Pop_{t-1}\ (1 + Birth\ Rate - Death\ Rate) + Net\ Migration$
➔ $Net\ Migration = Pop_t - Pop_{t-1}\ (1 + Birth\ Rate - Death\ Rate)$

vii. **Principal Component Analysis (type of Multivariate Analysis)**

$$COV(\bar{X}_1, \bar{X}_2) \equiv \frac{\sum_{i=1}^{m}(X_{1i} - \bar{X}_1)(X_{2i} - \bar{X}_2)}{m}$$

| COV | = | covariant |
|-----|---|-----------|
| $\overline{X}$ | = | mean of $\overline{X}$ |
| $m$ | = | number of points in each variable (the number of samples in each variable) |

viii. **Hedonic Price Method (Hedonic Regression)**

$P = f(LOC, TYPE, SIZE, VIEW, NEIGH)$

| $P$ | = | price of the rental unit |
|-----|---|--------------------------|

| LOC | = | location/proximity to the nearest urban core |
| TYPE | = | type of rental unit |
| SIZE | = | square footage of the unit |
| VIEW | = | quality of view from various windows |
| NEIGH | = | prevalence of crime, quality of local schools and frequency of MTA bus stops, etc. |

Exhibit "E," p. 156.

332. In <u>Matter of [name not provided]</u>, VSC (AAO, Jan. 9, 2014), the petitioner sought to establish that the proffered position qualified as a specialty occupation by meeting the criteria in the second alternative prong of 8 C.F.R. § 214.2(h)(4)(iii)(A)(2). Exhibit "N."

333. To support this argument, petitioner stated that the duties of the position were "unique on their face" and went on to list them. Exhibit "N," p. 23.

334. The AAO rejected this contention since the petitioner failed to elucidate "beneficiary's specific role in performing these functions within the petitioner's particular business operations" and did not offer any to "information regarding the day-to-day tasks in the actual performance of these responsibilities." Exhibit "N," p. 23.

335. Furthermore, a general description of the duties, such as "consulting with advertising agencies, representing the business and responding to the media" did not "provide a sufficient factual basis to support" the assertion that the application meets the established criteria. Exhibit "N," p. 22.

336. As such, that petitioner's proffered evidence was "insufficient to demonstrate that the petitioner's particular position is so complex or unique that it can be performed only by an individual with at least a bachelor's degree in a specific specialty, or its equivalent." Exhibit "N," p. 22.

2. Proof that the Duties of the Proposed Position are So Complex or Unique that Only an Individual with a Degree Can Perform Them

337.    In addressing this factor in its decision, defendant USCIS stated that the application did not support a finding that the nature of the duties of this particular position were not "so complex or unique that only an individual with a degree can perform them."  Exhibit "F," p.6.

338.    As a result, it was concluded that petitioner failed to provide "information that distinguishes the proposed position from similar market research analyst positions not requiring a four-year degree or its equivalent, based upon its unique nature or complexity."  Exhibit "F," p.6.

339.    Defendant USCIS began its analysis of the second prong of 8 C.F.R. § 214.2(h)(4)(iii)(A)(2) at the top of page five.  It recites the criteria as requiring "proof that the duties of the proposed position are so complex or unique that only an individual with a degree can perform them."  Exhibit "F," p.5.

340.    In the second sentence of the paragraph addressing this issue, the decision reads "For reasons already set forth in this decision, the nature of the duties of the proposed position as set forth in this petition does not support such a finding."  The next sentence reiterates the conclusion of defendant USCIS on this specific criteria by stating that the petitioner failed to provide "information that distinguishes the proposed position from similar residential market research analyst positions not requiring a four-year degree or its equivalent, based upon its unique nature or complexity."  Exhibit "F," p.5.

341.    While it should already by apparent that defendant USCIS failed to consider and/or ignored the proffered evidence, Dr. Grayson's position evaluation did not.  Based upon a review of the same materials provided to defendant USCIS along with the "raw, unfiltered data sets" (listed in the table within the original petitioner entitled "Market Specific Research Data"), Dr.

Grayson concluded that a degree in the field of economics, "with an emphasis on quantitative analysis and methodologies," for this position of market research analyst, was a necessity. Exhibit "E," pp. 145-146.

342.    Dr. Grayson stressed that in this particular situation and in other similar situations where he is required to review the adequacy of an individual for the position of market research analyst, he carefully reviews the transcripts of said individuals. Dr. Grayson stated that he does not just look at the transcript and degree to see if it states the individual received a bachelor's degree in economics. Instead, Dr. Grayson's analysis probes further, to determine if their transcripts demonstrated "they had acquired the necessary quantitative background – advanced courses in econometrics, statistics, etc. – to carry out the functions of the Market Research Analyst position." Exhibit "E," p. 144.

343.    In order to function effectively in the position of Market Research Analyst, Dr. Grayson asserted that a successful candidate must have an understanding of economics that "goes beyond the introductory concepts of supply and demand." Exhibit "E," p. 146.

344.    Dr. Grayson opined that when an individual achieves a degree in economics with coursework such as beneficiary has completed, that person will have obtained "the prerequisite tools for bringing economic principles, analytical methods, and quantitative skills to bear on problems in diverse contexts, such as regional development and industry-specific analysis (e.g., 'Urban Housing Markets in Los Angeles')." Exhibit "E," p. 146.

345.    In the Response to the RFE, plaintiff cited Dr. Grayson's expert opinion that the duties beneficiary would perform "require the theoretical and practical background" that only economics can provide, which includes the knowledge and application of calculus, modeling and statistical analysis. Exhibit "E," p. 51

346.    Without these foundations, Dr. Grayson stated, the ability of any person to perform the duties required by petitioner would be "severely hindered to the point where the firm might as well hire a candidate with a bachelor's degree in business, accounting or even history." Exhibit "E," p. 145.

347.    Dr. Smith's position evaluation letter also opined as to whether the duties of the proposed position were so complex or unique that only an individual with a degree in a specific specialty or its equivalent, could perform said duties.

348.    Having reviewed those specific duties, including the types of research and analysis which beneficiary would be expected to perform (microeconomic analysis, macroeconomic analysis, regression analysis, spatial economic analysis, population trend analysis, multivariate analysis, sentiment analysis and the hedonic price method), Dr. Smith was unambiguous in asserting that though the aforementioned analytical techniques were "economic in nature, not every individual who graduates with a bachelor's degree in economics is exposed to and instructed in their application. This depends on whether the student has chosen to enroll in economic courses which are quantitative in nature and intellectually rigorous." Exhibit "E," p. 156.

349.    Furthermore, Dr. Smith stated that these types of analysis are "theoretically challenging exercises," which "require the use of complex equations and formulas which are difficult for one to learn via self-study or on-the-job training. Furthermore, merely because an individual obtains a bachelor's degree in economics does not mean that person will be able to carry out the aforementioned functions. In logical terms, a bachelor's degree in economics is *necessary, but not sufficient* to conducting the duties listed under research and analysis." Exhibit "E," p.156 (emphasis in original).

3.  Conclusion

350.     At all times, the petition emphasized that the particular position is so complex or unique that it can be performed only by an individual with at least a bachelor's degree in a specific specialty, or its equivalent.

351.     This argument was supported by the information contained in the petition along with the position evaluation letters of Dr. Grayson and Dr. Smith, respectively.

352.     Throughout the Response, it was established that the specific, discrete duties of the beneficiary were directly linked to the educational credentials of the beneficiary.  This connection was not asserted in general, vague or circular terms, but rather with concrete examples and details, down to the specific data sets beneficiary would utilize and the sources of said data sets.

353.     Moreover, the position evaluation letters did not just contain empty, unsubstantiated statements regarding the uniqueness or complexity of the proposed duties for the position.  Instead, they stated why the proposed duties could only be carried out by a person with a degree in a specific specialty, or its equivalent.

354.     Through its Decision finding that the second prong of 8 C.F.R. § 214.2(h)(4)(iii)(A)(2) was not satisfied with respect to the position at issue, defendant USCIS' actions were arbitrary and capricious.  5 U.S.C. § 706(2)(A).

355.     This is because defendant USCIS failed to consider the relevant factors which typically determine whether a petition of this type has in fact satisfied the second prong of 8 C.F.R. § 214.2(h)(4)(iii)(A)(2).  The evidence provided to defendant USCIS belies the findings of its decision.  Town of Verona v. Jewell, Civil Action No. 08-0647 (N.D.N.Y. Mar. 26, 2015) ("a reviewing court's task is to determine whether the [agency's] decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment.") (citations and quotations omitted); *Tripoli Rocketry Ass'n, Inc. v. Bureau of Alcohol, Tobacco, Firearms, &*

*Explosives,* 437 F.3d 75, 77 (D.C. Cir. 2006) (explaining that "no deference" is owed to an agency's "purported expertise" where its explanation "lacks any coherence").

356.    For the above-stated reasons, the decision of defendant USCIS that plaintiff did not satisfy the second prong of 8 C.F.R. § 214.2(h)(4)(iii)(A)(2) was arbitrary and capricious and not in accordance with law.  5 U.S.C. § 706(2)(A).

D.    8 C.F.R. § 214.2(h)(4)(iii)(A)(4) was satisfied by the petition

357.    The fourth prong of 8 C.F.R. § 214.2(h)(4)(iii)(A) requires that the "nature of the specific duties are so specialized and complex that knowledge required to perform the duties is usually associated with the attainment of a baccalaureate or higher degree."  8 C.F.R. § 214.2(h)(4)(iii)(A)(4).

1.    Failure of defendant USCIS to Logically Follow Argument of Plaintiff

358.    Defendant USCIS mischaracterized the argument put forth by plaintiff in asserting that 8 C.F.R. § 214.2(h)(4)(iii)(A)(4) had been satisfied.  This was a failure not merely of comprehension but not following rudimentary logical structure.

359.    Specifically, defendant USCIS stated:

> As evidence that the nature of the specific duties of the position is so specialized and complex that the knowledge required to perform them is usually associated with the attainment of a baccalaureate or higher degree, as noted above, you assert that:
>
> > The proposed duties of the proffered position of Residential Market Research Analyst, have been described with sufficient detail to establish their nature as more specialized and complex than the nature of the duties of other positions in the pertinent occupational category whose performance does not require the application of knowledge usually associated with attainment of at least a bachelor's degree in a specific specialty, or its equivalent.
>
> Your assertions are not supported.

Exhibit "F," p. 7.

360.    The characterization of the above-referenced text by defendant USCIS is not accurate.  This is because defendant USCIS omitted the prefatory language from the above-cited text, which stated:

> It is therefore the position of this office, supported by Dr. Smith, that the proposed duties of the proffered position of Residential Market Research Analyst, have been described with sufficient detail to establish their nature as more specialized and complex than the nature of the duties of other positions in the pertinent occupational category whose performance does not require the application of knowledge usually associated with attainment of at least a bachelor's degree in a specific specialty, or its equivalent.

Exhibit "E," p. 53.

361.    The significance of those twelve (12) words cannot be understated.  The third word in that sentence is "therefore."  As pointed out in Alec Fisher, Critical Thinking:  An Introduction 23-24 (2nd ed. 2011), "there are certain words and phrases which people characteristically use to indicate that they are arguing a case – that they are presenting reasons for a conclusion.  The obvious word which people use in this context is 'therefore.'"

362.    "Therefore" is perhaps the most widely used and accepted "conclusion indicator" in the language of reasoning and argumentation.  Irving M. Copi et al., Introduction to Logic § 1.5(A) ("Conclusion and Premise Indicators), 21-22 (11th ed. 2002); Douglas Walton, Fundamentals of Critical Argumentation 139 (2006) ("Conclusion indicator words, such as 'therefore' and 'thus', and premise indicator words, such as 'for this reason', are important clues to identifying an argument."); David R. Morrow & Anthony Weston, A Workbook For Arguments: A Complete Course in Critical Thinking 5 (2011) ("The second strategy for distinguishing premises from conclusions is to look for *indicator words*. Some words or phrases are *conclusion*

*indicators*.  These are words or phrases that tell you that you're about to read or hear the conclusion of an argument."  The most common conclusion indicator, according to Morrow & Weston is "therefore.") (emphasis in original).

363.    Furthermore, defendant USCIS' finding here incorrectly considers the conclusions asserted in the aforementioned paragraph as "evidence."  Black's Law Dictionary 673 (10th ed. 2014) defines "evidence" as "something (including testimony, documents, and tangible objects) that tends to prove or disprove the existence of an alleged fact."

364.    However, defendant USCIS stated that this portion of the application relied upon assertions which were "not supported."  Exhibit "F," p. 7.

365.    Nevertheless, in the previous paragraph, defendant USCIS characterized those assertions as "evidence."  Exhibit "F," p. 7.

366.    Defendant USCIS reviewed the conclusions offered by plaintiff, described those conclusions as evidence, and then stated there are no grounds for such assertions (conclusions).

367.    Proceeding from the structural and logical flaws of defendant USCIS' analysis to one based on the substantive requirements for satisfaction of 8 C.F.R. § 214.2(h)(4)(iii)(A)(4), published federal court decisions and Precedential Decisions issued by the AAO provide little in the way of guidance as to duties that are "so specialized and complex that knowledge required to perform the duties is usually associated with the attainment of a baccalaureate or higher degree."

368.    This is the situation across the gamut of positions seeking to be classified as "specialty occupations."  It is not surprising then that  locating an explanation within any precedential authority which would demonstrate how a specific position – in this case, as a market research analyst – would meet the criteria at 8 C.F.R. § 214.2(h)(4)(iii)(A)(4) – is an inherently difficult task.

369.     Nevertheless, the voluminous record of AAO decisions, although not binding upon the AAO nor upon this or any other court, provide some explanation as to what criteria would meet this fourth prong.

## 2. Factors Considered by USCIS for Satisfaction of Fourth Prong

370.     A review of numerous AAO decisions emphasize five (5) factors generally examined when determining if a position of market research analyst meets the criteria of the fourth prong herein.  These factors are (i) whether the petition is sufficiently specialized and complex, (ii) the necessity of original market research, (iii) how any complex theories or techniques will be applied to the position, (iv) whether or not the market research analyst will be employed directly by the company needing their services and (v) whether the duties of the position, as set forth by petitioner, exceed the scope of the duties for the typical market research analyst position.

371.     In explicating the present facts and demonstrating how they apply to the aforementioned criteria, there will inevitably be overlap between information and evidence that satisfies one criteria yet also satisfies other criteria.  For example, demonstrating the complexity and specificity of the position (first factor) will overlap with the application of complex techniques or theories to the duties of the position (second factor).

372.     In the application submitted for the present position, the job description expounded upon the five (5) main job duties that would be carried out by the beneficiary.  Exhibit "E," pp. 26-39.  Where appropriate, these job duties contained deeper review of the subjects beneficiary would examine.  However, it was also understood, at the time of the preparation of the RFE, that merely reciting a litany of complicated mathematical and statistical tasks that beneficiary would perform would not demonstrate that this market research analyst position was indeed a specialty occupation.

(a)     Whether the Position is Sufficiently Specialized and Complex

373.    To establish the complexity of the position, the record should "contain explanations or clarifying data sufficient to elevate the position to one that is so specialized and complex that the knowledge to perform its duties is usually associated with the attainment of a baccalaureate or higher degree in a specific specialty" and not merely unsupported claims by the petitioner.  Matter of [name not provided], WAC 09 149 50035 (AAO, Apr. 29, 2011), p.12, annexed hereto as Exhibit "P."

374.    Where a position is described as "encompass[ing] routine marketing duties," it is less likely that the complexity of the position will be demonstrated.  Exhibit "P," p.12.

375.    The duties described by the petitioner cannot be limited to terms of generalized and generic functions.  The description should "convey the duties with sufficient specificity to establish any particular level of specialization and complexity that may inhere in them."  Matter of [name not provided], CSC (AAO, Dec. 3, 2010), p.10, annexed hereto as Exhibit "Q."

376.    It is the duties of a position and not the employer's self-imposed standard that are dispositive as to whether the position qualifies as a specialty occupation.  These duties must demonstrate that "position actually requires the theoretical and practical application of a body of highly specialized knowledge and the attainment of a baccalaureate or higher degree in the specific specialty as a minimum for entry into the occupation."  Defensor v. Meissner, 201 F.3d 384, 387-88 (5th Cir. 2000).

377.    In assessing the job duties of the proffered specialty occupation position, it will be insufficient if the job description "contains only general references to 'design[ing] and execut[ing] research surveys . . . [on] market conditions,' to 'gather[ing] information on competitors' prices, sales, methods of marketing and distribution,' to 'preparing reports of research findings,' to

'creat[ing], develop[ing], and maintain[ing] databases,' without providing any details about the substantive content of such activities or how the research and analysis would be conducted." Matter of [name not provided], SRC 04 231 51275 (AAO, June 5, 2006), p. 5, annexed hereto as Exhibit "R."

378.    The petitioner must provide more than "few specifics about the types of surveys to be conducted, the types of data to be collected, and the types of analysis the beneficiary would present to management. The petitioner must do more than simply recite certain job duties of a market research analyst in the Handbook.  Exhibit "R," p. 5.

379.    The petitioner must show how those job duties will be performed in relation to its own business. Simply going on record without supporting evidence will not satisfy the burden of proof that petitioner is required to meet. See Matter of Sofici, 22 I&N Dec. 158, 165 (Comnr. 1998) (citing Matter of Treasure Craft of California, 14 I&N Dec. 190 (Reg. Comnr. 1972)).

380.    In a previous AAO decision, it was determined that duties which included "[D]etermining statistical significance, assisting in coordinating development plans for petitioner's products, advising and coordinating with the product and marketing [redacted] linear regression analysis to analyze the relationship between price and quantity sold and the effects of promotional pricing, and making recommendations for product deployment with due regard for economies of scale contain no indication of requiring a minimum of a bachelor's degree or the equivalent in a specific specialty."  Matter of [name not provided], CSC (AAO, Feb. 7, 2012), p.9, annexed hereto as Exhibit "S."

381.    With respect to the level of specificity required by defendant USCIS, an example can be found where a petitioner stated the beneficiary would design computer programs, "but never provides the names of the specific programming languages the beneficiary would use to create

these programs or the operating system platforms that he would be working in. The petitioner does not explain what specific programs or databases the beneficiary will design to benefit its web-hosting facility. Thus, the petitioner does not provide sufficient detail of the duties of the position" to meet the criteria of the fourth prong. Matter of [name not provided], WAC 04 146 51985 (AAO, Jan. 13, 2006), p. 5, annexed hereto as Exhibit "T."

382. In assessing an application for a market research position, USCIS also reviews whether the involvement of the beneficiary would be on such a specialized methodological and analytical level" so that the business of petitioner has a legitimate need for the skills and services of beneficiary. Matter of [name not provided], WAC 04 211 51851 (AAO, Jan. 11, 2006), p.5, annexed hereto as Exhibit "U."

383. This can be demonstrated if the record provides "information about the specific research and analytic methodologies that the beneficiary would employ." Exhibit "U," p.5.

384. The detailed explanations of the duties of the specialty occupation at issue were provided in the initial application. Exhibit "E," pp. 26-40.

385. It has been stated above that where the duties of the position contain no indication that a minimum educational requirement of a bachelor's degree or the equivalent in a specific specialty is required, it will be more difficult or unlikely to demonstrate the position is a specialty occupation. Exhibit "S," p. 9.

386. Here, however, it cannot be argued that plaintiff's explication of the duties contained "no indication of requiring a minimum of a bachelor's degree or the equivalent in a specific specialty."

387. Specifically, the evaluation of the position provided with the application by Dr. Smith closely reviewed the duties the beneficiary would perform. Having been provided with the

duties that would be carried out in this particular residential market research analyst position with plaintiff, it was Dr. Smith's determination that the person selected must hold a bachelor's degree in economics. Exhibit "E," pp.154, 156 (The skills necessary to perform the duties of this particular position "are exclusively found when the individual has a bachelor's degree in economics," and qualifying this statement by asserting "not every individual who graduates with a bachelor's degree in economics is exposed to and instructed in their [specific duties of the proffered position] application," "[M]erely because an individual obtains a bachelor's degree in economics does not mean that person will be able to carry out the aforementioned functions. In logical terms, a bachelor's degree in economics is *necessary, but not sufficient* to conducting the duties listed under the research and analysis [section of the application].")

388.    In assessing the coursework performed by beneficiary, which included Econometrics, Applied Econometrics and Fixed Property Economics, Dr. Smith stated that "[T]hese [the courses completed by beneficiary] are domains of knowledge that cannot be sufficiently learned through independent study, but require guided scholarship at the post-secondary level." Exhibit "E," p. 154.

389.    In a subsequent section of his letter, Dr. Smith commented on the types of economic analysis which beneficiary would perform (microeconomic analysis, regression analysis, multivariate analysis, spatial economic analysis, etc.). He stated that:

> Consistent with my expertise in the field of economics, I have reviewed the manner in which these particular techniques are to be applied to the residential real estate market for the benefit of [plaintiff]. Utilizing economic concepts such as regression analysis, spatial economic analysis, population trend analysis and sentiment analysis in order to provide valuable information into the residential real estate market are theoretically challenging exercises. They require the use of complex equations and formulas which are difficult for one to learn via self-study or on-the-job training.

Exhibit "E," p. 156.

390.    Dr. Grayson propounded on a similar theme in his evaluation letter submitted with the application.  Dr. Grayson stated that in accordance with his "professional and expert judgment," the "position of Residential Market Research Analyst with [plaintiff] can only be performed by an individual with a degree in economics."  Exhibit "E," p. 145.

391.    Dr. Grayson further refined this determination by emphasizing that not only should this degree be in economics, according to Dr. Grayson, but "the applicant *must* possess a bachelor's degree in economics, with an emphasis on quantitative analysis and methodologies."  Exhibit "E," p. 145 (emphasis in original).

392.    The reasons offered by Dr. Grayson why such a specific and particular background is necessary is because "[W]ithout the theoretical and practical background that economics necessitates (calculus, modeling, statistical analysis), any market research analysis will be severely hindered to the point where the firm might as well hire a candidate with a bachelor's degree in business, accounting or even history."  Exhibit "E," p. 145 (emphasis in original).

393.    An economics degree with an emphasis in quantitative analysis and methodologies "goes beyond the introductory concepts of supply and demand.  Intermediate courses demonstrate the use of economic theories, the application of rigorous thinking and how it clarifies previously opaque phenomena to provide real-word insights with respect to the actions of various parties." Exhibit "E," p. 146.

394.    This is because in completing a curriculum in economics with a concentration and focus as described herein, the individual will "obtain the prerequisite tools for bringing economic principles, analytical methods, and quantitative skills to bear on problems in diverse contexts." Exhibit "E," p. 146.

(b)     Necessity of Original Market Research

395.     It is the work of market research analysts "in the design and analysis of original market research that sets this occupation apart from what might otherwise be characterized as marketing or sales manager positions, employment that also requires the incumbents to perform marketing research as they seek to identify and expand business opportunities for their employers." Matter of [name not provided], LIN 05 206 51392 (AAO, Jan. 29, 2007), p. 4, annexed hereto as Exhibit "V" and Matter of [name not provided], WAC 05 200 52324 (AAO, June 6, 2007), ("The AAO finds that it is market research analysts' work in the design and analysis of original market research that sets this occupation apart from what might otherwise be characterized as marketing or sales manager positions, employment that also requires the incumbents to perform marketing research as they seek to identify and expand business opportunities for their employers."), p. 4, annexed hereto as Exhibit "W."

396.     If the beneficiary will not be performing original market research of a type that would rise to the level of a specialty occupation, it will be less likely that the application meets this criterion.  Matter of [name not provided], EAC 03 046 53067 (AAO, Sept. 9, 2005), p. 8, annexed hereto as Exhibit "X."

397.     The necessity of original market research for the subject position was detailed in the initial application.  Exhibit "E," pp. 19-21.

398.     It was explained that even several years ago, "small business owners would rely upon their 'intuition' of the market place when it came to competing against better funded operations."  Exhibit "E," p. 20.

399. However, the present technological environment, which has brought about and the "proliferation of available information, generally referred to as 'Big Data' has changed these calculations." Exhibit "E," p. 19.

400. Additionally, the application stated that in the past, data providers had previously charged a hefty premium for their proprietary information. However, due to developments in technology, analytic tools have become available that are more financially accessible to companies of all sizes. Exhibit "E," pp. 20-21.

401. The initial application stated that plaintiff, through the employment in the specialty occupation position of residential market research analyst, would use 'Big Data' to improve its decision-making process, understand the conditions which would cause a tenant to vacate a unit, research the geographic areas of highest profitability and more accurately assess the needs of prospective tenants in order to develop offerings that would appeal to them. Exhibit "E," p. 20.

402. The application stated that competitive pressures caused by the use of "Big Data" could "exacerbate the deep divide between those companies which have data and the ability to utilize it (processing mining, extracting, targeting, etc.) and those who don't (downloading data sets but failing to do anything useful with them)." Exhibit "E," p. 20.

403. Since historically most national businesses were able to take advantage of data analysis where more local enterprises would not be able to, the application noted that the hiring of beneficiary would provide plaintiff with a more level playing field. Exhibit "E," pp. 19-20.

404. As stated in the application, "The companies that have the best data will win. It doesn't matter what industry you're in or how big or small your business is. Until you can understand precisely what your customer wants, what they don't want, how they want it and when

they want it, you'll be left to guess – and guessing is a very, very expensive business sport." Exhibit "E," pp. 20-21.

405.     In other words, companies larger than plaintiff would be able to reap disproportionate market gains if they utilize "Big Data" while plaintiff and similarly situated companies continue to rely upon "intuition" and other non-quantifiable factors.

406.     The availability of tools, resources and methods which have only become economically feasible within the past several years, will enable beneficiary to perform original market research on raw data instead of merely drawing upon information already parsed, curated and analyzed by others.

(c)     Application of Complex Theories or Techniques to Perform the Duties of the Specific Position

407.     If the application states that beneficiary would perform complicated analytical techniques, such as "Monte Carlo simulations, linear and nonlinear programming, dynamic programming, queuing and other stochastic-process models, Markov decision processes, econometric methods, data envelopment analysis, neural networks, expert systems, decision analysis, and the analytic hierarchy process," there must be "evidence or explanation" of how such "techniques are used in the course of performing the duties for the proffered position." <u>Matter of [name not provided]</u>, CSC (AAO, Nov. 1, 2011), p. 12, annexed hereto as Exhibit "Y."

408.     The application did not merely state that the beneficiary would perform various functions and tasks with respect to the data.

409.     For microeconomic analysis, the concept of elasticity of supply and demand would be examined in the housing market covered by plaintiff's business. Exhibit "E," pp. 31-32. On the second page of the table entitled "Market Specific Research Data," the first specific data point

in the second column is labeled "Market Saturation (Supply/Demand Analysis)."  Exhibit "E," p. 28.

410.     The "Data Point Subsets" corresponding to this "Specific Data Point(s) were listed as "Net change in residents vs. net change in residential units in Kings County" and "Net change in residents vs. net change in residential units in Queens County."  Exhibit "E," p. 28.

411.     The data providers from which the aforementioned data points and data subsets were to be extracted and analyzed were listed as New York City Population Projections by Age/Sex and Borough, 2010-2040 and The Newest New Yorkers, published by the New York City Department of City Planning in 2013, along with figures recorded by the United States Census Bureau.  Exhibit "E," p. 28.

412.     In the same table, the data points for a supply analysis (i.e., how many rental units currently exist in the relevant geographic areas) were listed under the column "Specific Data Point(s)" and in the seventh row, which read "Rental Housing Stock."  Exhibit "E," p. 27.

413.     The "Data Point Subsets" here were several.  These included (i) rental units by rent-regulatory status, (ii) per capita rental units in Kings County, (iii) per capita rental units in Queens County and (iv) the structure class of rental units.  Exhibit "E," p. 27.

414.     The sources which beneficiary was to rely upon for ascertaining these figures included the Survey of Market Absorption of New Multifamily Units (SOMA) and the Property Owners and Managers Survey (POMS), both published by the United States Census Bureau.  Exhibit "E," p. 27.

415.     The application also included data types through which beneficiary would attempt to gauge demand for rental-housing units.  In the "Geographic Research Data" table, the "Specific

Data Point(s)" that is relevant is "Housing Satisfaction Level by Neighborhood," contained in the last row. Exhibit "E," p. 30.

416. "Housing Satisfaction Level by Neighborhood" would be estimated by a review of (i) "Attitudinal and Behavioral Data (leisure activities, social media engagement, etc.)," (ii) "Locational Data (Geographic Information Systems)," and (iii) "Complaints Lodged with New York City Department of Buildings," all listed in the "Data Point Subsets" column. Exhibit "E," p. 30.

417. Beneficiary would obtain the data that would comprise the aforementioned "Data Point Subsets" from the proprietary data sources contained within "BehaviorBank," operated by Experian plc, the global information services company and from the New York City OpenData Project. Exhibit "E," p. 30.

418. The reason that the tables "Market Specific Research Data" and "Geographic Research Data" were included in the application was to provide clarity and depth to how beneficiary would perform the tasks of the residential market research analyst in direct anticipation for the scrutiny it was expected defendant USCIS would rightly provide.

419. In a decision sustaining an appeal of a textile company seeking to employ beneficiary as a project development coordinator, the AAO cited the details offered by the petitioner in the initial application and how the details of that position lined up with the business needs of petitioner. Matter of [name not provided], WAC 05 214 52778 (AAO, Aug. 6, 2007), p. 2, annexed hereto as Exhibit "Z."

420. Specifically, the "petitioner explained its need for a project development coordinator to assess its procedures and to develop strategies to enhance its business by providing computer systems analysis, project planning and organization, integration of new systems and

implementing extranet and system audits. The petitioner provided a detailed job description of the proffered position and examples of how the duties related to its specific business needs." Exhibit "Z," p. 3.

421. In that appeal, the textile company offered additional details for the record, "regarding problems the company faced and its desire to employ an individual to examine and propose ways to restructure its business organization and its business procedures and processes. The petitioner again listed specific projects requiring analysis and recommendations and specific issues to be addressed by the project development coordinator." Exhibit "Z," p. 4.

422. With respect to the specific position, the AAO noted favorably that the petitioner "provided examples of problems it was encountering in its attempt to stay competitive in the industry as well as to expand its business. The petitioner explained its need for a project development coordinator to assess its procedures and to develop strategies to enhance its business by providing computer systems analysis, project planning and organization, integration of new systems and implementing extranet and system audits. The petitioner provided a detailed job description of the proffered position and examples of how the duties related to its specific business needs." Exhibit "Z," p. 3.

423. The petitioner subsequently provided additional detailed information pertaining to the position and how its duties matched its business needs. This was done through providing "examples of how the performance of certain duties directly related to its business. [The petitioner provide] further detail regarding problems the company faced and its desire to employ an individual to examine and propose ways to restructure its business organization and its business procedures and processes. [The petitioner again] listed specific projects requiring analysis and

recommendations and specific issues to be addressed by the project development coordinator." Exhibit "Z," p.4.

424.    In reaching its decision to sustain the petition, the AAO observed that the petitioner therein had "not merely recited the general requirements of these occupations, but rather has provided detailed information regarding its expectations of the individual in the proffered position as it directly relates to the petitioner's business operations. Exhibit "Z," p.4.

425.    As a result of the foregoing, the AAO concluded that the petitioner satisfied the criterion at 8 C.F.R. § 214.2(h)(4)(iii)(A)(4) (8 C.F.R. § 214.2(h)(4)(iii)(A)(1)) as the record was found to be "sufficient to demonstrate that the nature of the specific duties is so specialized and complex that the knowledge required to perform the duties is usually associated with the attainment of a baccalaureate or higher degree. Exhibit "Z," p.4.

(i)    Defining "research methodology"

426.    Returning to an analysis of the specificity of the duties that would be performed by beneficiary, plaintiff notes that the initial application indeed contained an in-depth review of the research methodologies beneficiary would employ in the position.

427.    While countless AAO decisions have often cited the presence, or lack thereof, of "research methodologies" that would be utilized in a specialty occupation position, this term has never been defined by AAO.

428.    While "research methodology" seems to offer a definition within itself (i.e., a method of conducting research), plaintiff shall attempt to offer a definition of this term based on the academic literature and subsequently establish how the application contains information about those research methodologies which would be applied and utilized in the subject position.

429. "Research methodology" is defined as "the general approach the researcher takes in carrying out the research project." Paul D. Leedy & Jean Ellis Ormrod, <u>Practical Research: Planning and Design</u> 14 (7th ed. 2001).

430. There are three main types of research methodologies: quantitative, qualitative and a mixed methods approach. John W. Creswell, <u>Research Design: Qualitative, Quantitative and Mixed Methods Approaches</u> (2nd ed. 2003).

431. Quantitative research involves the collection of data so that information can be quantified and subjected to statistical treatment in order to support or refute "alternate knowledge claims." Quantitative research also involves data collection that is typically numeric and the researcher tends to use mathematical models as the methodology of data analysis. Creswell, *supra*, at 153.

432. Qualitative research involves any research that uses data that does not indicate ordinal values. Typically, the defining criterion is the type of data generated and/or used. In short, qualitative research involves collecting and/or working with text, images, or sounds. Gregory S. Guest et al., <u>Collecting Qualitative Data: A Field Manual for Applied Research</u> 3 (2012).

433. A common thread throughout almost all forms of qualitative research is an inductive and flexible nature. Though there are certainly a few qualitative data collection and analysis techniques that are more structured and deductively oriented than others (e.g., content analysis), most research initiatives in the qualitative vein take an iterative approach. <u>Id.</u>

434. Another defining attribute of qualitative research is the open-ended and inductive style of questioning and observation. <u>Id.</u>

435. The mixed methods approach to research emerged in the 1990s and was based upon the belief that researchers could incorporate methods of collecting or analyzing data from the

quantitative and qualitative research approaches in a single research study. R. Burke Johnson & Anthony J. Onwuegbuzie, *Mixed Methods Research: A Research Paradigm Whose Time Has Come*, EDUCATIONAL RESEARCHER, Oct. 2004, 14-26.

436.    In particular, researchers utilizing the mixed methods approach not only collect or analyze numerical data, which is standard for quantitative research, but also narrative data, which is customary for qualitative research in order to address the research question(s) defined for a particular research study.  Id.

437.    At bar, the application submitted discussed, in detail, the "research and analytic methodologies" that the beneficiary would utilize in the employ of plaintiff.

438.    The application included extensive detail and particularity pertaining to the research and analysis of existing data, in a section entitled "Providing research and analysis of existing data."  Exhibit "E," pp. 31-37.

439.    In order to not reiterate what has been stated in previous sections herein, the application clearly indicated that the following research and analytic methodologies would be utilized:  (i) microeconomic analysis, (ii) macroeconomic analysis, (iii) regression analysis, (iv) spatial economic analysis, (v) population trend analysis, (vi) multivariate analysis, (vii) sentiment analysis and (viii) the hedonic price method.  Exhibit "E," pp. 31-37.

440.    Having already established not merely a definition for research methodology and described the three main types thereof, it cannot be more clear that the eight preceding research types of analysis which beneficiary would perform are anything except for "research and analytic methodologies."

441.    This is supported not just by the description of these methods in the application but also by the literature in the field of real estate market research.

442.     The late Dr. Rena Mourouzi-Sivitanidou has described real estate market research as "a new field of study, which builds on the accumulated stock of knowledge from urban and real estate economics."     Rena Mourouzi-Sivitanidou, <u>Market Analysis for Real Estate</u> (Petros Sivitanides ed., 2011).[4]

443.     According to Dr. Mourouzi-Sivitanidou, the aim of this discipline is to provide answers to the following questions:  (1) How do the various real estate markets function at the broader macroeconomic, or metropolitan level, and at the more narrow microeconomic, or site level of analysis? and (2) How should one go about analyzing meaningfully real estate markets for development and/or investment purposes?  <u>Id.</u> at 14.

444.     To provide answers to these fundamental inquiries, Dr. Mourouzi-Sivitanidou's tome elucidates how market research is necessary "to analyze the market-related determinants of project profitability at the macro and micro level" within the real estate industry.  <u>Id.</u> at 14.

445.     Lest there be any confusion regarding the applicability of Dr. Mourouzi-Sivitanidou's scholarship, Part "C" of Market Analysis for Real Estate was entitled "Analyzing Residential Real Estate Markets."  Exhibit "AA," Cover page and table of contents, p. 6, annexed hereto.

446.     In discussing the analytic and research methodologies used by a real estate market researcher, Dr. Rena Mourouzi-Sivitanidou has stated that the "major focus and contribution of market analysis for real estate is the assessment of the underlying determinants of a project's

---

[4] Dr. Petros Sivitanides was the spouse of the late Dr. Mourouzi-Sivitanidou.  Following Dr. Mourouzi-Sivitanidou's passing, he assembled the lecture notes and handouts utilized by Dr. Mourouzi-Sivitanidou while teaching the graduate course "Market Analysis for Real Estate" at the University of Southern California.  The full text remains in the possession of Harvard University.  Dr. Petros Sivitanides is of Greek origins and received a doctorate degree in Urban and Real Estate Economics at the Massachusetts Institute of Technology.

income-earning capacity at two distinct levels: the *macroeconomic* (non-site) level and the *microeconomic* or *project-specific* level." Mourouzi-Sivitanidou, *supra*, at 12.

447.    Dr. Mourouzi-Sivitanidou devoted an entire chapter to the microeconomic analysis of residential real estate, titled "Analyzing Residential Projects: A Micro Perspective." Exhibit "AA," pp. 6-7.

448.    Within this microeconomic analysis, econometric techniques and absorption schedules were considered vital to any review of residential real estate. Mourouzi-Sivitanidou, *supra*, 214-260.

449.    In the application for the position of residential market research analyst, econometric techniques and absorption measures were accentuated as crucial to the duties beneficiary would perform. Exhibit "E," pp. 32-37.

450.    Chapter seven of Dr. Mourouzi-Sivitanidou's work ("Macroeconomic Analysis of Residential Real Estate Markets: The Basics of the Econometric Approach") centered on the importance of regression analysis and regression models to the study of residential real estate. Exhibit "AA," p. 6.

451.    As amply demonstrated by this point, the application stressed the centrality of research methodologies which included regression analysis to the duties to be performed by beneficiary in the residential market research analyst position with plaintiff.

452.    Moreover, the application provided the actual variables which would be used when performing these functions, such as the addition of amenities like a washer and dryer to an individual residential unit. Based upon the results of the equations when presented with the relevant variables, plaintiff would be able to optimally price its inventory. Exhibit "E," p. 33.

453. The application also included specifics regarding how beneficiary would apply spatial economic analysis to the duties of the specialty occupation position. To begin, it is axiomatic that space (or location) is critical in determining the value of real estate. Thus, spatial methods in valuation have been cited by numerous scholars as research methodologies used to account for the influence of location on value. Andy L. Krause & Christopher Bitter, *Spatial econometrics, land values and sustainability: Trends in real estate valuation research*, CITIES, Dec. 2012, S19-S25.

454. These advanced spatial methods have been divided into "those dealing with spatial dependence and those dealing with spatial heterogeneity." Id. at 20.

455. Specifically, scholars who have examined spatial methods with respect to residential real estate begin their analysis with ordinary least squares regression. Bradford Case et al., *Modeling Spatial and Temporal House Price Patterns: A Comparison of Four Models*, THE JOURNAL OF REAL ESTATE FINANCE AND ECONOMICS, Sept. 2004, 167-191; Suriatini Ismail, *Spatial Autocorrelation and Real Estate Studies: A Literature Review*, MALAYSIAN JOURNAL OF REAL ESTATE, 2006, 1-13 ; Robin Dubin et al., *Spatial Autoregression Techniques for Real Estate Data*, JOURNAL OF REAL ESTATE LITERATURE, Jan. 1999, 79-96; Karl E. Case & Robert J. Shiller, *Forecasting Prices and Excess Returns in the Housing Market*, REAL ESTATE ECONOMICS, Sept. 1990, 253-273.

456. Spatial methods were also reviewed in the application and identified as another critical tool which beneficiary would use in the position of residential market research analyst. Exhibit "E," p.33.

457.     Spatial economic analysis is a research methodology that would allow beneficiary to accurately estimate the price that should optimally be paid for a given property.  Exhibit "E," p.33.

458.     To carry out spatial economic analysis, it was stated that beneficiary would begin by utilizing the ordinary least squares regression model to explore any correlations between different variables.  Exhibit "E," p.33.

459.     The same section of the application also examined the concept of geographically weighted regression ("GWR").  Exhibit "E," p.33.

460.     Geographically weighted regression is a relatively recent contribution to the research methodologies used for the modelling of spatially heterogeneous processes within the field of real estate market research.

461.     Scholars have attributed its development as a research methodology to the pioneering work of A. Stewart Fotheringham, who co-authored a journal article on its principles and goals in 1996 entitled Geographically Weighted Regression:  A Method for Exploring Spatial Nonstationarity with Chris A. Brunsdon.  Chris A. Brunsdon et al., *Geographically Weighted Regression:  A Method for Exploring Spatial Nonstationarity*, GEOGRAPHICAL ANALYSIS, Oct. 1996, 281-298..

462.     At its most fundamental level, GWR is a method of analysis which relies upon a spatial weighting function, thereby improving performance of modelling spatially heterogeneous processes.

463.     GWR is a method of analysis which relies upon a spatial weighting function, thereby improving performance of modelling spatially heterogeneous processes.  As it does not calculate the global relations of the whole data, but concentrates on the relationship of the

dependent and independent variables which exist locally within a determined search area, GWR allows consideration of the spatially varying processes which would otherwise have been overlooked or not considered.

464.     Within the scholarly literature, GWR is considered a research methodology used for estimating values of real estate that is a more accurate alternative to multiple regression analysis.  This is because GWR can be applied to obtain prediction of results of different kind of activities connected with changing spatial planning and as a supporting tool for decision making processes concerning localization of investments.  A. Stewart Fotheringham et al., Geographically Weighted Regression: The Analysis of Spatially Varying Relationships (2002);  Robert Legg & Tia Bowe, *Applying Geographically Weighted Regression to a Real Estate Problem:  An example from Marquette, Michigan*, ARCUSER, Mar. 2009, 44-45; Radoslaw Cellmer, *The Use of the Geographically Weighted Regression for the Real Estate Market Analysis*, FOLIA OECONOMICA STETINENSIA, Jan. 2012, 19-32;  R. Kelley Pace et al., *Spatial Statistics and Real Estate*, THE JOURNAL OF REAL ESTATE FINANCE AND ECONOMICS, July 1998, 5-13;  Andy Krause, *Expanding GWR: Exploring an N-dimensional locally weighted regression technique for home price estimation*, PRESENTATION AT WESTERN REGIONAL SCIENCE ASSOCIATION, Feb. 2012, Poipu, Hawaii.

465.     The application did not merely proclaim that beneficiary would utilize GWR in such a form as a conclusory statement.  Rather, the application stated that:

> in the position of Residential Market Research Analyst, Beneficiary will use the percent of income paid per month toward housing costs as the dependent variable, while the independent variables will be employment status, overcrowding rate and median disposable income.  Applying GWR, it is expected that the primacy of one of the three independent variables can be determined.  This result will permit Petitioner's firm to market its offerings to those groups

likely to be most receptive to Petitioner's products (residential housing).

Exhibit "E," p. 34.

466.    The viability of GWR as a relevant research methodology to the duties of this position of residential market research analyst was elucidated in the application.  The application went even further and detailed specific variables beneficiary would use when utilizing GWR.

467.    Continuing with the research methodologies enumerated in the application, it was additionally stated that the duties of the position would include population trend analysis.  Exhibit "E," pp. 34-35.

468.    The inclusion of this method of analysis in the application was because it would reveal characteristics of the population at large, such as education levels and income, among others.  By being aware of why the population of an area is changing, petitioner would be in a better position to optimize its offerings to new area residents.  This includes the size of housing units migrants would be seeking and the prices they would be willing to pay.  Exhibit "E," pp. 34-35.

469.    That population trend analysis is a relevant and applicable research methodology for the position at issue is corroborated by the work of Dr. Mourouzi-Sivitanidou.  Dr. Mourouzi-Sivitanidou highlighted the importance of determining the population identity of a given geographic area by reviewing that area's net migration.  Mourouzi-Sivitanidou, *supra*, 89-90.

470.    Consistent with the details provided in the application, Dr. Mourouzi-Sivitanidou noted that population identity can be discerned from a careful review of the birth and death rates and net migration.  If a state or municipal government does not make this information available, then the residential real estate market research analyst should look to the raw data contained in population reports and data compiled by the United States Census Bureau.  Id.

471.     Had the application been reviewed by defendant USCIS, the inclusion of data points that would contribute to the determination of population identity would have been apparent.

472.     Specifically, the section of the application entitled "Gathering Market Specific Information" included data points such as "Transitioning Households." Exhibit "E," pp. 26-27.

473.     The data point subsets for "Transitioning Households" were (i) recently relocated households by age distribution, (ii) recently relocated households by educational achievement, (iii) recently relocated households by median income level, (iv) recently relocated households by percent of home ownership and (v) recently relocated households by percent of renters. Exhibit "E," p. 27.

474.     Relevant data point subsets were also indicated in the table entitled "Geographic Research Data." Here, the spatial variation of the populations of Kings and Queens County, respectively, was identified as highly relevant to the duties of the position. Exhibit "E," p. 30.

475.     In a subsequent section of the application, multivariate analysis was listed as one of the research methodologies beneficiary would utilize in the position with plaintiff. Exhibit "E," p. 35.

476.     Multivariate analysis is based on the statistical principle of multivariate statistics. Theodore Wilbur Anderson, An Introduction to Multivariate Statistical Analysis (3rd ed. 2003).

477.     Multivariate analysis explores the association between one outcome variable (the dependent variable) and one or more predictor variables (the independent variables). Multivariate techniques concern the statistical analysis of relationships among a set of variables, particularly when at least three variables are involved.

478.     Within the field of multivariate analysis are various statistical techniques that are capable of discovering underlying patterns. The methods of multivariate analysis identified in the

application which were part of the duties of the residential market research analyst position were Principal Component Analysis, Factor Analysis and Discriminant Analysis. Exhibit "E," p. 35.

479.    Considerable scholarly work in this field of study continues today as researchers seek to cope with the proliferation of data available to them. Hervé Abdi, *Multivariate Analysis* in THE SAGE ENCYCLOPEDIA OF SOCIAL SCIENCE RESEARCH METHODS 699-702 (Michael S. Lewis-Beck et al. eds., 2003); Hervé Abdi and Lynne J. Williams, *Principal Component Analysis*, WILEY INTERDISCIPLINARY REVIEWS: COMPUTATIONAL STATISTICS, Jun. 2010, 433-459. MULTIVARIATE DATA ANALYSIS (Joseph F. Hair Jr. et al. eds., 2006).

480.    The application did not simply state that beneficiary would use all of these research methodologies to help improve plaintiff's business. At all times, the application cited specific variables (percent of housing stock subject to rent regulations, percent of Greek-speaking residents and total number of residential units, etc.), how these variables would be utilized within the respective research methodologies, the relevance and applicability of said research methodologies to plaintiff's business and how beneficiary was equipped to carry out the duties which incorporated the specific research methodologies.

      (d)      Will the market research analyst be employed directly by the company needing their services?

481.    Though the AAO has stated that "market research analysts typically are not employed by the companies who need their services, but rather work for market research companies who contract their services to various companies for defined periods of time," where the petitioner has submitted sufficiently detailed and extensive information regarding the duties of the position, such would be sufficient to demonstrate that the petitioner "would in fact employ the

beneficiary as a market research analyst."  Matter of [name not provided], WAC 06 266 54551 (AAO, Jan. 31, 2008), p. 6, annexed hereto as Exhibit "BB."

482.    Part II, Section B of the application, entitled "Small Business and Big Data," emphasized that beneficiary, as a market research analyst, will be employed directly by plaintiff, along with the reasons for doing so.  Exhibit "E," pp. 19-21.

483.    The application also contained specific, discrete tasks that beneficiary would perform with respect to market research in order to improve plaintiff's business.  Furthermore, documentary evidence was provided by the proprietor of an all-purpose insurance brokerage, which cited the synergies that could be created if plaintiff was successful in enlarging its efforts in identifiable, underserved geographic areas.  Exhibit "E," pp. 80-82.

(e)    Do the duties of the position exceed the scope of the duties for the typical market research analyst?

484.    Another relevant factor examined by defendant USCIS in determining whether 8 C.F.R. § 214.2(h)(4)(iii)(A)(4) is satisfied is whether the record establishes "that the proposed position includes various market research and analysis functions that exceed the scope of a typical market research analyst position."  Matter of [name not provided], WAC 04 222 53261 (AAO, June 12, 2006), p. 3, annexed hereto as Exhibit "CC."

485.    Defendant USCIS often looks to whether the duties of the proffered position "exceed the scope" for that position, as described by the Handbook.  Where the duties of the position are generally consistent with those set forth in the Handbook, does not expound upon the duties listed therein nor offer any specificity with respect to the position at issue and where said position does not list a bachelor's degree as required, the position will not meet 8 C.F.R. § 214.2(h)(4)(iii)(A)(4).

486.     In an appeal of a denial for a position of a marketing and promotions specialist, it was determined by the AAO that no evidence or description of the duties of the position had been provided by the petitioner which showed that "the proposed duties [of the proffered position] exceed the scope of a typical marketing manager.  The AAO is not persuaded that the nature of the specific duties of the proposed position is more unique and complex than that of a typical marketing manager, a position that does not normally require a bachelor's or higher degree in a specific discipline."  Matter of [name not provided], WAC 05 192 50550 (AAO, May 1, 2007), p.9, annexed hereto as Exhibit "DD."

487.     Furthermore, the petitioner therein simply referenced duties for the proposed specialty occupation position that were similar to that which the Handbook listed as typical duties for such a position.  Exhibit "DD," p. 7.  In its decision, the AAO went on to state that providing a "generalized description outlining a range of duties that may be performed within an occupation cannot be relied upon to demonstrate the duties attached to specific employment. Making general conclusory statements regarding a position, rather than defining the activities associated with the position is insufficient. The petitioner must describe and provide evidence of the duties of the position rather than providing an overview of a particular occupation."  Exhibit "DD," p. 7.

488.     In the present matter, the proffered specialty occupation position in question is a market research analyst.  The five main duties were to (i) gather market specific information, (ii) identify geographical areas lacking in residential rental properties, (iii) provide research and analysis of existing data, (iv) prepare mid-quarterly and quarterly reports and (v) devise marketing and expansion strategies.  Exhibit "E," pp. 26-40. Subsumed within these duties were highly specific and detailed tasks within each main duty which beneficiary would be expected to perform.

489.     At the surface level, these duties appear to be similar to those listed by the Handbook for the market research analyst position.  Exhibit "J."

490.     However, a review of the detailed position requirements for beneficiary indicate that the duties for this specific position with plaintiff indeed exceed the scope of duties as described by the Handbook for the position of market research analyst.

491.     Specifically, the duties of this position contain numerous duties that can be found within the expected duties of economists, as set forth in the Handbook.  Bureau of Labor Statistics, U.S. Department of Labor, Occupational Outlook Handbook, 2014-15 Edition, Economists, on the Internet at http://www.bls.gov/ooh/life-physical-and-social-science/economists.htm (visited August 01, 2015), annexed hereto as  Exhibit "EE."

492.     The Handbook states that economists typically:

- Research and analyze economic issues
- Analyze data using mathematical models and statistical techniques
- Prepare reports, tables, and charts that present research results
- Interpret and forecast market trends and
- Advise businesses, governments, and individuals on economic topics.

Exhibit "EE."

493.     The Handbook goes on to state that "[E]conomists apply economic analysis to issues within a variety of fields" and that some "study the cost of products."  According to the Handbook, economists examine "historical trends and use them to make forecasts.  They research and analyze data using a variety of software programs, including spreadsheets, statistical analysis, and database management programs."  Exhibit "EE."

494.     It is further stated in the Handbook that "[M]any economists work for corporations and help them understand how the economy will affect their business. Specifically, economists

may analyze issues such as consumer demand and sales to help a company maximize its profits." Exhibit "EE."

495. Several types of economists are identified by the Handbook, along with a brief description of what they do, including:

- *Econometricians* develop models and use mathematical analyses to test economic relationships. They use techniques such as calculus, game theory, and regression analysis to explain economic facts or trends in all areas of economics; and
- *Microeconomists* study supply and demand decisions of individuals and firms. For example, they may determine the quantity of products consumers will demand at a particular price.

Exhibit "EE"  (emphasis in original).

496. Econometrics is that branch of economics that attempts to give empirical content to economic relations. The difference between econometrics and other branches of economics is the focus on theoretical models, whose parameters are estimated using regression analysis.

497. The application provided exhaustive detail and minutiae relating to the research methodologies which beneficiary would utilize in the proffered position. Most of these duties were economic in nature and required the specific skills which beneficiary possessed as a result of his bachelor's degree in economics with an emphasis on quantitative analysis.

498. Spatial economic analysis was also discussed as another tool beneficiary would use in the position. This is the field where spatial analysis and econometrics intersect.

499. To provide certain examples of how the proffered position satisfied 8 C.F.R. § 214.2(h)(4)(iii)(A)(4), the application included a discussion of how beneficiary would utilize spatial econometric methods to the duties in the proffered position. Exhibit "E," pp. 33-34.

500. Spatial econometric methods deal with the incorporation of spatial interaction and spatial structure into regression analysis. The application cited to the ordinary least squares model

(OLS) as the most common regression technique and the starting point for any regression analysis centered on spatial issues.  Exhibit "E," pp. 33-34.

501.     The application also included specific, real world variables such as the number of day care centers nearby and the frequency of mass transit stops, which added precision and detail to description of the duties of beneficiary.  Exhibit "E," p. 33.

502.     Geographically Weighted Regression (GWR) was also stated as a tool which would be used by beneficiary to hone any analysis by utilizing more than one independent variable in examining the spatial dimensions of the residential real estate market.  Exhibit "E," p. 34.

503.     In emphasizing the relevance and importance of GWR to the duties of the position, the application stated that the percent of income paid per month towards housing costs would be the dependent variable, while employment status, overcrowding rate and median disposable income would be the independent variables.  Exhibit "E," p. 34.

504.     Through the use of GWR, beneficiary could then determine which of these three variables was most significant and therefore, which group of people (based on employment status, persons living in overcrowded living quarters and those with disposable income above and below certain amounts) would be most receptive to the product (residential housing) offered by plaintiff. Exhibit "E," p. 34.

505.     The application also specified how microeconomic analysis would be applied by beneficiary.  The factors in a microeconomic analysis are considered from the supply and demand side, and criteria were provided that determined each of these sides.  These criteria were actual criteria beneficiary would focus on.  Exhibit "E," pp. 31-32.

506.     In the application, microeconomic analysis was identified as one of the theoretical tools that beneficiary would use in order to perform the duties of the position.  More specifically,

it was indicated that this analysis would focus on data sources "at the project-specific level," such as available housing stock and demand for housing units based on fluctuations in pricing. Exhibit "E," pp. 31-32. These data sources were listed individually in the table entitled "Market Specific Research Data." Exhibit "E," pp. 27-28.

507.    As the duties listed in the <u>Handbook</u> for a market research analyst do not even contain the words "economics," "mathematical models," and "statistical techniques," and recognizing that these terms are fundamental to the duties performed by economists, it is apparent that the duties of this specific position as a market research analyst, with plaintiff, exceed the scope of the duties of the typical market research analyst. Exhibit "J."

### 3. Conclusion

508.    At all times, the application emphasized that the "nature of the specific duties [of the proffered position] are so specialized and complex that knowledge required to perform the duties is usually associated with the attainment of a baccalaureate or higher degree."

509.    This was demonstrated through the in-depth analysis of the duties that beneficiary would perform and how these duties were sufficiently specialized and complex.

510.    Within the application, it was emphasized throughout that beneficiary would be performing original market research by relying on primary source materials and therefore would not merely be reviewing market research conducted by others.

511.    The application also elucidated and expounded upon the research methodologies which beneficiary would apply in performing the duties of the position. This was done not through conclusory statements but through reviewing the actual formulas, theories and equations along with the relevant variables and data sets, which would be relevant to this specific position.

512.     Having explicated the present facts and demonstrated how they apply to the aforementioned criteria for the satisfaction of 8 C.F.R. § 214.2(h)(4)(iii)(A)(4), there is inevitably overlap between information and evidence that satisfies one criteria while also satisfying other criteria.  For example, demonstrating the complexity and specificity of the position (first factor) will overlap with the application of complex techniques or theories to the duties of the position (second factor).

513.     In the application submitted for the present position, the job description significantly expounded upon the five (5) main job duties that would be carried out by the beneficiary.  Exhibit "E," pp. 26-40.

514.     The above-referenced deficiencies – ignoring or failing to review significant probative evidence (or more accurately, reviewing evidence but claiming it was the opposite of what it actually was) and failing to apply the relevant legal authorities, are demonstrative of the fact that defendant USCIS did not engage in "reasoned decisionmaking."  Judulang v. Holder, 132 S. Ct. 476, 484 (2011) ("[C]ourts retain a role, and an important one, in ensuring that agencies have engaged in reasoned decisionmaking. When reviewing an agency action, we must assess, among other matters, 'whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment.'") (citations and quotations omitted).

515.     Where an agency decision is replete with "manifest errors of fact and logic," such a decision cannot be sustained by a reviewing court.  Zhen Li Iao v. Gonzales, 400 F.3d 530, 535 (7th Cir. 2005) (Recognizing logically and factually flawed agency decisionmaking as a result of "caseload pressures" and limited agency resources are insufficient justifications to "affirm unreasoned decisions even when we understand why they are unreasoned.")

516.    The actions of defendant USCIS were in direct contravention of 8 C.F.R. § 214.2(h)(9)(i), which states that, when adjudicating petitions such as that submitted herein, "[T]he director shall consider all the evidence submitted."  By ignoring and/or failing to review the factual evidence presented, a review of "all the evidence submitted" was not considered.

517.    Defendant USCIS' decision, which concluded that plaintiff's application did not satisfy 8 C.F.R. § 214.2(h)(4)(iii)(A)(4), was arbitrary and capricious, since said actions ignored and/or disregarded highly probative evidence.  Central Hudson Gas & Electric Corp.

518.    Defendant USCIS was obligated under 5 U.S.C. § 706(2)(A) to "examine the relevant data and articulate a satisfactory explanation for its action[s] including a 'rational connection between the facts found and the choice[s] made.'"  Central Hudson Gas & Electric Corp.  By not even looking at the evidence, it is apparent that there cannot exist such a "rational connection" between the evidence and the conclusion that petitioner failed to satisfy 8 C.F.R. § 214.2(h)(4)(iii)(A)(4).

519.    For the above-stated reasons, the decision of defendant USCIS that 8 C.F.R. § 214.2(h)(4)(iii)(A)(4) was not satisfied was arbitrary and capricious and not in accordance with law.  5 U.S.C. § 706(2)(A).

520.    At bar, defendant USCIS began its analysis of whether 8 C.F.R. § 214.2(h)(4)(iii)(A)(4) was satisfied by committing errors of logic.  Subsequent to these errors of logic, these errors were compounded by failing to review and/or ignoring the evidence presented. Since the evidence presented to defendant USCIS was thus not reviewed and/or considered, there cannot be a "rational connection between the facts found and the choice made."  J. Andrew Lange, Inc.

521.     Through its Decision finding that 8 C.F.R. § 214.2(h)(4)(iii)(A)(4) was not satisfied, defendant USCIS' actions were arbitrary and capricious.  5 U.S.C. § 706(2)(A).

# VIII. Causes of Action

## A.     First Cause of Action – Violation of the APA with respect to 8 C.F.R. § 214.2(h)(4)(iii)(A)(1)

522.     Defendant USCIS' denial of plaintiff's petition was improper and reviewable under the APA.  5 U.S.C. § 702.

523.     In denying the petition, defendant USCIS concluded 8 C.F.R. § 214.2(h)(4)(iii)(A)(1) was not met.

524.     In reviewing the 8 C.F.R. § 214.2(h)(4)(iii)(A)(1), defendant USCIS' actions included, but were not limited to, (i) ignoring/failing to read highly probative evidence submitted, including but not limited to job advertisements for the position in question with plaintiff's company and not for any other company, (ii) discarding position evaluation letters in support of the petition based exclusively on the ignoring/failing to read the aforementioned highly probative evidence and (iii) applying the incorrect legal regulation(s) to evidence which is inapposite with what defendants claimed it was.

525.     As a result of defendant USCIS' actions, plaintiff has, and is, "suffering a legal wrong of agency action" and is adversely affected or aggrieved by agency action," and therefore "is entitled to judicial review thereof."  5 U.S.C. § 702.

526.     Had defendant USCIS read the proffered evidence and applied the appropriate laws and regulations, it would have been determined that 8 C.F.R. § 214.2(h)(4)(iii)(A)(1) was satisfied.

527.     A reasonable fact-finder is compelled to conclude that defendants ignored evidence which was material to the adjudication of the petition.

528.     Defendant USCIS failed to render a decision that was based upon factors which Congress has intended it to consider.

529.     Defendant USCIS failed to consider important aspects of the petition.

530.     Defendant USCIS offered an explanation for its decision which was contrary to the evidence which was before them.

531.     Defendant USCIS' decision cannot be ascribed to a difference in view or the product of agency expertise.

532.     The APA directs that the "reviewing court shall…hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. §706(2)(A).

533.     The conclusions of defendant USCIS with respect to 8 C.F.R. § 214.2(h)(4)(iii)(A)(1) are unsupported by substantial evidence.  5 U.S.C. §706(2).

534.     As a result of the foregoing, defendant USCIS' decision with respect to 8 C.F.R. § 214.2(h)(4)(iii)(A)(1) was "arbitrary, capricious, an abuse of discretion, [and] otherwise not in accordance with law."  5 U.S.C. §706(2)(A).

## B.     Second Cause of Action – Violation of the APA with respect to 8 C.F.R. § 214.2(h)(4)(iii)(A)(2) (First Prong)

535.     Defendant USCIS' denial of plaintiff's petition was improper and reviewable under the APA.  5 U.S.C. § 702.

536.     In denying the petition, defendant USCIS concluded that the first prong of 8 C.F.R. § 214.2(h)(4)(iii)(A)(2) was not met.

537.     In reviewing the first prong of 8 C.F.R. § 214.2(h)(4)(iii)(A)(2), defendant USCIS' actions included, but were not limited to, (i) ignoring/failing to read highly probative evidence

submitted, including but not limited to job advertisements for the position in question with plaintiff's company and not for any other company, (ii) discarding position evaluation letters in support of the petition based exclusively on the ignoring/failing to read the aforementioned highly probative evidence, (iii) misapplying the holding of <u>Matter of Michael Hertz Associates</u> and (iv) applying the incorrect legal regulation(s) to the submitted evidence.

538.    As a result of defendants USCIS' actions, plaintiff has and is "suffering a legal wrong of agency action" and is adversely affected or aggrieved by agency action," and therefore "is entitled to judicial review thereof."  5 U.S.C. § 702.

539.    Had defendant USCIS considered and/or reviewed the proffered evidence and applied the appropriate law and regulations, it would have been determined that the first prong of 8 C.F.R. § 214.2(h)(4)(iii)(A)(2) was satisfied.

540.    A reasonable fact-finder is thus compelled to conclude that defendants ignored evidence which was material to the adjudication of the petition.

541.    Defendant USCIS failed to render a decision that was based upon factors which Congress has intended it to consider.

542.    Defendant USCIS failed to consider important aspects of the petition.

543.    Defendant USCIS offered an explanation for its decision which was contrary to the evidence which was before them.

544.    Defendant USCIS' decision cannot be ascribed to a difference in view or the product of agency expertise.

545.    The APA directs that the "reviewing court shall…hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. §706(2)(A).

546.    The conclusions of defendant USCIS with respect to the first prong 8 C.F.R. § 214.2(h)(4)(iii)(A)(2) are unsupported by substantial evidence.  5 U.S.C. §706(2).

547.    As a result of the foregoing, defendant USCIS' decision with respect to the first prong of 8 C.F.R. § 214.2(h)(4)(iii)(A)(2) was "arbitrary, capricious, an abuse of discretion, [and] otherwise not in accordance with law."  5 U.S.C. §706(2)(A).

## C.    Third Cause of Action – Violation of the APA with respect to second prong of 8 C.F.R. § 214.2(h)(4)(iii)(A)(2)

548.    Defendant USCIS' denial of plaintiff's petition was improper and reviewable under the APA.  5 U.S.C. § 702.

549.    In denying the petition, defendant USCIS concluded that the second prong of 8 C.F.R. § 214.2(h)(4)(iii)(A)(2) was not met.

550.    In reviewing the second prong of 8 C.F.R. § 214.2(h)(4)(iii)(A)(2), defendant USCIS' actions included, but were not limited to, (i) ignoring/failing to read highly probative evidence submitted, including but not limited to job advertisements for the position in question with plaintiff's company and not for any other company, (ii) discarding position evaluation letters in support of the petition based exclusively on the ignoring/failing to read the aforementioned highly probative evidence, (iii) misapplying the relevant law to the submitted evidence.

551.    As a result of defendant USCIS' actions, plaintiff has and is "suffering a legal wrong of agency action" and is adversely affected or aggrieved by agency action," and therefore "is entitled to judicial review thereof."  5 U.S.C. § 702.

552.    Had defendant USCIS considered and/or reviewed the proffered evidence and applied the appropriate case law and regulations, it would have been determined that the second prong of 8 C.F.R. § 214.2(h)(4)(iii)(A)(2) was satisfied.

553. A reasonable fact-finder is thus compelled to conclude that defendants ignored evidence which was material to the adjudication of the petition.

554. Defendant USCIS failed to render a decision that was based upon factors which Congress has intended it to consider.

555. Defendant USCIS failed to consider important aspects of the petition.

556. Defendant USCIS offered an explanation for its decision which was contrary to the evidence which was before them.

557. Defendant USCIS' decision cannot be ascribed to a difference in view or the product of agency expertise.

558. The APA directs that the "reviewing court shall…hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. §706(2)(A).

559. The conclusions of defendant USCIS with respect to the second prong of 8 C.F.R. § 214.2(h)(4)(iii)(A)(2) are unsupported by substantial evidence. 5 U.S.C. §706(2).

560. As a result of the foregoing, defendant USCIS' decision with respect to the second prong of 8 C.F.R. § 214.2(h)(4)(iii)(A)(2) was "arbitrary, capricious, an abuse of discretion, [and] otherwise not in accordance with law." 5 U.S.C. §706(2)(A).

## D. Fourth Cause of Action – Violation of the APA with respect to 8 C.F.R. § 214.2(h)(4)(iii)(A)(4)

561. Defendant USCIS' denial of plaintiff's petition was improper and reviewable under the APA. 5 U.S.C. § 702.

562. In denying the petition, defendant USCIS concluded that 8 C.F.R. § 214.2(h)(4)(iii)(A)(4) was not met.

563. In reviewing 8 C.F.R. § 214.2(h)(4)(iii)(A)(4), defendant USCIS' actions included, but were not limited to, (i) failing to follow the logical structure of plaintiff's argument, (ii) ignoring/failing to read highly probative evidence submitted, including but not limited to job advertisements for the position in question with petitioner's company and not for any other company, (iii) discarding position evaluation letters in support of the petition based exclusively on the ignoring/failing to read the aforementioned highly probative evidence and (iv) misapplying the relevant law to the submitted evidence.

564. As a result of defendant USCIS' actions, plaintiff has and is "suffering a legal wrong of agency action" and is adversely affected or aggrieved by agency action," and therefore "is entitled to judicial review thereof." 5 U.S.C. § 702.

565. Had defendant USCIS considered and/or reviewed the proffered evidence and applied the appropriate law and regulations, it would have been determined that 8 C.F.R. § 214.2(h)(4)(iii)(A)(4) was satisfied.

566. A reasonable fact-finder is thus compelled to conclude that defendants ignored evidence which was material to the adjudication of the petition.

567. Defendant USCIS failed to render a decision that was based upon factors which Congress has intended it to consider.

568. Defendant USCIS failed to consider important aspects of the petition.

569. Defendant USCIS offered an explanation for its decision which was contrary to the evidence which was before them.

570. Defendant USCIS' decision cannot be ascribed to a difference in view or the product of agency expertise.

571.    The APA directs that the "reviewing court shall…hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. §706(2)(A).

572.    The conclusions of defendant USCIS with respect to 8 C.F.R. § 214.2(h)(4)(iii)(A)(4) are unsupported by substantial evidence.  5 U.S.C. §706(2).

573.    As a result of the foregoing, defendant USCIS' decision with respect to 8 C.F.R. § 214.2(h)(4)(iii)(A)(4) was "arbitrary, capricious, an abuse of discretion, [and] otherwise not in accordance with law."  5 U.S.C. §706(2)(A).

## E.    Fifth Cause of Action – Deprivation and Violation of Rights under the INA

574.    In denying plaintiff's petitions on behalf of beneficiary, defendant USCIS unlawfully interpreted and applied the term "specialty occupation" under 8 U.S.C. § 1101 (a)(15)(H), including but not limited to the improper disregard of certain evidence and the imposition of an impermissibly high burden of proof.  Matter of Pazandeh, 19 I&N Dec. 884 (BIA 1989), annexed hereto as Exhibit "FF."

575.    As a result, defendant USCIS deprived plaintiff of its rights under the INA to benefit from the specialty occupation provision at 8 U.S.C. § 1101 (a)(15)(H) and thereby violated those rights.

## F.    Sixth Cause of Action – Mandamus Act

576.    The failure of defendant USCIS to take into account the evidence supporting the petition – in particular, the ample evidence demonstrating that the position is a specialty occupation and that beneficiary possessed the background and abilities to fill said specialty occupation position – and the resultant denial of that petition, constitutes a violation of the duty owed to

plaintiff. <u>See</u> 8 U.S.C. § 1101(a)(15)(H); 8 C.F.R. § 103.2(b)(8)(i) ("If the evidence submitted with the application or petition establishes eligibility, USCIS *will approve* the application or petition . . . .") (emphasis added).

577. This Court therefore has authority under the Mandamus Act, 28 U.S.C. § 1361, to compel defendant USCIS to grant the petition, consistent with the duties owed to plaintiff.

**G.    Seventh Cause of Action – Declaratory Judgment Act**

578. Plaintiff is entitled to a declaration of its rights, which shall have the force and effect of a final judgment, in accordance with 28 U.S.C. § 2201(a).

# IX.    Prayer For Relief

Plaintiff hereby prays for relief as follows:

1. That this Court hold unlawful and set aside the findings of defendant USCIS that the position at issue was not a specialty occupation;

2. That this Court hold unlawful and set aside the decision of defendant USCIS denying plaintiff's petition on behalf of beneficiary as not in accordance with law;

3. That the Court declare that plaintiff had satisfied 8 C.F.R. § 214.2(h)(4)(iii)(A)(1);

4. That the Court declare that plaintiff had satisfied the first prong of 8 C.F.R. § 214.2(h)(4)(iii)(A)(2);

5. That the Court declare that plaintiff had satisfied the second prong of 8 C.F.R. § 214.2(h)(4)(iii)(A)(2);

6. That the Court declare that plaintiff had satisfied 8 C.F.R. § 214.2(h)(4)(iii)(A)(4);

7. That the Court declare that beneficiary was and is qualified to perform the duties of the position for which the nonimmigrant employment application was submitted;

8. That this Court declare that plaintiff had submitted sufficient evidence to establish that beneficiary will be employed in a "specialty occupation" position, as set forth in INA Section 101(a)(15)(H), at 8 U.S.C. § 1101 (a)(15)(H);

9. That this Court compel defendant USCIS to perform its duty owed to plaintiff by instructing defendant USCIS to approve plaintiff's petition filed on behalf of beneficiary;

10. That this Court grants reasonable attorney's fees and costs of court under the Equal Access to Justice Act. 28 U.S.C. § 2412 (d)(1)(A); and

11. That this Court grant such other and further relief as it deems just and proper.

Dated: Great Neck, New York
October 15, 2015

Respectfully submitted,

SHEEHAN & ASSOCIATES, P.C.

By: _____
Spencer Sheehan (SS8533)
*Attorneys for Plaintiff*
891 Northern Boulevard
Suite 201
Great Neck, NY 11021
Tel:  (516) 303-0552
Fax: (516) 234-7800
spencer@spencersheehan.com

## VERIFICATION

STATE OF NEW YORK   )
                    ) ss.:
COUNTY OF KINGS     )

JAMES J. ANESTIS, being duly sworn and subject to the penalties of perjury, deposes and says:

I am the managing member of 6801 Realty Co., LLC, plaintiff in the action herein.

I have read the annexed Complaint and know the contents therein, and the same are true to my knowledge, except those matters therein which are stated to be alleged upon information and belief, and as to those matters I believe them to be true. My belief as to those matters therein not stated upon knowledge, is based upon facts, records, and other pertinent information contained in the files of plaintiff.

Dated: New York, New York
       October 15, 2015

_____
JAMES J. ANESTIS

On the 15th day of October in the year 2015 before me, the undersigned, a Notary Public in and for said State, personally appeared James J. Anestis, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, and that by his signature on the instrument, the individual executed this instrument.

_____
Notary Public

SARAH E. VADALA
NOTARY PUBLIC-STATE OF NEW YORK
No. 01VA6291705
Qualified in Suffolk County
My Commission Expires December 09, 2017

CASE NO.
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

6801 REALTY CO., LLC,

        PLAINTIFF,

    - AGAINST -

UNITED STATES CITIZENSHIP AND IMMIGRATION SERVICES, LEÓN RODRIGUEZ,
DIRECTOR OF THE UNITED STATES CITIZENSHIP AND IMMIGRATION SERVICES,
LAURA B. ZUCHOWSKI, DIRECTOR OF VERMONT SERVICE CENTER, UNITED
STATES CITIZENSHIP AND IMMIGRATION SERVICES, UNITED STATES
DEPARTMENT OF HOMELAND SECURITY, JEH JOHNSON, SECRETARY OF THE
UNITED DEPARTMENT OF HOMELAND SECURITY, and LORETTA LYNCH, UNITED
STATES ATTORNEY GENERAL,

        DEFENDANTS.

# VERIFIED COMPLAINT

**Sheehan & Associates, P.C.**
*Attorneys for Plaintiff*
**891 Northern Boulevard**
**Suite 201**
**Great Neck, NY 11021**
**Tel: (516) 303-0552**
**Fax: (516) 234–7800**
**spencer@spencersheehan.com**

Pursuant to 22 NYCRR 130-1.1, the undersigned, an attorney admitted to practice in the courts of
New York State, certifies that, upon information, and belief, formed after an inquiry reasonable
under the circumstances, the contentions contained in the annexed documents are not frivolous.

Dated:  Nassau, New York
       October 15, 2015

 

_____
SPENCER SHEEHAN, ESQ.